**UNITED STATES DISTRICT COURT**
**WESTERN DISTRICT OF WASHINGTON**
**AT SEATTLE**

| | |
|---|---|
| R.M., | NO. 3:18-CV-05387-RBL |
| Plaintiff; | PLAINTIFF'S RESPONSE TO DEFENDANTS' SUMMARY JUDGMENT MOTION |
| vs. | |
| STATE OF WASHINGTON, et al., | ORAL ARGUMENT REQUESTED |
| Defendants. | NOTED FOR: JANUARY 11, 2019 |

Plaintiff R.M. replies to the Defendants' summary judgment motion.[1] In his Response, R.M. will show that the Defendants are not entitled to summary judgment based on qualified immunity because the law is well settled that failure to refer an individual to a specialist to provide treatment or pain relief can be a constitutional violation. R.M. acknowledges that the State of Washington is an improper defendant for a 42 U.S.C. §1983 cause of action but that it is a proper defendant in a negligence cause of action. R.M. agrees to dismiss defendants Bovenkamp and Braid.

---

[1] Although two of the Defendants, Sheri Malakhova and Dale Robertson are represented by their own counsel, they apparently join in this summary judgment motion. Motion for Summary Judgment, p. 2, fn. 1.

PLAINTIFF'S RESPONSE TO
DEFENDANTS' SUMMARY
JUDGMENT MOTION

1

**Kahrs Law Firm, P.S.**
2208 NW Market St., Suite 414 Seattle WA 98107
Ph: 206-264-0642 Fax: 206-237-8555
mike@kahrslawfirm.com

# I. INTRODUCTION

While residing at the Washington State Penitentiary, Plaintiff R.M. (R.M.) reported to medical staff that his penis was deformed and contained hard lumps. R.M. also reported that when his penis became erect, it curved off to the side and caused him pain. After a July 31, 2014 medical examination of his penis, Department of Corrections Medical Staff diagnosed him with Peyronie's disease (pay-roe-NEEZ) disease (PD). Medical providers submitted to the Care Review Committee ("CRC") a referral request for a urology consult. PD is the development of fibrous scar tissue inside the penis that causes curved, painful erections.

The CRC denied the urology referral request on August 6, 2014. R.M. underwent a second medical evaluation on November 20, 2014 and reported that his condition was "extremely painful" and "getting worse every day." Except for R.M.'s complaint that he was experiencing even more pain than before, the examination yielded findings consistent with the initial exam and R.M. was again diagnosed with PD. R.M. was prescribed Trental. On January 8, 2015, R.M. reported severe pain during nocturnal erections. On January 21, 2015, a second request for an urologist consult was presented to the CRC. The CRC denied the request.

The defendants' present a version of events that suggest "there was no treatment or cure" for PD and that a referral was not medically necessary. The argument is thus that the defendants acted reasonably and that it was not clear that the blocked referral was unlawful. However, whether treatment existed is a disputed material fact. Equally important but ignored by the defendants is that it is well established that the failure to treat pain of an inmate's penis due to PD can be a constitutional violation. In considering the facts most favorable to R.M., had R.M. been referred to a urologist, he could have received treatment that would have reduced his

PLAINTIFF'S RESPONSE TO
DEFENDANTS' SUMMARY
JUDGMENT MOTION

**Kahrs Law Firm, P.S.**
2208 NW Market St., Suite 414 Seattle WA 98107
Ph: 206-264-0642 Fax: 206-237-8555
mike@kahrslawfirm.com

pain and/or prevented further damage to his penis. Since it is well established that failure to refer an inmate to a specialist to treat a serious disease or relieve pain can violate the constitution, the defendants' motion for qualified immunity must be denied. The defendants' remaining requests for relief must also be denied at this early stage of the litigation.

## II. STATEMENT OF FACTS

In January or February of 2013, R.M. resided at the Washington State Penitentiary and started taking Lisinopril for hypertension. *Kahrs Decl.,* Ex. A. Toward the end of 2013, R.M. experienced curvature of his penis. *R.M. Decl.*, Ex. 2. In June, 2014, he awakened with severe pain in his penis. Now the bend was gone but there were hard lumps. *Id.* On July 27, 2014, R.M. submitted a Health Services Kite, complaining about blood clots on his penis. *Id.*, Ex. 2. He was worried about his blood pressure or Hepatitis C medication causing the "clots" which were actually plaques. *Id.*, Exhs. 2, 3.

R.M. went to his medical call-out on July 31, 2014. There he saw his immediate medical provider at Washington State Penitentiary, JoElla Phillips, PA-C. He told her that about a year earlier he had noticed a lump on his penis. Since he stopped his Hep C treatment, multiple lumps had developed and he was experiencing painful erections every night that would awaken him. *Kahrs Decl.*, Exhs. B, C. Dr. James Edwards then joined the discussion and informed R.M. of his preliminary diagnosis of PD and Dr. Edwards stated that it was unlikely related to any medications R.M. was taking.[2] *Id.* Dr. Edwards and PA-C Phillips then checked a subscription medical website known as UptoDate.com that WDOC uses to assist in making a diagnosis. With regard to PD, UptoDate.com recommended an early referral for urology

---

[2] At this time, R.M.'s high blood pressure medication, Lisinopril, had 13 reported incidents of causing Peyronie's disease. Kahrs Decl., Ex. D.

PLAINTIFF'S RESPONSE TO
DEFENDANTS' SUMMARY
JUDGMENT MOTION

**Kahrs Law Firm, P.S.**
2208 NW Market St., Suite 414 Seattle WA 98107
Ph: 206-264-0642 Fax: 206-237-8555
mike@kahrslawfirm.com

consult. Based on this recommendation, a consultation request was made to the Care Review Committee (CRC) for R.M. to see an urologist. *Id*., Ex. E.

To obtain treatment from a specialist in a non-emergency, WDOC requires majority approval by the CRC. The CRC meets telephonically to make this decision and is comprised of medical personnel employed by WDOC. *Id*., pp. 10-12. A Consultation Request / Report was made for R.M. on July 31, 2014 for a urologist. It informed the CRC that he was suffering pain every night and that when he had an erection his penis curved to one side and was painful. The case presenter, PA-C Phillips, recommended a Urology consult. *Id.,* Ex. F.

On August 6, 2014, R.M.'s case was reviewed by the CRC. *Id.*, Ex. G. In this report, it stated the CRC discussed that there was no effective treatment. The report stated a provider with prior experience at Harborview Medical Center Urology mentioned different injections can be made to lessen the curvature of the penis which preserves sexual function and reduces pain but that the current situation was not consistent with this.[3] *Id*. R.M. was informed the urology request did not meet the criteria of the Offender Health Plan.

On August 25, 2014, R.M. again saw PA-C Phillips about his various medical concerns. *Id.*, Exhibit H. At this meeting, he discussed with her the CRC decision and it was noted that he was not happy and was in the process of filing a grievance. R.M. remembers discussing his PD and that PA-C Phillips told him there was a urologist on the CRC, there was no treatment, it usually was not painful and even if painful, the pain would only last for a couple of years. *R.M. Decl*., Ex. 2. R.M. then filed grievance No. 14569364 on August 27, 2014 for the CRC's failure to permit him to see a urologist. He submitted another grievance October 24,

---

[3] There is no mention in the Report of who the provider was who had worked at Harborview nor how recently he or she had worked there. No evidence has been provided to identify the provider or their credentials.

PLAINTIFF'S RESPONSE TO
DEFENDANTS' SUMMARY
JUDGMENT MOTION

4

**Kahrs Law Firm, P.S.**
2208 NW Market St., Suite 414 Seattle WA 98107
Ph: 206-264-0642 Fax: 206-237-8555
mike@kahrslawfirm.com

2014. *Id.*, Ex.3. In this grievance, R.M. complained about his condition affecting his ability to use the bathroom. *Id.*

On November 10, 2014, Julie Mason visited R.M. about his filed grievance. She advised him to ask medical one more time to help him with his condition. *Id.*, Ex. 2. R.M. visited the clinic on November 13, 2014 to serve his affidavit. In his affidavit dated November 12, 2014, he stated he had told her that it seemed inappropriate for him to continue to have to ask for help to end his suffering. *Id.* He also stated that he had informed Ms. Phillips his condition was continually waking him up at night due to the pain and "sometimes [the pain] made it painful and difficult to urinate." *Id.* ¶ 4. He reported his symptoms had not changed. *Kahrs Decl.*, Ex. I.

R.M. visited the clinic and was seen by Dr. Edwards on November 20, 2014. *Id.*, Exhs. J, K. At this meeting, Dr. Edwards reviewed UpToDate.com with R.M. and told him it suggested the medication Trental. Dr. Edwards then prescribed Trental. R.M. appealed the denial of his grievance. *R.M. Decl.*, Ex. 4. He again complained that he was not permitted to see a specialist.

R.M. continued to have problems because the Trental did not have any major effect. *Kahrs Decl.*, Ex. L. He complained to Dr. Edwards during this January 8, 2015 visit about the severe pain with nocturnal erections and was upset he could not see a urologist. The exam again showed the multiple plaques of scar tissue and Dr. Edwards could not detect any progression of

PLAINTIFF'S RESPONSE TO
DEFENDANTS' SUMMARY
JUDGMENT MOTION

5

**Kahrs Law Firm, P.S.**
2208 NW Market St., Suite 414 Seattle WA 98107
Ph: 206-264-0642 Fax: 206-237-8555
mike@kahrslawfirm.com

the disease.[4] Because he had no other suggestions, Dr. Edwards agreed to refer it back to the CRC. *Id.*, Ex. M.

At the CRC meeting on January 21, 2015, it was decided that intervention was not medically necessary.[5] No explanation was provided in support of the decision. *Id.*, Ex. N. R.M. filed his appeal of the second level appeal to WDOC's headquarters but it was again denied. *R.M. Decl.*, Ex. 5. At this time, R.M. gave up trying for two years because it was obvious that the CRC would not approve his urology consult.

R.M.'s prescription for Trental was for 180 days. It ended May 18, 2015. *Kahrs Decl.* Ex. O. No health care provider followed up on this prescription and its results.

On January 3, 2017, R.M., now housed at Clallam Bay Corrections Center, complained to his treatment provider, RN Edith Kroha at about his medical problem with his penis. *Id.*, Ex. P. According to her notes, she observed nodules along his penis. *Id.* She told him that they had the access to an urologist to discuss cases.[6] *Id.*

Nothing had happened for R.M. since he saw Ms. Kroha in January so he sent a kite on May 21, 2017 to CBCC medical asking for status. Ms. Kroha saw R.M. on June 13, 2017. *Kahrs Decl.*, Ex. Q. At this appointment, Ms. Kroha claimed the conditions were unchanged in three years. R.M. filed another grievance on June 14, 2017 due to the lack of medical care. *R.M. Decl.,* Ex. 6. He stated in the grievance that Ms. Kroha confirmed the condition continued to worsen. She promised to consult with an urologist but it did not happen. The response stated

---

[4] When R.M. first reported the problem in the prior July, he stated he had been suffering about a year. Now, 18 months with symptoms, the disease was not getting better and resolving itself.
[5] R.M. sent Requests For Admissions to each voting member of the CRC. No member recalled whether they voted to deny or approve the request for a referral. *Kahrs. Decl.* ¶22.
[6] Given that a great deal of initial contacts at WDOC are performed by non-doctors it is reasonable that they would have the means to access resources to help with diagnosis.

PLAINTIFF'S RESPONSE TO
DEFENDANTS' SUMMARY
JUDGMENT MOTION

6

**Kahrs Law Firm, P.S.**
2208 NW Market St., Suite 414 Seattle WA 98107
Ph: 206-264-0642 Fax: 206-237-8555
mike@kahrslawfirm.com

that R.M. had been denied the urologist consult twice in 2015 and no further recommendations were made because no change was noted in his condition. *Id.* After the denial, he appealed the response on July 7, 2017. *Id.*, Ex. 7.

On July 19, 2017, R.M. was called to CBCC medical by Dr. J. David Kenney. Dr. Kenney was investigating based on the grievance appeal R.M. filed. *Kahrs Decl.,* Ex. R. At this appointment, Kenney noted painful nocturnal erections without urinary symptoms or testicular pain. *Id.*, Ex. S. In particular, Kenney noted that there were migratory penis lumps which according to R.M. coalesced in the dorsal surface of the penis. In response to the grievance R.M. filed, Dr. Kenney stated that R.M. felt it was getting worse and Kenney agreed "to present his issue to the CRC based on the basis of a worsening condition." *R.M. Decl.*, Ex. 7. The case was then submitted to the CRC for the urology consult.

On August 16, 2017, the CRC committee approved the request for a urology consult. *Kahrs Decl.*, Ex. T. Dr. Kenney stated he could not see anything that is not normal anatomy but he did not examine R.M.'s penis while it was erect. *R.M. Decl.* ¶ 22.

On October 6, 2017, R.M. was taken to Port Angeles to see a urologist, Dr. Bryan Russell. *Kahrs Decl.*, Ex. U. At this examination, Dr. Russell noted that the condition had continued for over three years without stabilization. He noted that two medications, Verapamil and Xiaflex have been used with "some success." *Id.* Both medications require application intracorporeally with the injection into a discrete lesion. Dr. Russell noted that at this time, there were no such lesions. R.M. was sent back with a prescription for 15% topical of Verapamil, to be applied on the outside of the penis. *Id.*

**Kahrs Law Firm, P.S.**
2208 NW Market St., Suite 414 Seattle WA 98107
Ph: 206-264-0642 Fax: 206-237-8555
mike@kahrslawfirm.com

Dr. Russell had called Dr. Aurich. Neither doctor had seen R.M. with an erection. Various medical procedures were discussed. Dr. Russell wrote the following:

> We discussed treatment options such as tuck penoplasty, patch graft penoplasty, injections of verapamil or collagenase into the plaque if a discrete plaque can be identified and also penile implant to hold the penis straight. I explained that none of us here, Dr. Bensen, Dr. Kowitz or myself have much experience with penoplasties or with collagenase injections. We often referred patient's him to Seattle for further evaluation at Virginia Mason, the University of Washington or some other tertiary care center

*Id*, p. 3.

On October 25, 2017, R.M. again saw Ms. Kroha at the clinic. *R.M. Decl.*, Ex. 8. In this Kite, R.M. told her he wanted to try all treatment options listed by Dr. Russell. Kroha promised to take his request to the CRC. The CRC reviewed the requests on November 8, 2017. *Id*., Exhs. 9-11. In these notifications, all the recommendations of Dr. Russell were denied by the CRC.

In December of 2013, the United States Food and Drug Administration approved Xiaflex as the first drug treatment for PD. *Kahrs Dec*., Ex. V. To treat PD, Xiaflex is injected into the area where collagen scar tissue, known as Peyronie's plaque, has formed. *Id*. R.M. had collagen scar tissue present in his penis during both examinations preceding the CRC's January 2015 decision to deny him a urology referral. *Id*., Exhs. 6, 13. The scar tissue had apparently abated by the time the referral was made in 2017 eliminating the possibility of Xiaflex injections. This same issue holds true for Verapamil injections.

## IV.    EVIDENCE RELIED UPON

R.M. relies upon the pleadings and exhibits filed already on record, along with the declarations of Michael Kahrs and R.M.

\\\

PLAINTIFF'S RESPONSE TO
DEFENDANTS' SUMMARY
JUDGMENT MOTION

**Kahrs Law Firm, P.S.**
2208 NW Market St., Suite 414 Seattle WA 98107
Ph: 206-264-0642 Fax: 206-237-8555
mike@kahrslawfirm.com

# V. ARGUMENTS AND AUTHORITY

## A. Burden of Proof on Motion to Dismiss.

On a motion for summary judgment, the court must draw all inferences from the admissible evidence in the light most favorable to the non-moving party. *Addisu v. Fred Meyer, Inc.,* 198 F.3d 1130, 1134 (9th Cir.2000). Summary judgment is appropriate when, viewing the evidence in the light most favorable to the non-moving party, there exists "no genuine issue as to any material fact" such that the "moving party is entitled to judgment as a matter of law." Fed.R.Civ.P.56(c). A material fact is a fact relevant to the outcome of the pending action. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S. Ct. 2505, 91 L. Ed. 2d 202 (1986). Genuine issues of material fact are those for which the evidence is such that "a reasonable jury could return a verdict for the nonmoving party." *Id.*

The moving party bears the initial burden of demonstrating the absence of a genuine issue of material fact. *Celotex Corp. v. Catrett,* 477 U.S. 317, 323, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). Once the moving party meets that initial burden, the opposing party must then set forth specific facts showing that there is a genuine issue of fact for trial in order to defeat the motion. *Anderson*, 477 U.S. at 250.

## B. Qualified Immunity

The "doctrine of qualified immunity protects government officials 'from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.' " *Mattos v. Agarano*, 661 F.3d 433, 440 (9th Cir. 2011) (en banc) (quoting *Pearson v. Callahan,* 555 U.S. 223, 129 S.Ct. 808, 815, 172 L.Ed.2d 565 (2009)). The purpose of qualified immunity is to strike a

PLAINTIFF'S RESPONSE TO
DEFENDANTS' SUMMARY
JUDGMENT MOTION

9

**Kahrs Law Firm, P.S.**
2208 NW Market St., Suite 414 Seattle WA 98107
Ph: 206-264-0642 Fax: 206-237-8555
mike@kahrslawfirm.com

balance between the competing "need to hold public officials accountable when they exercise power irresponsibly and the need to shield officials from harassment, distraction, and liability when they perform their duties reasonably." *Id.* Whether the officials are entitled to qualified immunity depends on (1) whether the facts that the plaintiffs have alleged or shown make a constitutional violation and (2) whether the constitutional right at issue was clearly established at the time of the violation. *Saucier v. Katz*, 533 U.S. 194, 201 (2001). The deciding question is whether at the time of the encounter, the state of the law gave defendants fair warning that their alleged treatment of plaintiff was unconstitutional. *Blankenhown v. City of Orange*, 485 F.3d 463, 481 (9th Cir. 2007). To be clearly established, existing precedent must have placed beyond debate the constitutionality of the officials' actions as those actions unfolded in the specific context of the case at hand. *Hamby v. Hammond*, 821 F.3d 1085, 1092 (2016).

General statements of the law are not inherently incapable of giving fair and clear warning, and in other instances a general constitutional rule already identified in the decisional law may apply with obvious clarity to the specific conduct in question, even though "the very action in question has [not] previously been held unlawful," *U.S. v. Lanier*, 520 U.S. 259, 271 (1997). *See also Hope v. Pelzer,* 536 U.S. 730, 741, 122 S. Ct. 2508, 153 L.Ed.2d 666 (2002) ("[A] general constitutional rule already identified in the decisional law may apply with obvious clarity to the specific conduct in question, even though the very action in question has [not] previously been held unlawful." (internal quotation marks omitted)).

A finding of deliberate indifference necessarily precludes a finding of qualified immunity; prison officials who deliberately ignore the serious medical needs of inmates cannot claim that it was not apparent to a reasonable person that such actions violated the law.

*Hamilton v. Endell*, 981 F.2d 1062, 1066 (1992). A claim of deliberate indifference to a serious medical need contains both an objective and a subjective component. To satisfy the objective component, a prisoner must demonstrate that his medical condition is "objectively, sufficiently serious." *Farmer v. Brennan,* 511 U.S. 825, 834, 114 S.Ct. 1970, 128 L.Ed.2d 811 (1994) (internal quotations omitted). A serious medical condition is one that has been diagnosed by a physician as mandating treatment or one that is so obvious that even a lay person would perceive the need for a doctor's attention. To satisfy the subjective component, a prisoner must demonstrate that prison officials acted with a "'sufficiently culpable state of mind.'" *Farmer,* 511 U.S. at 834, 114 S.Ct. 1970 (quoting *Wilson v. Seiter,* 501 U.S. 294, 297, 111 S.Ct. 2321, 115 L.Ed.2d 271 (1991)). The officials must know of and disregard an excessive risk to inmate health; indeed they must "both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists" and "must also draw the inference." *Farmer,* 511 U.S. at 837, 114 S.Ct. 1970. It is enough to show that the defendants knew of a substantial risk of harm to the inmate and disregarded the risk. *Id.* Additionally, "a factfinder may conclude that a prison official knew of a substantial risk from the very fact that the risk was obvious." *Farmer,* 511 U.S. at 842, 114 S.Ct. 1970.

> ***1.     Defendant CRC Members Are Not Entitled to Qualified Immunity.***

The Defendants argue that individual members of the CRC are subject to qualified immunity because (1) the plaintiff cannot show that any individual members of the CRC clearly violated the established law; (2) plaintiff cannot show it would have been clear to any members that their conduct was unlawful. Furthermore, they argue plaintiff cannot show that the CRC's actions caused R.M. injury.

PLAINTIFF'S RESPONSE TO
DEFENDANTS' SUMMARY
JUDGMENT MOTION

**Kahrs Law Firm, P.S.**
2208 NW Market St., Suite 414 Seattle WA 98107
Ph: 206-264-0642 Fax: 206-237-8555
mike@kahrslawfirm.com

It has been established for decades that prison physicians violate inmates' constitutional rights when they deliberately disregard an inmate's serious medical condition. Deliberate indifference to serious medical needs of prisoners constitutes the "unnecessary and wanton infliction of pain," *Estelle v. Gamble*, 429 U.S. 97, 104 (1976). Furthermore, since 1992, it has been a clearly established Eight Amendment violation to deny treatment, causing wanton and unnecessary pain, "[b]y choosing to rely upon a medical opinion which a reasonable person would likely view as inferior. *Hamilton*, 981 F.2d at 1067. In addition, since 2008, the refusal to refer an inmate with progressive worsening pain of the penis has been considered deliberate indifference in the 7th Circuit. *See Hayes v. Snyder,* 546 F.3d 516, 526 (7th Cir. 2008).

In the present case, R.M. was diagnosed with PD. PD is a serious medical condition and the failure to treat this disease violates the Eighth Amendment. The *Hayes* court described PD as follows:

> Peyronie's disease is a connective tissue disorder involving the growth of fibrous scar tissue in the soft tissue of the penis. The hardened scar tissue prevents the normal tissue from moving where it otherwise would in a healthy organ, and this causes an abnormal (and often painful) curvature of the penis. Urologists can diagnose this condition, though it sometimes takes an even higher degree of specialty because "the disease and its current treatments are not well understood by most urologists in general practice."

*Id*. at 521 (citing http://en.wikipedia.org/wiki/Peyronie's disease). In *Hayes*, the Court found that a jury could find that the failure to provide prescription medication for relief from the pain constituted deliberate indifference and thus a constitutional violation. *Id*. at 524-26.

Like R.M., the prisoner in *Hayes* unsuccessfully tried to obtain a referral for a specialist due to PD. Hayes reported painful testicular cramps that caused painful urination and his penis to bend upward into a fishhook position. *Id.* at 519. Initially diagnosed with testicular cysts,

PLAINTIFF'S RESPONSE TO
DEFENDANTS' SUMMARY
JUDGMENT MOTION

**Kahrs Law Firm, P.S.**
2208 NW Market St., Suite 414 Seattle WA 98107
Ph: 206-264-0642 Fax: 206-237-8555
mike@kahrslawfirm.com

Hayes was given Tylenol III for the pain and a prophylactic antibiotic. *Id.* at 518. Hayes continued to suffer from pain and discomfort and returned to the medical unit. Despite physician recommendations to refer Hayes to see a urologist, the medical director, Dr. Hamby, did not make the referral. *Id.*at 518-19. Like the defendants in this case, Dr. Hamby did not believe a referral was medically necessary. *Id*. at 523. Hayes was ultimately diagnosed with PD upon his release from prison. *Id*. at 521.

The district court concluded that a layperson would not be able to diagnose Hayes's malady or determine what treatment was needed and held that his condition was not objectively serious. *Id.* at 522. The appellate court held that Hayes met his burden that he was suffering from a serious medical condition in that a trier of fact could conclude that even a layperson, let alone a physician, would realize that a man with cysts and growths on his testicles who could not urinate without pain required a doctor's attention. *Id.* at 521. The court also held that Dr. Hamby intentionally or recklessly disregarded Hayes's serious medical condition by ignoring reports of worsening pain. *Id.* at 526. Dr. Hamby argued that the early diagnosis was for a rare, progressively worsening condition which objectively appears in its early stages as an insignificant medical condition. *Id*. at 524. Dr. Hamby testified to denying requests from other physicians to refer Hayes to a specialist and that in his opinion, prescription pain-killers were never warranted. *Id*. Also, Dr. Hamby stated that referral to a specialist was not appropriate when he didn't know what was causing the pain. The appellate court noted that the reason a specialist would be called in is that a generalist is unable to identify the cause of a particular ailment. *Id*. at 526. The court held that Hayes's medical records showed a universal awareness

PLAINTIFF'S RESPONSE TO
DEFENDANTS' SUMMARY
JUDGMENT MOTION

13

**Kahrs Law Firm, P.S.**
2208 NW Market St., Suite 414 Seattle WA 98107
Ph: 206-264-0642 Fax: 206-237-8555
mike@kahrslawfirm.com

that his problems fell within the domain of a urologist, and that a jury could conclude that Dr. Hamby's treatment of Hayes constituted deliberate indifference. *Id.*

Here, the nightly pain PD caused R.M., in and of itself, notwithstanding the other symptoms, makes it a serious medical condition. The fact that it also caused R.M.'s penis to curve when erect and to inflict other deformities such as penile lumps only magnifies the seriousness of the condition. R.M. also had urination problems. Furthermore, known complications of PD include tissue loss, scar tissue, sexual dysfunction, erection problems, and shortening of the penis. *See* http://en.wikipedia.org/wiki/Peyronie's disease. Defendants do not address the issue of R.M.'s nightly pain in their briefing. Under the most basic analysis, the CRC's failure to address his pain precludes qualified immunity.

However, even if this court finds that the pain in R.M.'s penis was not enough to put the CRC on notice that it needed refer R.M. to a urologist to treat his pain or else violate R.M.'s constitutional rights, the CRC violated his constitutional rights when it failed to refer him to a specialist for further evaluation based on the PD diagnosis. Defendants argue that the CRC's denial of the urologist referral was reasonable by suggesting that at the time of the first meeting in August 2014, "there was no treatment or cure for the disease" and that at the second meeting in January 2015, there was no "change in R.M.'s condition requiring a change of their initial determination." *Dkt #47, p. 20:20-23.* Thus, their argument is heavily, if not completely dependent on the incorrect supposition that PD could not be treated. In order for the defendants to prevail on qualified immunity, the Court must believe there is no reasonable inference that a referral would have garnered R.M. any acceptable treatment to meet the definition of medical necessity. To the contrary, FDA approved treatment for PD was available. R.M. would have

**Kahrs Law Firm, P.S.**
2208 NW Market St., Suite 414 Seattle WA 98107
Ph: 206-264-0642 Fax: 206-237-8555
mike@kahrslawfirm.com

been a good candidate for treatment in 2015 because he had the necessary collagen scar tissue or plaque in his penis necessary to receive Xiaflex injections. By 2017, the plaque had diminished, but the pain remained. Furthermore, he had lost tissue and function. Thus, the time for early intervention passed, causing a loss of chance for R.M to receive the least intrusive form of acceptable treatments. Clearly, the defendants were deliberately indifferent like Dr. Hamby in *Snyder v. Hayes*, 546 F.3d 516 (2008).

PD is a serious medical condition. Furthermore, subjectively, the defendants knew that PD was a serious medical condition and should have made the referral. UptoDate.com recommended the referral and there is no evidence of any other medical research that was relied upon. Making medical assessments based on such limited information is clearly reckless, especially when the most logical recommendation, referral to a specialist, is ignored. It is not reasonable to find the defendants entitled to qualified immunity for what they did not know simply because they ignored prudent information and did not take reasonable steps to get an answer. The fact that Dr. Edwards testified he followed UptoDate.com to prescribe Trental, but that the CRC did not approve the primary and only recommendation made by Uptodate.com that is referenced in a CRC Report (referral to a specialist) demonstrates deliberate indifference. Notwithstanding any conclusory statements offered by defendants regarding their perceived effectiveness of Trental, the drug did not in any way resolve R.M.'s pain; in fact, his pain continued to worsen even after the drug was administered, resulting in the second CRC referral. *R.M. Decl.* ¶¶ 20-21. By the time the CRC voted on January 25, 2015, it was nothing less than obvious that a referral was needed. The CRC members were deliberately indifferent to R.M.'s medical needs when they voted no on the approval and are not entitled to qualified immunity.

PLAINTIFF'S RESPONSE TO
DEFENDANTS' SUMMARY
JUDGMENT MOTION

15

**Kahrs Law Firm, P.S.**
2208 NW Market St., Suite 414 Seattle WA 98107
Ph: 206-264-0642 Fax: 206-237-8555
mike@kahrslawfirm.com

Arguing that no treatment was available to help R.M. only serves to cast light on the most critical point: specialists are in the position to assess how to address serious medical conditions, especially when they relate to rare conditions involving male genitalia. In this case, the CRC members disregarded the course of action suggested not only by R.M.'s providers PA-C Phillips and Dr. Edwards, but by DOC's own subscription based medical database which recommended an "early referral in the disease process."[7] A jury could find that disregarding resources WDOC put in place to inform the healthcare decisions relating to prisoner healthcare is deliberate indifference.[8]

The CRC members in this case concluded PD could not be treated and that the requisite medical necessity did not exist to support a referral. As pointed out by the defendants, a treatment is medically necessary if it is essential to life / preservation of limb, reduces intractable pain, prevents significant deterioration of activities, of daily living, or is of proven value to significantly reduce the risk of one of the above outcomes. Dkt #47, p. 5. If the care lacks medically recognized efficacy, it is not medically necessary. *Id.* No evidence has been presented to support the defendants blanket statement that treatment would not have reduced R.M. intractable pain.

Nowhere in the record is there any evidence that the CRC members knew about Xiaflex treatment, or other potential treatments, let alone evaluated the merits of their success. While it may not be reasonable to impute the knowledge and efficacy of available treatment for PD to the CRC, the CRC members cannot be granted qualified immunity for intentionally

---

[7] Dr. Edwards presented the request but then turned around and reached consensus with the other members of the committee to deny the referral.

[8] It does not require a great deal of speculation to assume WDOC subscribed to this service to avoid the cost of having specialists on call to answer question from their general practitioners.

PLAINTIFF'S RESPONSE TO
DEFENDANTS' SUMMARY
JUDGMENT MOTION

**Kahrs Law Firm, P.S.**
2208 NW Market St., Suite 414 Seattle WA 98107
Ph: 206-264-0642 Fax: 206-237-8555
mike@kahrslawfirm.com

disregarding the prudent course of action put before it by R.M.'s medical providers and Uptodate.com for a urology consult. Rather than rely on medical evidence or testimony to support an argument that PD was not treatable, defendants rely on conclusory statements found in the CRC report dated August 6, 2014. The report states in pertinent part:

> [P]rovider with experience at Harborview Urology reports treatment depends on how severe the curvature, different injections to lessen the curvature, mostly to preserve function and reduce pain. Significant curvature with erection can cause pain, but c/o was typically pain with intercourse not intractable (constant) pain. Current sx being reported are not consistent with this. Discussed literature indicating no definitive treatment or cure for this condition. UptoDate also indicates pain r/t to this also resolved in two years.

*Kahrs Decl.*, Ex. G.

The report is contradictory. It was not logical for members of the CRC to conclude that treatment was not viable when the nature of treatment depended on the severity of the curve of the penis and no discussion of R.M's curvature or its severity is either documented or discussed in the report. The very factors that dictated the nature and success of treatment were ignored by the CRC. R.M had reported that his erections resulted in curvature and pain. The CRC report acknowledged these symptoms of PD but then stated R.M.'s complaints were "pain with intercourse" When R.M. had reported being awaken by pain from nocturnal erections as well as daily pain. *R.M. Decl.* ¶ 17.

Furthermore, there is no evidence that Xiaflex was discussed. While literature was allegedly addressed at the CRC, the assessment that no treatment or cure existed is blatantly inaccurate in light of the acceptance of a new treatment by the FDA. Any suggestion that the CRC members relied on a reasonable medical opinion to decide there was no viable treatment is also misguided. While the report identified somebody in the CRC has having experience in

PLAINTIFF'S RESPONSE TO
DEFENDANTS' SUMMARY
JUDGMENT MOTION

17

**Kahrs Law Firm, P.S.**
2208 NW Market St., Suite 414 Seattle WA 98107
Ph: 206-264-0642 Fax: 206-237-8555
mike@kahrslawfirm.com

urology, there is no evidence of this alleged person's qualifications, whether they had any personal experience or training with PD or Xiaflex, or whether they even knew of the Xiaflex treatment. Granted, the case law affords qualified immunity in scenarios where there are different medical opinions as to how to treat a serious medical condition; however, in this case there was no medical opinion which a reasonable person would rely on to contradict the assessments of R.M.'s medical providers or UpToDate.com.

The holding in *Snow v. McDaniel* as applied to this case requires the issue of qualified immunity for members of the CRC be denied. *Snow v. McDaniel*, 681 F.3d 978 (2012) (overruled on other grounds, *Peralta v. Dillard*, 744 F.3d 1076 (2014) (*en banc*)). Snow had experienced chronic pain caused by hip disease. Both his treating physicians and outside orthopedic doctors documented severe pain and recommended bilateral hip surgery. The Nevada DOC "Utilization Review Panel," the equivalent of WDOC's CRC, denied surgery and argued they had a mere difference of opinion as to whether surgery was necessary. *Id*. at 982-84. The Ninth Circuit disagreed and held that a "reasonable jury could conclude that the decision of the non-treating, non-specialist physicians to repeatedly deny the recommendations for surgery was medically unacceptable under all of the circumstances." *Id*. at 988. The court noted that the physicians on the Utilization Review Panel were not board certified in orthopedics and except for an isolated exception, none of the members had treated Snow. *Id. at 987.*

Like in *Snow*, there was no specialist that treated R.M. to overrule or disagree with the recommendations of UptoDate.com or PA-C Phillips and Dr. Edwards. To the contrary, the decision not to refer to a specialist stemmed not from a medical opinion from a treating

PLAINTIFF'S RESPONSE TO
DEFENDANTS' SUMMARY
JUDGMENT MOTION

**Kahrs Law Firm, P.S.**
2208 NW Market St., Suite 414 Seattle WA 98107
Ph: 206-264-0642 Fax: 206-237-8555
mike@kahrslawfirm.com

physician, but rather an unsupported conclusion that treatment would not help.[9] Proceeding on this false assumption against the consult recommendation could constitute deliberate indifference.

Another case on point regarding qualified immunity is *Hamilton v. Endell*, 981 F.2d 1062 (1992). Hamilton had several ear surgeries and the surgeon who operated on his ear several times instructed the prison system that the plaintiff's "ear had not yet healed and the [the plaintiff] should ... not fly anywhere for about six months." *Id.* at 1064. Despite these instructions, the defendants solicited a second medical opinion from another physician who, based on his own personal experience, said Hamilton could fly immediately. "There was nothing "in the record to indicate that [this second physician] ever treated Hamilton, reviewed his file, or so much as looked in his ear." *Id.*

Prison officials transported Hamilton via airplane despite his surgeon's advice and Hamilton alleged that he suffered severe damage to his ear as a result of the flight. *Id.* Analogizing to cases that found deliberate indifference where prison officials and doctors deliberately ignored a prior physician's instructions for reasons unrelated to the medical needs of the prisoner, the court held that "choosing to rely upon a medical opinion which a reasonable person would likely determine to be inferior" and forcing the plaintiff to fly "may have amounted to the denial of medical treatment" and could have constituted deliberate indifference. *Id.* at 1067.

As in *Hamilton,* the circumstances here raise an inference that the defendants were unreasonably relying on their own non-specialized conclusions unrelated to the prisoner's own

---

[9] It is critical to note that even WDOC does not know which doctor claimed during the August 6, 2014 CRC meeting that their Harborview experience led them to believe there was no cure less than a year after Xiaflex was approved by the FDA.

PLAINTIFF'S RESPONSE TO
DEFENDANTS' SUMMARY
JUDGMENT MOTION

19

**Kahrs Law Firm, P.S.**
2208 NW Market St., Suite 414 Seattle WA 98107
Ph: 206-264-0642 Fax: 206-237-8555
mike@kahrslawfirm.com

medical needs – a deliberate indifference without question. On August 6, 2016, PA-C Phillips and Dr. Edwards reviewed R.M.'s case, made the PD diagnosis, consulted with UptoDate.com, and agreed the referral to an urologist was necessary. The case was referred to the CRC. Despite the referral from both his health care providers and UptoDate.com, the CRC concluded there was no treatment for PD and denied the referral.[10] Four months later, after R.M.'s symptoms persisted and his pain increased, and after Trental[11] failed, the CRC for a second time denied a request for urology consult. A jury could reasonably conclude that the CRC members were deliberately indifferent for not treating R.M.'s pain by denying the referral or authorizing any additional remedy, notwithstanding the recommendations of UptoDate.com.

The defendants' reliance on *Hamby v. Hammond* is misguided. In that case, the question was whether prison officials pursued a medically unreasonable course of treatment by declining to refer Hamby for surgical evaluation for a hernia. *Hamby v. Hammond,* 821 F.3d 1085, 1089 (2016). Hamby is not on point because the evidence presented showed that the defendants acted on a "bona fide medical opinion" and opted for a specific course of treatment held to be constitutional on several prior occasions. *Id.* at 1095. R.M. is not alleging that he needed surgery in lieu of conservative treatment. Rather, he is asserting that he did not receive treatment at all, or at a minimum a referral to somebody who was qualified to assess his medical needs *Hamby* involves surgical referral for an irreducible hernia repair and does nothing to clarify constitutional rights under the facts presented here. *Bianchi v. Department of*

---

[10] Same as the January 21, 2015 CRC decision, this decision was also reached by consensus. *Kahrs Decl.* ¶ 22.

[11] The medical records indicate the drug was discontinued in May, 2015. R.M. had been given a 180 day supply but it was not reissued, *Kahrs Decl.,* Ex. 15. The reasonable inference must be that it had no positive impact in treating R.M.'s pain.

PLAINTIFF'S RESPONSE TO
DEFENDANTS' SUMMARY
JUDGMENT MOTION

20

**Kahrs Law Firm, P.S.**
2208 NW Market St., Suite 414 Seattle WA 98107
Ph: 206-264-0642 Fax: 206-237-8555
mike@kahrslawfirm.com

*Corrections* does not apply for the same reasons discussed in this paragraph as it merely recites *Hamby* on a similar set of hernia injury facts.

Furthermore, other than providing an overview of qualified immunity, the unpublished Order issued in *Pennick v. Lystad* is of no consequence. In that case, doctors concluded after an eye exam that the prisoner showed no objective signs of conjunctivitis and thus did not prescribe Visine A. Contrary to the facts in *Pennick*, R.M. was actually diagnosed with PD and demonstrated objective signs of the disease. Not only does the present case have nothing to do with the human eye, R.M. manifested signs of his disease which would make his providers and the CRC members subjectively aware of his risk of harm.

*Odom v. Corizon* is not instructive to anything material in this case. In *Odom*, the alleged deliberate indifference occurred beginning in 2010. Xiaflex injection therapy had not been known as a treatment option at that time and there was no evidence to suggest Vitamin E therapy was effective at all. Finally, the remaining arguments against other treatment providers involved disagreements with the treatment they administered. In the case at bar, R.M. has presented evidence that treatment for his PD existed and the record supports a finding that the CRC was neither of aware of the treatment nor its effectiveness. While the notes from the August 6, 2014 meeting suggest the CRC members meeting at that time were aware of injection therapy, they concluded the treatment would not be effective on the erroneous assumption R.M.'s symptoms were not amenable to treatment. The inaccuracy of the report suggesting that R.M.'s symptoms were not consistent with treatment is irreconcilable. Furthermore, the literature referenced and the "provider" relied upon remains unidentified. If the Court relies on the August 6, 2014 meeting notes when evaluating the actions of the January 21, 2015 CRC

PLAINTIFF'S RESPONSE TO
DEFENDANTS' SUMMARY
JUDGMENT MOTION

21

**Kahrs Law Firm, P.S.**
2208 NW Market St., Suite 414 Seattle WA 98107
Ph: 206-264-0642 Fax: 206-237-8555
mike@kahrslawfirm.com

members, the unexplained inconsistencies and the unidentified information from the unidentified provider must be construed in favor of the plaintiff.

Finally, R.M. has attempted to identify how each member of the CRC voted at the January 21, 2015 meeting. No defendant member recalled how he or she voted. *Kahrs Dec.* ¶ 22, Ex. W. Ultimately, the outcome of a prisoner's care rests with the decisions of the CRC. In the present case, the urology referral was denied as was any medically supported treatment for PD. This led to prolonged pain as well as loss of treatment options to help R.M. maintain the health of his penis. When the defendants arguments are followed to the their logical conclusion, a prisoner would be precluded from bringing suit against WDOC or the CRC members if he were unlawfully deprived of non-emergency treatment. All liability for WDOC and its employees would be removed by delegating all decisions to a committee that could disclaim liability by not recollecting why and how a vote was made. Regardless, the named defendant CRC members were getting paid to make critical treatment decisions for R.M. and were acting under color of state law to execute their legal duty. The reasonable inference based on the evidence that there was a consensus decision is that they all agreed to deny R.M. the referral on January 21, 2015.

**2.** ***Defendants Edwards, Kenney and Kroha Are Not Entitled to Qualified Immunity.***

Defendants Edwards, Kenney and Kroha are not entitled to qualified immunity because, at a minimum, each individual participated in the January 21, 2015 CRC meeting which denied R.M. the referral he sought and that was submitted by Dr. Edwards and Ms. Kroha. Notwithstanding that both Dr. Edwards and Ms. Kroha conferred and Dr. Edwards presented the case, the result was reached by "consensus" which would infer that all three agreed with the

PLAINTIFF'S RESPONSE TO
DEFENDANTS' SUMMARY
JUDGMENT MOTION

22

**Kahrs Law Firm, P.S.**
2208 NW Market St., Suite 414 Seattle WA 98107
Ph: 206-264-0642 Fax: 206-237-8555
mike@kahrslawfirm.com

denial of the consult. Dr. Edwards also assumed that R.M.'s condition could not have been caused by any medications he was taking – clearly wrong. Kahrs Decl., Exhs. A, D.

**C.** **The State of Washington Can Be Liable for Medical Negligence as a Qualified Entity Pursuant to Wash. R. Code 7.70.020(3).**

The defendants argue that the State of Washington cannot be liable for medical negligence because it is not a health care provider pursuant to Wash. R. Code 7.70.020(1). In support of this argument they cite to Wash. R. Code 7.70.020(1). This is only one of three alternate definitions of a health care provider. The applicable definition contained in Wash. R. Code 7.70.020(3) permits an entity to be considered a health care provider as follows:

> An entity, whether or not incorporated, facility, or institution employing one or more persons described in part (1) above, including, but not limited to, a hospital, clinic, health maintenance organization, or nursing home; or an officer, director, employee, or agent thereof acting in the course and scope of his or her employment, including in the event such officer, director, employee, or agent is deceased, his or her estate or personal representative.

Wash. R. Code 7.70.020(3).

WDOC is certainly an institution employing medical staff who were acting in the course of their duties when treating R.M. The Washington Legislature made it clear its intent for WDOC to meet the constitutional requirements to treat inmates.

> It is the intent of the legislature that inmates in the custody of the department of corrections receive such basic medical services as may be mandated by the federal Constitution and the Constitution of the state of Washington.

Wash. R. Code 72.10.005 (in relevant part). The Washington Legislature set forth further rules governing the providing of healthcare to inmates. Wash. R. Code 72.10.020. The State of Washington is a health care provider that is statutorily obligated to provide constitutionally proper health care to all inmates, whether indigent or not. It is a proper defendant because it has

PLAINTIFF'S RESPONSE TO
DEFENDANTS' SUMMARY
JUDGMENT MOTION

23

**Kahrs Law Firm, P.S.**
2208 NW Market St., Suite 414 Seattle WA 98107
Ph: 206-264-0642 Fax: 206-237-8555
mike@kahrslawfirm.com

employed all the individual defendants named in this lawsuit, and each defendant CRC member meets the definition of a health care provider under the statute.

**D.      Sufficient Evidence Exists to Present a Genuine Issue of Material Fact that the Defendants Breached the Standard of Care.**

The Defendants argue that individual members of the CRC who did not provide actual medical care to R.M. cannot breach any standard of care, citing Wash. Rev. Code 7.70.030(1). The Defendants assume approving or denying medical care through a committee does not make then a health care provider subject to liability under Wash. Rev. Code 7.70.030(1). A reading of Rev. Code of Wash. 7.70.020 defines an individual health care provider as a person who provides "health care or related services," no more and no less. Extending this interpretation to members of a committee who make determinations on the type of treatment is required by case law. *See Eelbode v. Chec Medical Centers, Inc.*, 97 Wn. App. 462, 984 P.2d 436 (1999).

In *Eelbode*, the plaintiff took a pre-employment physical. Eelbode signed a waiver before taking the physical and was then injured. *Id*. at 464. Chec argued that Eelbode was not a patient and a physician-patient relationship is required to establish liability under Washington's medical malpractice act, arguing no duty not to harm Eelbode existed. *Id*. at 467. This argument was rejected.

> The medical malpractice act sets forth three causes of action: (1) failure to follow the accepted standard of care; (2) failure to obtain informed consent; and (3) a promise that the injury would not occur. *RCW 7.70.030*. A cause of action for informed consent or a promise not to injure requires that the injured person be a patient. *RCW 7.70.030(2), (3)*. But a claim of failure to follow the accepted standard of care does not require a physician-patient relationship. *RCW 7.70.030(1).*

*Id. See also Daly v. U.S.*, 946 F.2d 1467, 1469 (9th Cir. 1991) ("Washington relaxed this requirement when the legislature passed a comprehensive medical malpractice act in 1976.").

**Kahrs Law Firm, P.S.**
2208 NW Market St., Suite 414 Seattle WA 98107
Ph: 206-264-0642 Fax: 206-237-8555
mike@kahrslawfirm.com

Thus, even if the CRC members did not have such a relationship, they can still be liable. But the CRC members do have a physician-patient relationship.

Rev. Code of Wash. 7.70.020(1) specifically designates certain individuals as health care providers. These include physicians, nurses, physician's assistants and nurse practitioners. Each member of the care review committee were defined as health care providers and provided referral recommendations. They were all acting within the scope of their medical capacity, based on their medical training and experience.

As for individuals treating R.M. they are liable for their decision in reaching consensus as a member of the CRC committee to deny the urology referral they had originally agreed to present. Ms. Kroha, Dr. Edwards and Dr. Kenney reached consensus with the other members of the CRC to deny the referral on January 21, 2015. *See* section B.2., *supra*.

Finally, there is sufficient evidence to deny summary judgment.[12] His treatment providers did not provide him access to a urologist who could prescribe the treatment most likely to alleviate his pain and suffering. Any treatment provided proved ineffective and WDOC did not give R.M. access to a doctor who would have been aware of the only FDA approved drug for PD. The argument incorporating Dr. Russell's October 2017 report only acknowledges the same possible diagnosis. It does not acknowledge that Dr. Russell made some recommendations that, if timely acted on in 2015, would have resulted in the alleviation of pain. There are genuine issues of material fact.

\\\

---

[12] The Defendants argue that R.M. cannot provide the requisite expert testimony required for a medical negligence case. Per the case schedule, plaintiff is not required to disclose any experts until April 19, 2019. Such an argument is premature. See section E, *infra*.

PLAINTIFF'S RESPONSE TO
DEFENDANTS' SUMMARY
JUDGMENT MOTION

25

**Kahrs Law Firm, P.S.**
2208 NW Market St., Suite 414 Seattle WA 98107
Ph: 206-264-0642 Fax: 206-237-8555
mike@kahrslawfirm.com

**E.**     <u>The Defendants' Motion for Summary Judgment Is Not Ripe for Review Because It's premature.</u>

Pursuant to Fed. R. Civ. P. 56(d), a court may stay a motion for summary judgment to allow for discovery. See *United States v. Kitsap Physicians Serv.,* 314 F.3d 995, 1000 (9th Cir. 2002) ("provides a device for litigants to avoid summary judgment when they have not had sufficient time to develop affirmative evidence."). Rule 56(d) continuance "should be granted almost as a matter of course unless the non-moving party has not diligently pursued discovery of the evidence." *Burlington N. Santa Fe R.R. Co. v. The Assiniboine & Sioux Tribes of the Fort Peck Reservation,* 323 F.3d 767, 773–74 (9th Cir. 2003) (internal quotation marks and citations omitted).

This lawsuit was originally filed in Thurston County on January 19, 2018 with the amended complaint filed April 13, 2018. The amended complaint was served on the State of Washington on April 16, 2018. Notice of removal was filed in this Court April 20th, 2018. Dkt No. 1.

After counsel conferred, this Court ordered a joint discovery plan on July 10, 2018. Dkt. 43. All parties submitted initial disclosures on August 17, 2018. Plaintiff submitted written interrogatories and requests for production to Defendant State of Washington on October 4, 2018 to seek more documents and some information. He also submitted requests for admissions to each named defendant. The answers were provided November 4, 2018.

The answers to the requests for admissions that the individual defendants participated and voted in the Care Review Committee decisions dated both August 6, 2014 and January 21, 2015 assert the Defendants either had no memory, or if there was participation, the decision was by "consensus." *Kahrs Decl.*, ¶ 22.

PLAINTIFF'S RESPONSE TO
DEFENDANTS' SUMMARY
JUDGMENT MOTION

26

**Kahrs Law Firm, P.S.**
2208 NW Market St., Suite 414 Seattle WA 98107
Ph: 206-264-0642 Fax: 206-237-8555
mike@kahrslawfirm.com

In the discovery plan, any motions for qualified immunity were to be filed November 18, 2018. On this date, the Defendants filed 25 page motion for summary judgment of which the qualified immunity argument took 3 ½ pages.[13] After this Court asked for supplemental briefing, the Defendants again argued both for qualified immunity and full summary judgment.

The date for disclosure of expert witnesses is April 19, 2019.[14] Discovery is to be completed by June 21, 2019. The scheduled dates for expert disclosure and the end of discovery are not close. The facts show that R.M. has been diligent in pursuing discovery and there is more to be done.

The defendants rely on one main argument in support of their summary judgment motion – there is no medical solution to PD, thus, no harm, no foul. R.M. has provided evidence that in 2013, the FDA approved a drug specifically for the treatment of PD. Kahrs Decl., Ex. V. The FDA would not approve such a drug unless it was known to be able to treat PD.

R.M. has been diligent in pursing discovery within the case schedule. The deadline for expert disclosure and discovery completion are months away. R.M. is entitled to a continuance if this Court denies the Defendants' motion for qualified immunity.

\\\

\\\

---

[13] If one reads the actual argument, it appears that the Defendants are subsuming their argument that no facts support Plaintiff's allegations against the Defendants into the summary judgment argument which is a legal argument.

[14] The purpose of determining qualified immunity early is to prevent unwarranted discovery. This rule is advantageous to both defendants and plaintiffs because if qualified immunity is granted, neither parties are required to pay the expense of expert witnesses.

PLAINTIFF'S RESPONSE TO
DEFENDANTS' SUMMARY
JUDGMENT MOTION

27

**Kahrs Law Firm, P.S.**
2208 NW Market St., Suite 414 Seattle WA 98107
Ph: 206-264-0642 Fax: 206-237-8555
mike@kahrslawfirm.com

# VI.    CONCLUSION

For the reasons stated above, the defendants are not entitled to qualified immunity. Nor are they entitled to summary judgment. They are only entitled to the dismissal of two administrative employees and the State of Washington is only a defendant for the negligence issue. At a minimum, R.M. is entitled to conduct more discovery as required including the opportunity to provide the testimony of an expert witnesses.

DATED this 7th day of January, 2019.

KAHRS LAW FIRM, P.S.


/s Michael C. Kahrs         .
MICHAEL C. KAHRS, WSBA# 27085
Attorney for Plaintiff

/s Dan N. Fiorito III          .
Dan N. Fiorito, WSBA# 34009
Attorney for Plaintiff

PLAINTIFF'S RESPONSE TO
DEFENDANTS' SUMMARY
JUDGMENT MOTION

28

**Kahrs Law Firm, P.S.**
2208 NW Market St., Suite 414 Seattle WA 98107
Ph: 206-264-0642 Fax: 206-237-8555
mike@kahrslawfirm.com

# CERTIFICATE OF SERVICE

I hereby certify that on this 7th day of January, 2019, I caused to be electronically filed the foregoing document with the Clerk of the Court using the CM/ECF system which will send notification of such filing to the individuals listed below, and I hereby certify that I have mailed by United States Postal Service this document to the following non CM/ECF participants: N/A.:

TO:

     Rhjianna M. Fronapfel
     Elizabeth A. Leedom
     Bennett Bigelow & Leedom
     601 Union St. Ste. 1500
     Seattle, Wa 98101

     Ketia Berry Wick
     Brian P. Waters
     Johnson Graffe Keay Moniz & Wick
     925 Fourth Ave., Ste. 2300
     Seattle, WA 98104

     Michelle Hitomi Hansen
     7141 Cleanwater Dr. SW
     P.O. Box 40126
     Olympia, WA 98504
     Michelleh3@atg.wa.gov


s/ *Michael C. Kahrs*              01/07/2019
Michael Kahrs                      Date

PLAINTIFF'S RESPONSE TO
DEFENDANTS' SUMMARY
JUDGMENT MOTION

29

**Kahrs Law Firm, P.S.**
2208 NW Market St., Suite 414 Seattle WA 98107
Ph: 206-264-0642 Fax: 206-237-8555
mike@kahrslawfirm.com