1
2
3
4

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT TACOMA

5

6

R.M.,

7

                              Plaintiff,

8

          v.

9

STATE OF WASHINGTON, ET AL.,

10

                              Defendants.

11

Case No. 18-5387-RBL-TLF

REPORT AND
RECOMMENDATION TO DENY
DEFENDANTS' SUMMARY
JUDGMENT MOTION
CONCERNING QUALIFIED
IMMUNITY

Noted for June 7, 2019

12      This matter is before the Court on defendants' filing of a motion for summary judgment.

13   Dkt. 47. Plaintiff has brought suit under 42 U.S.C. § 1983 against defendants for alleged Eighth

14   Amendment violations in providing inadequate medical care as well as state law medical

15   negligence claims. Dkt. 92, Second Amended Complaint. This matter has been referred to the

16   undersigned Magistrate Judge. *Mathews, Sec'y of H.E.W. v. Weber*, 423 U.S. 261 (1976); 28

17   U.S.C. § 636(b)(1)(B); Local Rule MJR 4(a)(4).

18      In this Report and Recommendation, the issue of qualified immunity is addressed. As to

19   the other arguments in Defendants' Motion for Summary Judgment, the Court should reserve

20   ruling until after discovery is complete. For the reasons set forth below, the undersigned

21   recommends the Court deny defendants' motion as to qualified immunity. The undersigned

22   further recommends the Court deny the remainder of defendants' motion without prejudice as

23   premature with leave to re-file at the close of discovery.

24
25

1

## FACTUAL AND PROCEDURAL HISTORY[1]

2

Plaintiff brings this action pursuant to 42 U.S.C. § 1983 alleging defendants violated his

3

Eighth Amendment rights by acting with deliberate indifference to his serious medical need in

4

treating his Peyronie's disease (PD). Dkt. 92, at 9-10, Second Amended Complaint. Plaintiff also

5

alleges state law medical negligence claims against defendants based on the breach of their duty

6

to properly treat him, resulting in damages. *Id.*

7

The individually named defendants[2] are Department of Corrections (DOC) current and

8

former employees, medical professionals and medical contractors, who were members of the

9

Care Review Committee (CRC) that made decisions related to plaintiff's treatment on several

10

separate occasions during the period in question. *Id.*, at 1-10. Three of the named defendants,

11

James Edwards, M.D., Edith Kroha, ARNP, and J. David Kenney, M.D., in addition to

12

participating in at least one of the CRC decisions at issue, also directly examined and/or treated

13

[1] The Court notes that in their reply to the motion for summary judgment, defendants argue the Court should reject new allegations in plaintiff's January 7, 2019, declaration. Dkt. 85, at 9-10. Because the Court has allowed plaintiff to amend his complaint and defendants have had an opportunity to submit additional briefing, the Court sees no basis to reject or not consider the allegations made in plaintiff's declaration and has, accordingly, considered them to the extent they are relevant in deciding this motion.

14

15

16

[2] The following individuals are named as defendants and identified as follows in plaintiff's Second Amended Complaint: Sheryl Allbert, employed by the State of Washington and a member of the CRC; Allison Berglin, employed by the State of Washington and a member of the CRC; Diego Lopez de Castilla, employed by the State of Washington and a member of the CRC; James J. Edwards, employed by the State of Washington, a member of the CRC, and treated plaintiff; Dale Fetroe, employed by the State of Washington and a member of the CRC; Steven Hammond, employed by the State of Washington and a member of the CRC; J. David Kenney, employed by the State of Washington and a member of the CRC; Mary Keppler, employed by the State of Washington and a member of the CRC; Edith Kroha, employed by the State of Washington and a member of the CRC, and treated plaintiff; Frank Longano, employed by the State of Washington and a member of the CRC; Sheri Malakhova, employed by the State of Washington and a member of the CRC; Ken E. Moore, employed by the State of Washington and a member of the CRC; Shirlee M. Neisner, employed by the State of Washington and a member of the CRC; Martha Newlon, employed by the State of Washington and a member of the CRC; Joan Palmer, employed by the State of Washington and a member of the CRC; Kelly Remy, employed by the State of Washington and a member of the CRC; Jon Reyes, employed by the State of Washington and a member of the CRC; Dale Robertson, employed by the State of Washington and a member of the CRC; Kenneth Sawyer, employed by the State of Washington and a member of the CRC; F. John Smith, employed by the State of Washington and a member of the CRC; Bo Stanbury, employed by the State of Washington and a member of the CRC; Jane and John Does 1-10. Dkt. 92, at 3-5, Second Amended Complaint.

17

18

19

20

21

22

23

24

25

REPORT AND RECOMMENDATION TO DENY
DEFENDANTS' SUMMARY JUDGMENT MOTION
CONCERNING QUALIFIED IMMUNITY - 2

1    plaintiff for his condition. *Id.* The State of Washington is also named as a defendant but with

2    respect to plaintiff's state law negligence claim only.[3] Dkt. 92, Second Amended Complaint,

3    ¶3.2.

4        These claims arose during the period of time when plaintiff was a prisoner at several

5    institutions including Washington State Penitentiary (WSP) and Clallam Bay Corrections Center

6    (CBCC). *Id.*, at 5-9.

7        At the end of 2013, plaintiff began experiencing curvature of his penis.[4] *See* Dkt. 79, at 7,

8    Plaintiff's Decl., Exh. 2, (plaintiff's affidavit dated 11/12/14). In or around June of 2014,

9    plaintiff began waking up with severe pain in his penis and observed that hard lumps had

10   formed. *Id.* Plaintiff believed these lumps may have been blood clots because they were moving

11   around from day to day. *Id.*

12       On July 27, 2014, while incarcerated at WSP, plaintiff submitted a health services kite

13   complaining of what he believed to be blood clots. *Id.*, at 6-7, Plaintiff's Decl., Exh. 1 (health

14   services kite dated 7/27/14). Plaintiff indicates he began experiencing intermittent dull throbbing

15   pain during the day and that it affected his ability to urinate "because it would spray and

16   sometimes there would be some pain at the tip of my penis." *Id.* at 3, Plaintiff's Decl. ¶17.

17       On July 31, 2014, plaintiff reported to Physician's Assistant (PA-C) Joella Phillips the

18   symptoms of hard lumps and painful erections which also caused his penis to curve, and which

19   woke him up every night due to pain. Dkt. 81, at 7-8, Amended Kahrs Decl. Exh. B, C (PA-C

20

---

21   [3] Plaintiff specifically concedes the State of Washington is an improper defendant for a 42 U.S.C. §1983
22   cause of action. Dkt. 77, at 1, Plaintiff's Response to Motion for Summary Judgment. The Second
     Amended Complaint only alleges a claim against the State of Washington "under the state tort of
23   negligence." Dkt. 92, Second Amended Complaint, ¶3.2.
     [4] Plaintiff also indicates he had begun taking Lisinopril for hypertension in January or February of 2013.
24   Dkt. 92, Second Amended Complaint, ¶4.1. The complaint asserts that by 2014, 13 cases of Lisinopril
     causing Peyronie's disease (PD) had been reported to the Federal Drug Administration. *Id.*

25   REPORT AND RECOMMENDATION TO DENY
     DEFENDANTS' SUMMARY JUDGMENT MOTION
     CONCERNING QUALIFIED IMMUNITY - 3

1   Phillips examination report dated 7/31/14). Plaintiff was examined by PA-C Phillips and James

2   J. Edwards, M.D. *Id.*

3          The July 31, 2014, examination report indicates a finding of one fibrous firm 5 millimeter

4   lump on the right side of the penile shaft and numerous 4 to 7 millimeter lumps on the left side of

5   the penile shaft. *Id.* Plaintiff was assessed with Peyronie's disease (PD). *Id.* The report also

6   indicates plaintiff expressed concern his symptoms were related to his blood pressure or

7   Hepatitis C medications and that Dr. Edwards informed him this was very unlikely. *Id.*

8          Dr. Edwards checked UpToDate (a subscription service that, according to defendants,

9   offers the latest information on diseases) for treatment recommendations based on plaintiff's

10  diagnosis. *Id.*; Dkt. 53, at 4, Edwards Decl. UpToDate recommended that individuals diagnosed

11  with PD, such as plaintiff, be evaluated by a urologist. *Id.*

12         On July 31, 2014, Dr. Edwards and PA-C Phillips submitted a request to the CRC[5] that

13  plaintiff be evaluated by a urologist. *See* Dkt. 81, at 56, Amended Kahrs Decl., Exh. F

14  (Consultation Request/Report dated 7/31/14). The request indicates:

15         "44 y/o male with complaint of penile lumps and nad deformity. He
           states that about 1 year ago while on Hep C treatment he noticed that he
16         had a lump on the right side of his penis. After completing Hep C
           treatment he developed more lumps on the right side of penis. He when
17         [sic] he has an erection the penis curves to one side and is painful. This
           wakes him up every night due to the pain. Requesting urology consult."

18  *Id.*

19  A.     First CRC Review

20

21

22

23  [5] According to defendants, the CRC is "a committee created under Section IX of the DOC Offender
    Health Plan for the purpose of determining whether requests for purchased health care services are or are
24  not medically necessary." Dkt. 53, at 4, Edwards Decl.

25  REPORT AND RECOMMENDATION TO DENY
    DEFENDANTS' SUMMARY JUDGMENT MOTION
    CONCERNING QUALIFIED IMMUNITY - 4

On August 6, 2014, the CRC met to evaluate the request by Dr. Edwards and PA-C

Phillips, that plaintiff be examined by a urologist. Dkt. 81, at 57, Amended Kahrs Decl. Exh. G

(CRC Report dated 8/6/14).[6] The CRC report states as follows:

> "44 y/o male with complaint of penile lumps nad deformity. He states
> that about 1year ago while on Hep C treatment he noticed that he had a
> lump on the right side of his penis. After completing Hep C treatment he
> developed more lumps on the right side of penis. He [sic] when he has an
> erection the penis curves to one side and is painful. This wakes him up
> every night due to the pain. Requesting Urology consult. One fibrous
> firm lump on right side, 4-7mm lumps on the left side. UpToDate
> recommendations reviewed for Peyronies. Discussed revision of
> intervention. Discussed no effective treatment but UpToDate advises
> early referral in disease process. Provider with experience at Harborview
> Urology reports treatment depends on how severe the curvature, different
> injections and treatments to lessen the curvature, mostly to preserve
> sexual function and reduce pain. Significant curvature with erection can
> cause pain, but c/o was typically pain with intercourse not intractable
> (constant) pain. Current sx being reported are not consistent with this.
> Discussed literature indicating no definitive treatment or cure for this
> condition. UpToDate also indicates pain r/t to this also resolves in 2
> years. Case discussed by the group and determined it is NOT medically
> necessary."

*Id.* Dr. Edwards' declaration also states he recalls that the CRC "reviewed medical literature

which indicated there was no definitive treatment or cure for this condition." Dkt. 53, at 4,

Edwards Decl.[7] The decision to deny the request for a urology consult was made "by consensus"

---

[6] The following individuals are listed as "voting members present" on the CRC report: Arthur Tordini, M.D.; Dale Robertson, PA-C; Kelly Remy, PA-C; Carol Thamert, ARNP; Kenneth Lauren, M.D.; Deigo Lopez de Castilla, M.D.; Joseph Lopin, M.D.; Christine Bunnell, PA-C; Bo Stanbury, PA-C; Mary Keppler, ARNP; Patricia Christiansen, PA-C; Sheryl Allbert, ARNP; Frank Longano, M.D.; Beverly Shapiro, M.D.; Laura Manigo-Hedt, PA-C; Phu Ngo, PA-C; James J. Edwards, M.D.; F. John Smith, M.D.; Jo Ella Phillips, PA-C; Glen Silver, ARNP; H. Jon Reyes, PA-C; Ken E. Moore, PA-C; Allison Anderson, ARNP; Kenneth Sawyer, M.D.; J. David Kenney, M.D.; G. Steven Hammond, M.D. Dkt. 81, at 57, Amended Kahrs Decl. Exh. G (CRC Report dated 8/6/14).

[7] Dr. Edwards also states in his declaration that he is "familiar with Peyronie's disease through my medical school training and because I have seen a few cases of this disease in my medical practice. There is little known about Peyronie's disease except it is an incurable disease and satisfactory treatments for the disease did not exist in 2014 and still do not exist today." Dkt. 53, at 3, Edwards Decl. PA-C Phillips states in her declaration that she is "familiar with Peyronie's disease because I have had at least two patients with the condition." Dkt. 58, at 2, Phillips Decl. ¶5.

REPORT AND RECOMMENDATION TO DENY
DEFENDANTS' SUMMARY JUDGMENT MOTION
CONCERNING QUALIFIED IMMUNITY - 5

of the CRC. *Id.*; Dkt. 81, at 4, 80, Amended Kahrs Decl., Exh. W; Dkt. 92, at ¶4.5, Second Amended Complaint.

On August 25, 2014, plaintiff saw PA-C Phillips and discussed the CRC decision. Dkt. 58, at 10, Phillips Decl., Attach. E. PA-C Phillips' declaration and primary encounter report on that date states plaintiff was not happy with outcome of the CRC review. *Id.* On August 27, 2014, plaintiff indicates he filed a grievance[8] (No.14569364) based on the CRC's denial of the urology examination. Dkt. 79, at 8, Plaintiff's Decl., Exh. 2 (plaintiff's affidavit dated 11/12/14). On October 24, 2014, plaintiff filed a grievance based on the CRC's denial of the urology consultation. *Id.*, at 10, Plaintiff's Decl. Exh. 3 (Level I Grievance dated 10/24/14). The grievance described his condition as excruciating, that it continually woke him up at night, and sometimes made it difficult for him to use the bathroom. *Id.*

On November 12, 2014, plaintiff met with RN Mason and complained that his condition had been worsening. *See id.*, at 7-10, Plaintiff's Decl., Exh. 2 (plaintiff's affidavit dated 11/12/14), Exh. 3 (Level 1 Initial Grievance dated 10/24/14). RN Mason instructed plaintiff to report this to his provider. *Id.*

On November 13, 2014, plaintiff met with PA-C Jen Ambrose and served her with an affidavit dated November 12, 2014. *See* Dkt. 79, at 7-9, Plaintiff's Decl., Exh. 2, (plaintiff's affidavit dated 11/12/14). In the affidavit plaintiff described meeting with PA-C Phillips and discussing the CRC's denial of the urology referral.[9] *Id.* The affidavit indicates plaintiff explained his condition to PA-C Phillips "and how it had progressed." *Id.* He indicates he

---

[8] Defendants do not dispute that plaintiff submitted grievances and completed all grievances processes prior to filing suit. Dkt. 93, Defendants' Answer to Second Amended Complaint, at ¶4.12; Dkt. 97, Defendants' Supplemental Brief Regarding Plaintiff's Second Amended Complaint, at ¶6.

[9] Plaintiff's affidavit indicates he believes this encounter occurred in September 2014, although it appears he may be referring to his August 25, 2017 encounter with PA-C Phillips. *See* Dkt. 79, at 6-8, Plaintiff's Decl., Exh. 2, (plaintiff's affidavit dated 11/12/14).

REPORT AND RECOMMENDATION TO DENY DEFENDANTS' SUMMARY JUDGMENT MOTION CONCERNING QUALIFIED IMMUNITY - 6

1   informed PA-C Phillips that the pain was so severe it was continuously waking him up at night

2   due to pain, and that the condition sometimes made it painful and difficult to urinate. *Id.*

3   Plaintiff indicates PA-C Phillips explained the denial of the urology referral by telling

4   him that there was a urologist on the CRC who said there was no treatment for PD, that it usually

5   was not painful, and even when it was painful the pain only lasted a couple of years. *Id.* Plaintiff

6   indicates he asked PA-C Phillips if he was "supposed to just suffer for two years" and that she

7   stated "there was nothing she could do." *Id.* Plaintiff claims he told PA-C Phillips that if PD was

8   not usually supposed to be painful that he must not have PD. *Id.* PA-C Phillips acknowledges

9   meeting with plaintiff on August 25, 2014 and that she has read plaintiff's November 12, 2014

10  affidavit and, "while [she] do[es] not remember the specifics of our discussion now, [she] likely

11  would have discussed the points [plaintiff] identified in his Affidavit with him." Dkt. 58, at 3,

12  Phillips Decl. at ¶8.

13  PA-C Ambrose's report from November 13, 2014, acknowledges receiving plaintiff's

14  affidavit. Dkt. 81, at 59, Amended Kahrs Decl., Exh. I (primary encounter report with Jen

15  Ambrose PA-C dated 11/13/14). The report indicates that plaintiff reported hard nodules

16  throughout his penis, that he'd been seen multiple times by medical providers that believed he

17  had PD, and that his case had been brought to the CRC for a urology consult but the request for a

18  urology consult had been denied. *Id.* The report indicates that no examination was done; plaintiff

19  stated his symptoms were unchanged and that he was there to prove he was coming to medical

20  for this condition for his lawsuit. *Id.* The report indicates on that date plaintiff otherwise reported

21  no change in his symptoms, including no increase, frequency, or pain with urination. *Id.*

22  On November 20, 2014, plaintiff was examined by Dr. Edwards again. Dkt. 81, at 61,

23  Amended Kahrs Decl., Exh. J (Edwards encounter report dated 11/20/14). Dr. Edwards' report

24

25  REPORT AND RECOMMENDATION TO DENY
    DEFENDANTS' SUMMARY JUDGMENT MOTION
    CONCERNING QUALIFIED IMMUNITY - 7

indicates that plaintiff stated his penis hurt when he gets erections. *Id.* The report indicates "there is some curvature apparently with erections, but basically there is not a deformity of significance" and the problem is more that the lumps bother plaintiff, he says they are painful with erection, have shortened his penis, and he is unable to masterbate. *Id.* Dr. Edwards indicated his examination of plaintiff looked very much the same as on July 31, 2014, noting that there were fibrous nodules and no observable deformity upon examination but that, of course, the penis was "not erect." *Id.* Dr. Edwards indicated he reviewed UpToDate again which suggested some possible medications for treating PD and that the first one listed was Trental. *Id.* Plaintiff agreed to try the Trental and was prescribed a 180 day supply. *Id.*

Plaintiff's initial, Level I, grievance was denied on November 25, 2014, stating that plaintiff had not returned to sick call since the urology referral was denied and advising him to inform his provider that his symptoms were worsening. Dkt. 79, at 10, Plaintiff's Decl. Exh 3 (Level I – Initial Grievance). Plaintiff appealed the denial of his grievance to Level II. *Id.*, at 11, Plaintiff's Decl. Exh. 4 (Grievance Appeal to Level II). The Level II grievance was denied on January 6, 2015. *Id.* The denial explanation stated that plaintiff's medical records indicated his condition was "stable" and Dr. Edwards wanted plaintiff to try the medication for 180 days before exploring other treatment. *Id.*

On January 8, 2015, plaintiff was examined by Dr. Edwards again. Dkt. 81, at 62, Amended Kahrs Decl. Exh L (Edwards encounter report dated 1/8/15). Plaintiff indicates he informed Dr. Edwards that the pills (Trental) weren't helping, he was still experiencing severe pain with nocturnal erections, as well as intermittent dull throbbing pain during the day, and that he actually felt the pain was worsening. Dkt. 79, at 3-4, Plaintiff's Decl. at ¶20. Dr. Edwards' report indicates that plaintiff believed the Trental was helping slow the progression "a little bit"

1    but that he still had "severe pain with nocturnal erections" and that plaintiff was upset DOC had

2    not allowed him to see a urologist. Dkt. 81, at 62, Amended Kahrs Decl. Exh. L (Edwards

3    encounter report dated 1/8/15). The report states the examination showed "the same multiple,

4    firm plaques of scar tissue of the penile shaft, characteristic of Peyronie's disease" as on previous

5    visits and that Dr. Edwards was "unable to detect any progression on exam." *Id.* Dr. Edwards'

6    report indicates he informed plaintiff that the only suggestion he could make was to take the

7    issue back to the CRC. *Id.*

8    B.    Second CRC Review

9         On January 8, 2015, Dr. Edwards submitted another request to the CRC for a urology

10   consult. Dkt. 81, at 63, Kahrs Decl. Exh. M (Consultation Request/Report dated 1/8/15). The

11   request states "Pt has peyronie's dz and has severe pain with nocturnal erections." *Id.* In January

12   2015, plaintiff also appealed the denial of his grievance to Level III indicating his condition was

13   not "stable", as the Level II grievance denial had stated, that he was enduring endless suffering,

14   and reiterating his request to be referred to a specialist. Dkt. 79, at 12, Plaintiff's Decl. Exh. 5

15   (Grievance Appeal to Level III).

16        On January 21, 2015, the CRC met again to evaluate Dr. Edwards' new request for a

17   urology consultation. Dkt. 81, at 64, Kahrs Decl. Exh. N (CRC Report dated 1/21/15).[10] The

18   CRC report states:

19            "Pt has Peyronie's disease and reports severe pain with nocturnal
              erections. He has been presented to CRC before and urology consultation
20            was determined not medically necessary at that time. He does not have

21   _____
     [10] The CRC report reflects the following individuals as "voting members present": Dale Fetroe, M.D.;
22   Edith Kroha, ARNP; Dale Robertson, PA-C; Kelly Remy, PA-C; Kenneth Lauren, M.D.; Diego Lopez de
     Castilla, M.D.; Sheri Malakhova, M.D.; Bo Stanbury, PA-C; Mary Keppler, ARNP; Joan Palmer, PA-C,
23   Sheryl Allbert, ARNP; Martha Newlon, ARNP; Frank Longan, M.D.; J. David Kenney, M.D.; Eric
     Larsen, ARNP; James J. Edwards, M.D.; F. John Smith, M.D.; Jon Reyes, PA-C; Ken E. Moore, PA-C;
24   Shirlee M. Neisner, ARNP; Allison Berglin, ARNP; Kenneth Sawyer, M.D.; and G. Steven Hammond,
     M.D. Dkt. 81, at 64, Kahrs Decl. Exh. N (CRC Report dated 1/21/15).

25   REPORT AND RECOMMENDATION TO DENY
     DEFENDANTS' SUMMARY JUDGMENT MOTION
     CONCERNING QUALIFIED IMMUNITY - 9

1

2

> problems urinating or other symptoms. He also complains of some
> deformity of his penis. Plaques noted on clinical exam but otherwise no
> problems noted. The group discussed the case and determined that the
> intervention proposed is not medically necessary."

3

4

*Id.* On February 12, 2015, plaintiff's grievance was denied at Level III with DOC Assistant

Secretary Bovenkamp finding the matter adequately investigated and no evidence that plaintiff

had been denied treatment that was medically necessary. Dkt. 79, at 12, Plaintiff's Decl. Exh. 5

(Grievance Appeal to Level III).

7

On March 25, 2015, plaintiff was transferred to CBCC. Dkt. 47, at 8, Defendant's Motion

for Summary Judgment. It appears that plaintiff did not seek treatment again specifically for PD

until January 3, 2017. Dkt. 92, at 7, Plaintiff's Second Amended Complaint at ¶4.12; Dkt. 81, at

64, Kahrs Decl. Exh. P (Primary Encounter Report with Edith Kroha, ARNP, dated 1/3/17); *see*

Dkt. 60, Weller Decl.. Plaintiff's second amended complaint alleges he "did not follow up on his

PD until 2017 because every previous request for an intervention was denied and he had been

told that his condition would resolve itself in two years." Dkt. 92, at 7, Plaintiff's Second

Amended Complaint at ¶4.12. On May 18, 2015, plaintiff indicates his prescription for Trental

ended and that no one followed up with him regarding his prescription or the results. Dkt. 79, at

4, Plaintiff's Decl. at ¶21.

On January 3, 2017, plaintiff was examined by ARNP Edith Kroha at CBCC. Dkt. 81, at

64, Kahrs Decl. Exh. P (Primary Encounter Report with Edith Kroha, ARNP, dated 1/3/17).

Plaintiff indicates he told ARNP Kroha about his painful and debilitating condition and that it

was worsening. Dkt. 79, at 13, Plaintiff's Decl., at Exh. 6 (Level I – Initial Grievance dated

6/16/17). Plaintiff claims ARNP Kroha told him she would discuss his condition with a urologist

or get plaintiff an appointment. *Id.* ARNP Kroha's report indicates that plaintiff insisted his penis

had shrunk by 50% in length and width, that he experienced painful erections and has fibrous

25

REPORT AND RECOMMENDATION TO DENY
DEFENDANTS' SUMMARY JUDGMENT MOTION
CONCERNING QUALIFIED IMMUNITY - 10

tissue on the penile shaft and did not believe he had PD. Dkt. 81, at 64, Kahrs Decl. Exh. P (Primary Encounter Report with Edith Kroha, ARNP, dated 1/3/17). The report indicates the examination showed palpable ribbons of fibrous firm tissue along the penile shaft. *Id.* The report assessed the condition as PD. *Id.*

On May 21, 2017, plaintiff sent a kite to medical asking about the status of his urology consult. Dkt. 57, at 6, Peterson Decl., Attach. B (Health Services Kite dated 5/21/17). PA-C Peterson responded to the kite the following day saying the CRC had denied his request to see a urologist in January 2015, and there was no note in his chart stating any plans to see a urologist. *Id.*

On June 13, 2017, plaintiff returned to the clinic and asked for clarification on if he was going to see a urologist because he had been told he would be referred to one. Dkt. 52, at 2, Kroha Decl. at ¶6. Plaintiff was again seen and examined by ARNP Kroha. *Id.* ARNP Kroha's encounter report indicates plaintiff complained again his penis had shrunk by half, that he had painful erections, that there was an increase of fibrous tissue in his penile shaft, and that fibrous "beeds" had appeared along the dorsum of his penile shaft a year after his Hepatitis C treatment in 2013. *Id.*, at 2-7, Kroha Decl., and Attach. B. (ARNP Kroha Primary Encounter Report dated 6/13/17).

The report indicates ARNP Kroha examined the penis and found no sores, rashes or lesions, the penis was three and one-fourth inches from base of the shaft to the tip and on the dorsum she observed a row of 3-5 mm nodules along the shaft. *Id.* She indicated plaintiff had been advised by multiple practitioners that he has PD which "he does not believe." *Id.* She noted plaintiff denied interference with urinary stream or function; they discussed the fact his request to see a urologist had been presented to the CRC and denied in 2015. *Id.*

1   She noted the findings are "unchanged in 3 years" and the plan was to continue

2   observation. *Id.* However, ARNP Kroha also indicates in her declaration that she agreed on that

3   date to submit a request for a urology consultation to the CRC. *Id.*

4   In June 2017, plaintiff also filed a grievance complaining that ARNP Kroha had promised

5   a urology consultation on his January 3, 2017, visit but that it had not happened. Dkt. 79, at 13,

6   Plaintiff's Decl., at Exh. 6 (Level I – Initial Grievance dated 6/14/17). Plaintiff indicated in his

7   grievance that when he had seen ARNP Kroha on June 13, 2017, she had "confirmed my

8   condition continues to get worse, and again stated his case would be discussed with a

9   urologist."*Id.* In July 2017, plaintiff appealed the denial of this grievance. Dkt. 79, at 14,

10  Plaintiff's Decl., at Exh. 7 (Grievance Appeal to Level II dated 7/7/17).

11  As part of the investigation of plaintiff's grievance J. David Kenny, M.D., examined

12  plaintiff.[11] Dkt. 51, at 2, Kenny Decl. Plaintiff's complaint alleges that Dr. Kenny noticed the

13  "'deformity was more noticeable' and the pain issue had not resolved." Dkt. 92, Second

14  Amended Complaint at ¶ 4.17. On July 19, 2017, Dr. Kenny submitted his Grievance

15  Investigation Report which indicates:

16          I met with this patient to discuss his medical concerns. The past record
            was reviewed with him and an examination performed. The patient stated
17          that his perception is the condition continues to change (that is, the pain
            is not resolved and the deformity is more noticeable). Mr. [text redacted]
18          agreed with the decision to present his issue to CRC on the bases of a
            worsening condition.

19  Dkt. 51, at 3-10, Kenny Decl. ¶ 7, and Attach. B (Grievance Investigation Report dated 7/19/17).

20  Dr. Kenny's examination report reflects the following:

21          Follow up urology/CRC

22  ───────────────────────

23  [11] Dr. Kenney's declaration states that he is "familiar with Peyronie's disease through my medical school
    training and because I have managed patients with this condition. I am aware that Peyronie's disease is an
    incurable disease and that there were no completely satisfactory treatments for the disease in 2017 and
24  there are still no completely satisfactory treatments for the disease today." Dkt. 51, at 2, Kenny Decl. ¶ 6.

25  REPORT AND RECOMMENDATION TO DENY
    DEFENDANTS' SUMMARY JUDGMENT MOTION
    CONCERNING QUALIFIED IMMUNITY - 12

Consult (signature) WINDLE RN
Hep C 'few years ago' Lump on side of penis. Painful Nocturnal
eruptions.
Moved around ? Pyronie's Ds. Lately Thinks tissue in penis died. Now
painful,
nocturnal erections. Has scar tissue. Red. Diameter "like nothing" length
Specifically since last CRC Level III determination ___ patient Jan/15.
Wakes up
with painful erections last 2 nights ago. "I woke up and it bends,
contorts, & twists'
and 'hurts' all the time. No urinary symptoms. No testicular
pain/complaints
Concerns: 1) shrinking size 2) lump 3) painful erections ofy O/E
(chaperoned)
No asymmetry of penis/gonads (circled L)(down arrow) with patient
directed
palpation (right facing arrow) no discrete 'lump'. (circled N) carcenosa
somewhat
prominent dorsal veins Meatus WNL. Urethra (circled N) to palpation.

Assess:
1. Hx migratory penis lumps which have according to patient coalesced
on the dorsal surface penis
2. Reported painful erections lasting minutes accompanied by penis
bending, contorting & twisting
3. Reported pe loss of penile mass.
Mgmt: 1. Discussed with PA Kroha who examined the patient and will
present to
CRC for urology eval.
2. Extensive discussion regarding normal penile anatomy with 2
diagrams.
Pt appears to understand basic anatomy.
3. Pt. expresses concern that he would like urology evaluation. Discussed
CRC presentation of subjective and objective data.
4. PTC pm (delta sign) condition, worsening condition or new S/S

*Id.*, at 6-7.

C.      Third CRC Review

ARNP Kroha submitted a request for a urology consult to the CRC. Dkt. 81, at 72,

Amended Kahrs Decl. Exh. T (CRC Report dated 8/16/17). On August 16, 2017, the CRC met to

review the recommendation for a urology consultation. *Id.* The CRC report indicates as follows:

"47 yr. old male complains of worsening painful nocturnal erections
which contorts, bends and twists his penis. He is convinced that the
migratory penile lumps have coalesced on the dorsum of the entire shaft,
causing the diameter and length of his penis to shrink dramatically. This

REPORT AND RECOMMENDATION TO DENY
DEFENDANTS' SUMMARY JUDGMENT MOTION
CONCERNING QUALIFIED IMMUNITY - 13

> [sic] symptoms appeared after treatment with Boceprevin in 2013.
> Presented to CRC for similar complaints in 2015, and 2013 per patient
> reqst to see urologist – Level 3. Patient states symptoms worsening.
> Denies any urinary symptoms. Exam: No inguinal LAD, no hernia,
> lesions, sores, rash. Testes descended x2 NT, no masses. Patient directed
> area of concern is the dorsum of normal cavernosa. Normal anatomy,
> also examined by Dr. Dave Kenny. Per Dr. Kenney, cannot see anything
> that is not normal anatomy for the area. Concerned because he is a lifer,
> he is so overly concerned about this, might be some merit for him to see
> urologist who will probably find it is also normal. Occurs at least
> 3x/week. RUBICON eval with urologist discussed. P wants physical
> exam done by specialist. He has a very fixed idea that something is
> terribly wrong. He always seems to have some sort of problem that once
> resolved, will fixate on something else. Suggested MH eval. The
> committee discussed the intervention proposed and determine the
> intervention DID meet medical necessity.

*Id.* The CRC approved the request for a consultation with a urologist. *Id.*

Plaintiff was subsequently examined by urologist Byron D. Russell, M.D., on October 6, 2017. Dkt. 81, at 73-74, Kahrs Decl. Exh. U (Dr. Russell History and Physical Examination Report dated 10/6/2017). Dr. Russell submitted a report with the following assessment:

> "Probable Peyronie's disease fluctuating in location and spared [sic] he
> is over 3 years without either stabilization or resolution. I talked to him at
> length about the nature of the disease and treatment options which
> generally have been disappointing. Topical verapamil is the least invasive
> and most conservative approach but cures are not that common.
> Intracorporeal verapamil and more recently Xiaflex have been used with
> some success. However that approach requires a discrete lesion to inject and
> on exam he does not have that finding. Sometimes a penile implant is the
> best solutions to both maintain quality of erections and prevent further loss
> of length. That is certainly the most aggressive, radical approach and I
> don't know whether under current circumstances he would even be
> considered for such treatment."

*Id.* Dr. Russell summarized his plan as follows:

> "I will send back to the medical center at the prison a prescription for
> 15% topical verapamil. If that is covered under the prison health plan he
> could try daily applications for up to 3 months to see if there is any
> improvement. I don't believe he is a candidate for intracoporeal
> injections based on current findings. I am not sure whether, as a prisoner,
> he would be considered for a penile implant."

REPORT AND RECOMMENDATION TO DENY
DEFENDANTS' SUMMARY JUDGMENT MOTION
CONCERNING QUALIFIED IMMUNITY - 14

*Id.* Plaintiff alleges that Dr. Russell told him the damage from the condition would be permanent, that a prosethetic was necessary, and that had DOC provided him treatment back in 2014-2015, it could have prevented the severity of the deformity. Dkt. 92, Second Amended Complaint at ¶ 4.20; Dkt. 79, at 21, Plaintiff's Decl. Exh. 14 (Grievance Appeals Level II dated 1/14/18).

Dr. Russell's medical records also reflect a "telephone encounter" on February 12, 2018, regarding plaintiff's case, which is summarized as follows:

> "I called Dr. Aurich back regarding this inmate's condition and care plan. I have not seen the patient with an erection to confirm the deformity he describes. Neither has Dr. Aurich. We discussed treatment options such as tuck penoplasty, patch graft penoplasty, injections of verapamil or collagenase into the plaque if a discrete plaque can be identified and also penil implant to hold the penis straight. I explained that none of us here, Dr. Bensen, Dr. Kowitz or myself have much experience with penoplasties or with collagenase injections. We often referred patient's him to [sic] Seattle for further evaluation at Virginia Mason, the University of Washington or some other tertiary care center.
>
> It is unclear whether an inmate who is expected to spend the rest of his life in prison needs aggressive management for Peyronie's. On the other hand he does maintain he has severe pain with erections and it is difficult to withhold treatment altogether.
>
> In the absence of documentation of the severity of the deformity is hard to advise him more specifically. I could not feel a discrete plaque when I examine the patient. Treatment may depend on the creation of an artificial erection using a tourniquet and intracorporeal injection of saline under anesthesia. Dr. Aurich's contact [sic] this into consideration and see whether further treatment will referral [sic] as appropriate."

Dkt. 81, at 75, Amended Kahrs Decl., Exh. U ("Telephonic Encounter" by Dr. Russell).

D.    Fourth CRC Review

On October 25, 2017, plaintiff sent a medical kite stating he wanted to try all of the treatment options listed by Dr. Russell. Dkt. 79, at 15-16, Plaintiff's Decl. Exhs. 8, 9 (Health Services Kites dated 10/25/17 and 11/25/17). On November 8, 2017, the CRC reviewed the request and on November 28, 2017, all treatment options were denied as not medically

REPORT AND RECOMMENDATION TO DENY
DEFENDANTS' SUMMARY JUDGMENT MOTION
CONCERNING QUALIFIED IMMUNITY - 15

1   necessary.[12] *Id.*, at 16-19, Plaintiff's Decl. Exhs. 9-12 (CRC Patient Notifications dated

2   11/28/17). On December 9, 2017, plaintiff filed a grievance. *Id.*, at 20, Plaintiff's Decl. Exhs. 13

3   (Level I – Initial Grievance dated 12/9/17). The grievance was denied on the grounds that none

4   of the recommendations were medically necessary. *Id.* Plaintiff's level II and III appeals were

5   also denied. *Id.*, at 21-23, Plaintiff's Decl. Exhs. 14, 15 (Grievance Appeals Level II dated

6   1/14/18 and Level III dated 2/25/18). Plaintiff notes that in his level II appeal, he stated that his

7   condition had been designated a level 1 medical condition which was then changed back to the

8   original level 3 condition he received in 2014 and 2015. *Id.*

9         Defendants moved for summary judgment on November 16, 2018. Dkt. 47. On December

10  10, 2018, the Court issued an order directing defendants to submit a supplemental brief

11  addressing only the issue of qualified immunity. Dkt. 71. Additional briefing was submitted. Dkt.

12  72. Plaintiff opposed defendants' motion and also moved to amend his complaint. Dkt. 73, 77.

13        Oral argument was held on defendants' motion for summary judgment on January 25,

14  2019. Dkt. 88. By order dated February 13, 2019, the Court granted plaintiff's motion to amend

15  the complaint and directed the parties to file the second amended complaint and amended

16  answers and to submit additional briefing on the motion for summary judgment in light of the

17  second amended complaint. Dkt. 90. Additional briefing was submitted and a second oral

18  argument was held on defendants' motion for summary judgment on May 13, 2019. Dkts. 97-

19  101.

20

21

22  ─────────────────────
    [12] The Court notes it is unclear from the evidence presented at this point which defendants were present at
23  the CRC committee meeting on November 8, 2017. However, in light of the fact that discovery has just
    begun, and as discussed in more detail below, the Court finds any dispositive finding on the merits of
24  plaintiff's claims with respect to any of the defendants, and the CRC's decisions on that date, would be
    premature.

25  REPORT AND RECOMMENDATION TO DENY
    DEFENDANTS' SUMMARY JUDGMENT MOTION
    CONCERNING QUALIFIED IMMUNITY - 16

1    Defendants argue they are entitled to qualified immunity because plaintiff cannot show

2    defendants violated a clearly established constitutional right. Dkt. 47

3                                     DISCUSSION

4    A.    Eighth Amendment Standard Regarding Medical Care for Prison Inmates

5           To state an Eighth Amendment claim relating to medical care, a plaintiff must include

6    factual allegations that a state actor acted, or failed to act, in a manner that shows deliberate

7    indifference to his serious medical needs. *Jett v. Penner*, 439 F.3d 1091, 1096 (9th Cir. 2006). A

8    plaintiff alleging a claim of deliberate indifference must prove two elements: the seriousness of

9    the prisoner's medical need and the nature of the defendant's response to that need. *McGuckin v.*

10   *Smith*, 974 F.2d 1050, 1059 (9th Cir. 1992). This includes "both an objective standard – that the

11   deprivation was serious enough to constitute cruel and unusual punishment – and a subjective

12   standard – deliberate indifference." *Snow v. McDaniel*, 681 F.3d 978, 985 (9th Cir. 2012).

13          Delays in providing medical care may support a claim for deliberate indifference. *Estelle*

14   *v. Gamble*, 429 U.S. 97, 104–05 (1976). To establish a claim of deliberate indifference arising

15   from delay in providing care, a plaintiff must show that the delay was harmful. *See McGuckin,*

16   974 F.2d at 1059. "A prisoner need not show his harm was substantial; however, such would

17   provide additional support for the inmate's claim that the defendant was deliberately indifferent

18   to his needs." *Jett*, 439 F.3d at 1096; s*ee also McGuckin*, 974 F.2d at 1060.

19          If the prison's medical staff is not competent to examine, diagnose, and treat inmates'

20   medical problems, they must "refer prisoners to others who can." *Hoptowit v. Ray*, 682 F.2d

21   1237, 1253 (9th Cir. 1982), *overruled on other grounds*, *Sandin v. Conner*, 515 U.S. 472 (1995);

22   *see also Ortiz v. City of Imperial*, 884 F.2d 1312, 1314 (9th Cir. 1989) (per curiam). A failure to

23   competently treat a serious medical condition, even if some treatment is prescribed, may

24   constitute deliberate indifference in a particular case. *Id.* And, "[d]eliberate indifference may be

25

1  found where prison officials fail to provide an inmate with medical care for reasons unrelated to

2  the medical needs of the prisoner, such as administrative concerns." *Oliver v. Carey*, 315 Fed.

3  Appx. 649 (9th Cir. 2009) (citing *Jett*, 439 F.3d at 1097) (In *Oliver*, the plaintiff alleged that

4  defendant doctors were deliberately indifferent when they denied his grievance appeal based on

5  an eight to ten month delay for orthopedic services, and because "the scheduling of contract

6  providers was beyond the authority of CSP staff.").

7        A prison official who ignores a treating physician's instructions may act in deliberate

8  indifference. *See Wakefield v. Thompson*, 177 F.3d 1160, 1165 (9th Cir. 1999) ("[A] prison

9  official acts with deliberate indifference when he ignores the instructions of the prisoner's

10  treating physician or surgeon."). A prison official who interferes with the instructions of a

11  physician may be liable for an Eighth Amendment violation. *See Hamilton v. Edell*, 981 F.2d

12  1062, 1066–67 (9th Cir. 1992) (prison officials' decision to force inmate to fly in contravention

13  of treating physician's specific orders could constitute deliberate indifference to inmate's

14  medical needs), *overruled in part on other grounds, Saucier v. Katz*, 533 U.S. 194, 121 S.Ct.

15  2151, 150 L.Ed.2d 272 (2001). Choosing a non-expert opinion over the opinion of an expert may

16  also constitute deliberate indifference. *See Snow v. McDaniel*, 681 F.3d 978, 985 (9th Cir. 2012).

17  B.    Qualified Immunity

18        Qualified immunity is judge-made doctrine that provides immunity from a civil rights

19  lawsuit for government officials who can show that there was no clearly established law defining

20  the contours of the right alleged by the plaintiff, in existence at the time of the events alleged in

21  the lawsuit. *Ziglar v. Abbasi*, 137 S.Ct. 1843, 1866 (2017). The law of qualified immunity has

22  developed over time and has generated controversy. *See* Note, *How Ziglar v. Abbasi Sheds Light*

23  *on Qualified-Immunity Doctrine*, 96 Wash. U. L. Rev. 883, 895-96 (2019) (observing that -- in

24

25  REPORT AND RECOMMENDATION TO DENY
   DEFENDANTS' SUMMARY JUDGMENT MOTION
   CONCERNING QUALIFIED IMMUNITY - 18

1  addition to the difficulty that trial and appellate courts face when analyzing substantive legal

2  issues in the context of qualified immunity case law – the resources of the parties, and the

3  resources of the trial courts, may not be efficiently or effectively deployed when a Section 1983

4  case is decided under the qualified immunity doctrine).

5      In the current case, when the Court asked during the second oral argument (Dkt. 101)

6  whether the parties contended that qualified immunity must be decided in this early summary

7  judgment motion, or whether it should be decided after further factual development – through

8  discovery, and even potentially at trial – the parties indicated that qualified immunity should be

9  decided *now*.

10      Unless plaintiff makes a two-part showing, qualified immunity shields government

11  officials from liability. The plaintiff must show both: The official(s) violated a federal statutory

12  or constitutional right, and -- at the time of the alleged act or failure to act there was clearly

13  established law that defined the contours of the federal right objectively putting the official(s) on

14  notice – i.e., every reasonable official would understand that what they are doing is unlawful.

15  *District of Columbia v. Wesby,* 138 S.Ct. 577, 589 (2018); *Emmons v. City of Escondido,* __ F.3d

16  __, No. 16-55771, 2019 WL 1810765, at *2 (April 25, 2019) (per curiam). To determine whether

17  there was clearly established law, the Court has stated, "[w]hile there does not have to be a case

18  directly on point, existing precedent must place the lawfulness of the particular [action] beyond

19  debate"; and the Court has also observed, "there can be the rare obvious case, where the

20  unlawfulness of the officer's conduct is sufficiently clear even though existing precedent does

21  not address similar circumstances." *Wesby*, 138 S.Ct. at 590. A clearly established right exists if

22  "controlling authority or a robust consensus of cases of persuasive authority" have held, on facts

23  that are close or analogous to the current case, that such a right exists. *Hines v. Youseff*, 914 F.3d

24

25  REPORT AND RECOMMENDATION TO DENY
   DEFENDANTS' SUMMARY JUDGMENT MOTION
   CONCERNING QUALIFIED IMMUNITY - 19

1  1218, 1229-1230 (9th Cir. 2019) (quoting *Dist. of Columbia v. Wesby,* 138 S.Ct. 557, 589-90).

2  Summary judgment granting qualified immunity is not appropriate when there is a genuine issue

3  of material fact concerning both: (1) Whether it would be clear to a reasonable officer that their

4  conduct was unlawful under the circumstances they confronted, and (2) Whether the defendant's

5  conduct violated a constitutional right." *Bonivert v. City of Clarkston*, 883 F.3d 865, 871-72 (9th

6  Cir. 2018).

7      If a summary judgment motion is filed early in the litigation – before there has been a

8  realistic discovery opportunity relating to each party's theory of the case -- the District Court

9  should grant any FRCP 56(d) motion "fairly freely." *Jacobson v. United States Department of*

10  *Homeland Security*, 882 F.3d 878, 883-84 (9th Cir. 2018).

11      The party that filed the motion for summary judgment bears the initial burden to

12  demonstrate the absence of a genuine dispute of material fact for trial. *Celotex Corp. v. Catrett,*

13  477 U.S. 317, 323 (1986). When qualified immunity is reviewed in the context of a defense

14  motion for summary judgment, the evidence must be considered in the light most favorable to

15  the plaintiff with respect to central facts. *Tolan v. Cotton,* 572 U.S. 650, 657 (2014) (per curiam).

16  A genuine dispute concerning a material fact is presented when there is sufficient evidence for a

17  reasonable jury to return a verdict for the non-moving party. *Anderson v. Liberty Lobby, Inc.*,

18  477 U.S. 242, 253 (1986). A "material" fact is one which is "relevant to an element of a claim or

19  defense and whose existence might affect the outcome of the suit," and the materiality of which

20  is "determined by the substantive law governing the claim." *T.W. Elec. Serv., Inc. v. Pacific Elec.*

21  *Contractors Ass'n*, 809 F.2d 626, 630 (9th Cir. 1987).

22      When the Court considers a motion for summary judgment, "[t]he evidence of the non-

23  movant is to be believed, and all justifiable inferences are to be drawn in [their] favor." *Anderson*

24

25  REPORT AND RECOMMENDATION TO DENY
DEFENDANTS' SUMMARY JUDGMENT MOTION
CONCERNING QUALIFIED IMMUNITY - 20

1    *v. Liberty Lobby, Inc.,* at 255. Yet the Court is not allowed to weigh evidence or decide

2    credibility. *Id.* If the moving party meets their initial burden, an adverse party may not rest upon

3    the mere allegations or denials of his pleading; his or her response, by affidavits or as otherwise

4    provided in FRCP 56, must set forth specific facts showing there is a genuine issue for trial.

5    FRCP 56(e)(2). The Court may not disregard evidence solely based on its self-serving nature.

6    *Nigro v. Sears, Roebuck & Co.,* 784 F.3d 495, 497 (9th Cir. 2015).

7    C.    Clearly Established Law

8            When the facts of the instant case are evaluated in light of legal rules that existed at the

9    time of the events in question, "'[t]he salient question is whether the state of the law at the time

10   of an incident provided 'fair warning' to the defendants 'that their alleged [conduct] was

11   unconstitutional.'" *Tolan,* 572 U.S. at 656 (quoting *Hope v. Peltzer,* 536 U.S. 730, 741 (2002));

12   *Hardwick v. County of Orange,* 844 F.3d 1112, 1117 (9th Cir. 2017). The "obvious case" is a

13   rare type of situation. *Hope*, 536 U.S. at 741. "An officer loses qualified immunity, even in novel

14   factual circumstances, if he or she commits a 'clear' constitutional violation." *Hines v. Youseff*,

15   914 F.3d 1218, 1230 (9th Cir. 2019); *see also, Simon v. City of New York*, 893 F.3d 83, 97 (2nd

16   Cir. 2018) (denying qualified immunity to officers who carried out a material witness warrant in

17   a manner that far exceeded the terms of the arrest warrant, holding the witness against her will

18   for more than 18 hours over two days; the court determined that his was a rare obvious case

19   under the Fourth Amendment, because a violation was "so obvious that it violated clearly

20   established law despite the lack of binding authority directly on point").

21           Precedent that analyzes a similar constitutional issue may, or may not, provide the

22   requisite notice that a specific act or omission is unlawful. *See, Kisela v. Hughes*, 138 S.Ct. 1148,

23   1153-1154 (2018) (reviewing case law from the U.S. Court of Appeals for the Ninth Circuit and

24

25   REPORT AND RECOMMENDATION TO DENY
     DEFENDANTS' SUMMARY JUDGMENT MOTION
     CONCERNING QUALIFIED IMMUNITY - 21

1    finding that there was not a sufficient factual match with the instant case to put defendants on

2    notice).

3            There is a different assessment of granularity or specificity with which factual "matches"

4    are determined, for purposes of analyzing whether clearly established law existed at the time of

5    the alleged incident, depending on the constitutional right that is being claimed. *Kisela,* at 1152

6    (noting that specificity is extraordinarily important in the context of a Fourth Amendment claim).

7    There are circumstances where a general statement of the law may provide clear and fair warning

8    to government officials; "'[t]he salient question [remains] whether the state of the law' at the

9    time of an incident provided 'fair warning' to the defendants 'that their alleged [conduct] was

10   unconstitutional.'" *Tolan,* 572 U.S. at 656 (quoting *Hope,* 536 U.S. at 741; *Hardwick,* 844 F.3d

11   at 1117.

12           Although qualified immunity is an issue to be decided at the earliest point possible during

13   litigation, in order to identify whether there was clearly established law regarding a given set of

14   facts, the district court must consider a certain amount of factual granularity. *Compare, Morales*

15   *v. Fry*, 873 F.3d 817, 822-823 (9th Cir. 2017) (observing that if a qualified immunity case goes

16   to trial because genuinely disputed issues of material fact remain, then the qualified immunity

17   from suit is transformed into a defense); *with Daniels Sharpsmart v. Smith*, 889 F.3d 608, 617

18   (9th Cir. 2018) (Court of Appeals reverses in part, holding the defendants' motion to dismiss

19   claims for damages should have been granted -- contours of rights under the dormant Commerce

20   Clause doctrine were not sufficiently defined in the law at the time of the defendant's alleged

21   acts or omissions; there was no precedent [at the time of the alleged incident] on facts close

22   enough to the instant case, therefore, qualified immunity applied). The Ninth Circuit Pattern Jury

23   Instruction Committee does not have a jury instruction concerning qualified immunity, because

24

25   REPORT AND RECOMMENDATION TO DENY
     DEFENDANTS' SUMMARY JUDGMENT MOTION
     CONCERNING QUALIFIED IMMUNITY - 22

1   if the issue goes to the jury, the jury would only be resolving factual disputes – and the question

2   of whether there was clearly established law would be a purely legal question reserved for the

3   district court judge. *Morales*, 873 F.3d at 823-827.

4   D.   Analysis

5        In this case, (viewing the facts as they currently exist in the record in the light most

6   favorable to the plaintiff) although there are no cases with precisely the same facts, there is

7   substantial analogous authority such that the state of the law at the time of the incidents in

8   question provided fair warning to the defendants that their alleged conduct was unconstitutional.

9   In addition, even if this were not the case, after the facts are fully developed it is possible that

10  this case could be interpreted to fit the "obvious" category, depending on the precise nature of

11  the medical condition and exactly how much information was received – and the timing of

12  information being received – by each of the defendants about the plaintiff's symptoms.

13       The closest caselaw existing at the time of the events in this case that should have put the

14  defendants on notice -- for purposes of qualified immunity -- is from the United States Court of

15  Appeals for the Seventh Circuit. In *Hayes v. Snyder*, 546 F.3d 516 (7th Cir. 2008) the Court

16  determined that the State's medical provider, Dr. Hamby, was not entitled to summary judgment

17  on a prisoner's claim that the defendant acted with deliberate indifference to his serious medical

18  needs in treating plaintiff's condition which was later diagnosed as Peyronie's disease. *Hayes*,

19  546 F.3d 516. In that case, Dr. Hamby did not render a full diagnosis of the plaintiff's condition

20  when the plaintiff complained of testicular cysts in the fall of 2001. *Id.*, at 518. The plaintiff was

21  examined by Dr. Hamby for the first time when he visited the medical unit on October 4, 2001.

22  *Id.*

23

24

25  REPORT AND RECOMMENDATION TO DENY
    DEFENDANTS' SUMMARY JUDGMENT MOTION
    CONCERNING QUALIFIED IMMUNITY - 23

The plaintiff in *Hayes* had previously complained to a different prison medical doctor – Dr. Choudry -- in the fall of 2000. *Id.* Dr. Choudry consulted with a urologist in December 2000 but concluded that neither removal of the cysts nor a referral for urology consult or biopsy was indicated. *Id.* Plaintiff asked to be seen by a urologist in March 2001. *Id.*

By the time the plaintiff in *Hayes* sought treatment in September 2001, the pain was daily. *Id.* He was given a prophylactic antibiotic and Tylenol III for pain. *Id.* When Dr. Hamby, the defendant, evaluated plaintiff in October 2001, he observed "tenderness" and "discomfort" yet Dr. Hamby did not refer to "pain" in his notes. *Id.* The plaintiff asserted that he had told Dr. Hamby that he was in pain. *Id.*

In *Hayes*, another physician, Dr. Shute, evaluated plaintiff later in 2001 and recommended to Dr. Hamby that the plaintiff should receive prescription-strength pain medications and also that plaintiff should be evaluated by a urologist. *Id.* Dr. Hamby denied the plaintiff these recommended steps. *Id.* Plaintiff filed grievances requesting referral to a specialist in the appropriate field of medicine and also attempted to describe the details of the condition and symptoms he was experiencing. *Id.*, at 519. The symptoms included pain during urination, a bent penis, swelling of the testicles, and constant pain with new growths. *Id.* Dr. Hamby stated that no further treatment was necessary and that plaintiff was being seen and monitored regularly. *Id.*, at 519-20.

When the plaintiff in *Hayes* was released from prison on August 15, 2002, he went to a Veteran's Administration hospital where the medical professionals followed recommendations from the prison that the plaintiff should be seen for psychiatric issues. *Id.*, at 520-21. The Veteran's Hospital also gave plaintiff a short evaluation by a urologist, and provided him with prescription-strength ibuprofen and a prescription for a narcotic to address pain. *Id.* After visits

REPORT AND RECOMMENDATION TO DENY
DEFENDANTS' SUMMARY JUDGMENT MOTION
CONCERNING QUALIFIED IMMUNITY - 24

1   to his family physician he was evaluated on October 10, 2002 by a urologist who diagnosed

2   plaintiff with Peyronie's disease. *Id.* After that diagnosis plaintiff was referred to a pain-

3   management physician who was a specialist for ongoing chronic pain treatment. *Id.*

4         The Seventh Circuit determined that plaintiff had established a serious medical condition

5   (for purposes of summary judgment), and that "viewing the record in the light most favorable to

6   Hayes, a reasonable trier of fact *could* conclude that Dr. Hamby was subjectively aware of

7   Hayes's serious medical condition and either knowingly or recklessly disregarded it." *Hayes*, 546

8   F.3d at 524. The Court determined that the risk of harm to plaintiff was serious and obvious, the

9   condition was unusual yet symptoms would have put even a lay person on notice that special and

10   prompt treatment was necessary. *Id.* The Court held that, viewing the facts in the light most

11   favorable to the plaintiff, a reasonable trier of fact could conclude that Dr. Hamby was

12   deliberately indifferent in failing to respond to plaintiff's pain complaints  and failing to refer

13   plaintiff for evaluation by a specialist in order to make a medically appropriate diagnosis or

14   treatment assessment. *Id.*, at 523-26.

15         This published opinion in *Hayes* is on point, even if the facts are not precisely on all fours

16   with the exact symptoms and developing situation described in the summary judgment pleadings

17   and exhibits in this case. *Id.* As described above, and taken in the light most favorable to the

18   plaintiff, the plaintiff was first diagnosed with PD by Dr. Edwards on July 31, 2014. *See supra*

19   Facts and Procedural History Section, at 3-4.

20         Plaintiff repeatedly and consistently reported the painful symptoms of the disease as well

21   as the deformity, plaques and nodules, and at various points complained of urinary issues from

22   July 2014 to early 2015, when he was transferred to a different prison. *See supra* Facts and

23   Procedural History Section, at 3-10; *see, generally,* Dkt. 79, Plaintiff's Decl. Moreover, viewing

24

25   REPORT AND RECOMMENDATION TO DENY
     DEFENDANTS' SUMMARY JUDGMENT MOTION
     CONCERNING QUALIFIED IMMUNITY - 25

1   the facts in the light most favorable to the plaintiff, the defendant members of both the 2014 and

2   2015 CRC committees were aware that plaintiff had symptoms of painful erections with

3   deformity that woke him up every night, and that he had plaques or nodules on his penis. *See*

4   *supra* Facts and Procedural History Section, at 4-10; Dkt. 81, at 57, 64 Amended Kahrs Decl.

5   Exh. G (CRC Report dated 8/6/14), and Exh. N (CRC Report dated 1/21/15). Defendants were

6   further aware of the recommendation of plaintiff's treating medical providers, based on

7   UpToDate, that he be referred to a urology expert based on the diagnosis of PD, and they were

8   aware that some treatments were available in the field of urology, including injections, that could

9   reduce pain and preserve sexual function for individuals with PD where there was significant

10   curvature and pain with erections, both symptoms plaintiff complained of. *Id.* Yet, defendants

11   chose to deny the referral to a urology expert based on the non-expert conclusion that there was

12   "no definitive treatment or cure" for PD and information from UpToDate that the pain would

13   resolve within two years. [13] *Id.*

14          Based on these facts, a reasonable jury could find that, with respect to both the 2014 and

15   2015 CRC decisions, denying the referral to a medical expert was "medically unacceptable under

16   the circumstances" and made "in conscious disregard of an excessive risk to [the inmate]'s

17   health." *Rosati v. Igbinoso*, 791 F.3d 1037, 1039 (9th Cir. 2015), *quoting Jackson v. McIntosh*,

18   90 F.3d 330, 332 (9th Cir. 1996) ("An inmate challenging denial of treatment must [show] that

19   the denial 'was medically unacceptable under the circumstances,' and made 'in conscious

20

21   [13] The 2014 CRC report, after citing plaintiff's symptoms as including pain and curvature with erections,
     states that there are some treatments available in the field of urology for severe curvature and pain but that

22   "current sx being reported are not consistent with this." Dkt. 81, at 57, 64 Amended Kahrs Decl. Exh. G
     (CRC Report dated 8/6/14). While there may be other interpretations or explanations for these statements,

23   viewed the facts in the light most favorable to the plaintiff, a reasonable juror could conclude defendants
     were aware of plaintiff's symptoms, were aware treatments could be available from a urologist that could

24   address his symptoms of pain and deformity, and chose not to refer or otherwise attempt to treat plaintiff.

25   REPORT AND RECOMMENDATION TO DENY
     DEFENDANTS' SUMMARY JUDGMENT MOTION
     CONCERNING QUALIFIED IMMUNITY - 26

disregard of an excessive risk to [the inmate]'s health.'").[14] Moreover, in light of *Hayes* alone, viewing the facts in the light most favorable to plaintiff, defendants should have been on notice that such actions or inactions, would constitute a constitutional violation.

After plaintiff's request to be seen by a urologist was rejected by the CRC for the second time in early 2015, plaintiff did not file grievances or complain to medical providers specifically about his PD symptoms for a period of over a year while he was at CBCC. *See supra* Facts and Procedural History Section, at 10; Dkt. 92, at 7, Plaintiff's Second Amended Complaint at ¶4.12; Dkt. 81, at 64, Kahrs Decl. Exh. P (Primary Encounter Report with Edith Kroha, ARNP, dated 1/3/17); *see* Dkt. 60, Weller Decl. However, in 2017, plaintiff again complained to his providers and filed grievances related to significant pain, deformity, and plaques/nodules. *See* supra Facts and Procedural History Section, at 10-17; Dkt. 81, at 64, Kahrs Decl. Exh. P (Primary Encounter

---

[14] The Court notes that defendants argue, in part, that because plaintiff was given Trental by Dr. Edwards in 2015, plaintiff's complaints are simply a disagreement with a course of treatment, not deliberate indifference. Dkt. 47, at 15-17; Dkt. 72, at 2-3. However, the evidence shows Dr. Edwards prescribed Trental even though the primary recommendation of UpToDate and his own initial recommendation to the CRC was to refer plaintiff to a urologist. *See* supra Facts and Procedural History Section, at 10-17. Furthermore, Dr. Edwards prescribed Trental on the basis that it was the first medication listed as a possible treatment on UpToDate and not based on any considered or specialist knowledge regarding its effectiveness for plaintiff's particular symptoms or manifestation of his condition. *Id.*; Dkt. 81, at 61, Amended Kahrs Decl., Exh. J (Dr. Edwards encounter report dated 11/20/14). Moreover viewing the evidence in the light most favorable to the plaintiff, plaintiff informed Dr. Edwards that Trental was not helping, he was still experiencing severe pain with nocturnal erections, as well as intermittent dull throbbing pain during the day, and that he actually felt the pain was worsening. Dkt. 79, at 3-4, Plaintiff's Decl. at ¶20. And, the evidence shows that when the CRC met in 2015, plaintiff was complaining of by and large the same significant symptoms as when the CRC met in 2014. Dkt. 81, at 62, Amended Kahrs Decl. Exh. L (Dr. Edwards encounter report dated 1/8/15) and Exh. N (CRC Report dated 1/21/15). Furthermore, although there is some indication in Dr. Edwards' notes that plaintiff stated the Trental might be slowing the progression "a little bit," there is no indication his symptoms were improving and, in fact, plaintiff indicates he told Dr. Edwards they were worsening. Dkt. 81, at 62, Amended Kahrs Decl. Exh. L (Dr. Edwards encounter report dated 1/8/15); Dkt. 79, at 3-4, Plaintiff's Decl. at ¶20. The Court notes that the law was clearly established at the time that a physician need not fail to treat an inmate altogether in order to violate that inmate's Eighth Amendment rights. *Ortiz v. City of Imperial,* 884 F.2d 1312, 1314 (9th Cir. 1989). Rather, a failure to competently treat a serious medical condition, even if some treatment is prescribed, may constitute deliberate indifference in a particular case. *Id.* Accordingly, viewing the evidence in the light most favorable to plaintiff, defendants should have been on notice that their actions or inactions under these circumstances would constitute deliberate indifference.

Report with Edith Kroha, ARNP, dated 1/3/17); Dkt. 79, at 13, Plaintiff's Decl., at Exh. 6 (Level

I – Initial Grievance dated 6/14/17); Dkt. 57, at 6, Peterson Decl., Attach. B (Health Services

Kite dated 5/21/17; Dkt. 52, at 2, at 2-7, Kroha Decl., and Attach. B. (ARNP Kroha Primary

Encounter Report dated 6/13/17)).

The evidence shows that each time plaintiff attempted to obtain an evaluation by a

specialist, that request was rejected – until eventually he was referred to a urology specialist, Dr.

Russell, in October 2017. *See* supra Facts and Procedural History Section, at 2-16; Dkt. 81, at 57,

64, 72, Kahrs Decl. Exh. N (CRC Report dated 1/21/15), Exh. G (CRC Report dated 8/6/14), and

Exh. T (CRC Report dated 8/16/17). There is no indication that pain medication was given to the

plaintiff, despite his allegations of painful symptoms and interference with his sleep due to

painful nocturnal erections.  *See* supra Facts and Procedural History Section, at 2-16. Plaintiff

presents evidence that he told the medical providers, and indicated in his grievances, that he was

in severe pain. *Id.* And, when plaintiff was eventually referred to a urology specialist, the CRC

denied plaintiff's request to receive the treatment that was recommended by that specialist. *See*

supra Facts and Procedural History Section, at 14-17; Dkt. 79, at 16-19, Plaintiff's Decl. Exhs. 9-

12 (CRC Patient Notifications dated 11/28/17).

Defendants argue that qualified immunity applies because plaintiff failed to bring any

concerns to the medical professionals at the CBCC for several months after he was transferred to

that institution. Dkt. 47, at 8.

However, viewing the facts and drawing reasonable inferences from the facts in the light

most favorable to the plaintiff, as plaintiff points out in his complaint, by the time he was

transferred to CBCC, he had already been complaining consistently about his symptoms to

providers for over a year and a half, his requests to see a urologist had been denied twice, and he

1   had never been provided with any form of effective treatment. *See* supra Facts and Procedural

2   History Section; Dkt. 92, at 7, Plaintiff's Second Amended Complaint at ¶4.12. As such, a

3   reasonable juror could conclude – rather than (as defendants imply) that plaintiff's symptoms

4   resolved or were not as significant -- but instead, (as plaintiff argues) that plaintiff was still

5   suffering continually from painful symptoms and endured the condition, believing it was futile to

6   keep formally complaining to medical professionals and asking for help when he had been

7   repeatedly denied a referral or effective treatment. Dkt. 92, at 7, Plaintiff's Second Amended

8   Complaint at ¶4.12.

9          While plaintiff's failure to seek treatment for some period may ultimately be considered

10  by a finder of fact as evidence relevant to liability or damages regarding individual defendants, it

11  does not entitle any defendants to qualified immunity as the facts are currently presented in this

12  early motion for summary judgment. This would be a jury question, because there is a genuine

13  dispute of material facts regarding whether the defendants exhibited deliberative indifference to

14  serious medical needs by failing to respond to, follow through on, and report to a specialist the

15  defendant's symptoms that plaintiff reported during his time at WSP, and during the process of

16  his transfer to and incarceration at CBCC. A reasonable jury would be able to consider all of the

17  facts as well as reasonable inferences from the facts, and reasonably find that the reports of

18  painful symptoms made by plaintiff during 2014 should have been responded to earlier, and if he

19  had been given treatment prior to transfer that treatment would have been more likely to carry

20  over after transfer.

21         Not only were the defendants on notice from Seventh Circuit precedent, there was also

22  precedent from the Ninth Circuit that was analogous (though not as close on the specific facts).

23  Under clearly established Ninth Circuit precedent that existed at the time of the events in the

24

25
REPORT AND RECOMMENDATION TO DENY
DEFENDANTS' SUMMARY JUDGMENT MOTION
CONCERNING QUALIFIED IMMUNITY - 29

1    instant case, delay or denial of medical care for a serious medical need due to inadequate

2    treatment may constitute deliberate indifference under the Eighth Amendment. *Ortiz v. City of*

3    *Imperial*, 884 F.2d 1312, 1314 (9th Cir. 1989); *Tenore v. Goodgame,* No. 2:11-cv-1082 WBS

4    CKD P, 2014 WL 496697 at *8 - *10 (E.D. Cal. 2014) (denial of defense motion for summary

5    judgment because plaintiff made a sufficient showing of a serious medical condition and

6    deliberate indifference due to defendants' delay in diagnosis and treatment for scabies in

7    plaintiff's genital area that spread, became painful, and symptoms caused serious harm to

8    plaintiff).

9            At the time the CRC made its determinations, the law was clearly established in the Ninth

10   Circuit that if the prison's medical staff is not competent to examine, diagnose, and treat

11   inmates' medical problems, they must "refer prisoners to others who can." *Hoptowit v. Ray*, 682

12   F.2d 1237, 1253 (9th Cir. 1982), *overruled on other grounds by Sandin v. Conner*, 515 U.S. 472,

13   115 S.Ct. 2293, 132 L.Ed.2d 418 (1995); *see also Ortiz*, 884 F.2d at 1314; *Toussaint v.*

14   *McCarthy*, 801 F.2d 1080, 1111-12 (9th Cir. 1986), *abrogated in part on other grounds by*

15   *Sandin*, 515 U.S. 472. It was also clearly established in the Ninth Circuit that defendants may not

16   unreasonably rely on their own non-specialized conclusions with deliberate indifference to a

17   prisoner's medical needs. *Snow v. McDaniel*, 681 F.3d 978, 986 (9th Cir. 2012). In light of *Snow*,

18   *Ortiz*, *Hoptowit, Toussaint,* and *Tenore*, viewing the facts in the light most favorable to the

19   plaintiff, the defendants would have been on notice that the symptoms exhibited by plaintiff

20   would be a serious medical condition, that delay in treating the pain would have been deliberate

21   indifference, that failure to obtain an evaluation from a specialist would have been deliberative

22   indifference, and that choosing to rely upon a medical opinion which a reasonable person would

23

24

25

likely determine to be inferior under the circumstances would amount to the denial of medical treatment and deliberate indifference.

The Court also notes, the Ninth Circuit has held that a finding of deliberate indifference is inconsistent with a finding of qualified immunity. *Albers v. Whitley,* 743 F.2d 1372, 1376 (9th Cir. 1984), *rev'd on other grounds,* 475 U.S. 312 (1986); *Trap v. United States,* No. CV 13-00003 DMG (JPRx), 2016 WL 6921128 at *3 (C.D. Cal. 2016). Here, viewing the facts in the light most favorable to the plaintiff at this point, a reasonable factfinder could conclude the defendants were deliberately indifferent to plaintiff's serious medical need.

Finally, the Court should consider that the "obvious case" is a rare – yet possible -- type of situation. *See, Hope,* 536 U.S. at 741 (handcuffing an inmate to a hitching post in a restricted position for a 7-hour period, along with taunting, unnecessary heat exposure, prolonged thirst, and deprivation of bathroom breaks, was arguably so obvious a constitutional violation that even if the specific facts were novel, officials would still be on notice that their acts violated clearly established law concerning the right to be free from cruel and unusual punishment). It would seem possible that where there is a serious medical condition that involves a dysfunction and deformity in a person's sexual organ(s), where pain is intense and interferes with sleep and urination, and where the defendants are repeatedly informed of the symptoms yet fail to quickly and sufficiently address them, that such a circumstances would be obvious and sufficient to put the official(s) on notice that their acts and omissions would violate the Eighth Amendment. *See, Hope,* 536 U.S. at 741.

Viewing the facts in the light most favorable to the plaintiff, the Court should hold that for purposes of qualified immunity analysis, the defendants' conduct in evaluation and treatment of plaintiff concerning his Peyronie's disease violated a clearly established constitutional right.

1   Accordingly, the Court should deny defendants' motion for summary judgment based on

2   qualified immunity at this stage.

3   E.    Defendant's Remaining Arguments/State Law Claims

4         The Court notes that defendants also moved for summary judgment on the merits on both

5   plaintiff's § 1983 and state law negligence claims. Dkt. 47, at 13; Dkt. 72, at 2-3. Plaintiff argues

6   that if the Court denies defendants' motion based on qualified immunity, decision on the

7   remainder of defendants' summary judgment motion is premature as plaintiff has not had the

8   opportunity to conduct discovery.[15] Dkt. 77, at 25-28.

9         Many of defendants' arguments implicate facts and issues which have not been fully

10  developed through discovery at this point. *See, generally*, *Jacobson v. United States Department*

11  *of Homeland Security*, 882 F.3d 878, 883-84 (9th Cir. 2018) (If a summary judgment motion is

12  filed early in the litigation – before there has been a realistic discovery opportunity relating to

13  each party's theory of the case -- the District Court should grant any FRCP 56(d) motion (e.g. to

14  delay, defer or deny consideration of the summary judgment motion) "fairly freely."). For

15  instance, defendants, in part, argue that they are entitled to summary judgment on the merits on

16  the § 1983 and state law negligence claims on the grounds that their actions did not cause injury

17  because there is no medical solution or "definitive treatment" for PD. Dkt. 47, at 16, 23,

18

19  [15] The Court also notes that defendants appear to raise the argument for the first time in their reply to

20  defendants' motion that the state medical negligence action against the State of Washington is barred by Eleventh Amendment immunity. Dkt. 85, at 8. Because this argument was not raised by defendants in their original motion, the Court should decline to address it on the merits at this point. However, the Court

21  notes that it does appear from the record that the State of Washington has likely waived its immunity from the state-law claims by removing the case to federal court. *Lapides v. Board of Regents*, 535 U.S. 613,

22  122 S.Ct. 1640, 152 L.Ed.2d 806 (2002) (State's act of removing lawsuit from state court to federal court waives Eleventh Amendment immunity); *Bank of Lake Tahoe v. Bank of Am.*, 318 F.3d 914, 916 (9th Cir.

23  2003), *as amended on denial of reh'g and reh'g en banc* (Mar. 14, 2003) (State of Nevada waived its immunity from the state-law claims by joining in the removal of the case to federal court.); *see* Dkt. 1, at

24  2.

25  REPORT AND RECOMMENDATION TO DENY
    DEFENDANTS' SUMMARY JUDGMENT MOTION
    CONCERNING QUALIFIED IMMUNITY - 32

1   Defendants' Motion for Summary Judgment; Dkt. 85, at 5-6, Defendants' Reply to Motion for

2   Summary Judgment. Defendants also argue they are entitled to summary judgment because

3   plaintiff has not proffered any expert testimony to show injury. *Id.*

4          Although defendants presented some evidence with respect to the medical issues, the

5   Court should decline to rule fully on the merits portions of defendants' motion at this time and

6   allow plaintiff an opportunity to conduct further discovery and obtain expert testimony if

7   appropriate. For instance, it is unclear from the evidence at this point what treatment may or may

8   not have been available to plaintiff from a urologist and the effectiveness of such treatment

9   during some of the periods at issue.[16] As plaintiff points out, defendants' motion was made very

10  early in the discovery process and plaintiff has not had the opportunity to fully investigate the

11  facts, much less obtain a medical expert.[17] Dkt. 77, at 27.

12

13  _____

[16] The Court acknowledges that ultimately to establish a claim of deliberate indifference arising from
delay in providing care, a plaintiff must show that the delay was harmful. *See Berry v. Bunnell*, 39 F.3d
1056, 1057 (9th Cir.1994); *McGuckin*, 974 F.2d at 1059; *Wood v. Housewright*, 900 F.2d 1332, 1335 (9th
Cir.1990); *Hunt v. Dental Dep't*, 865 F.2d 198, 200 (9th Cir.1989); *Shapley v. Nevada Bd. of State Prison
Comm'rs*, 766 F.2d 404, 407 (9th Cir. 1985). "A prisoner need not show his harm was substantial;
however, such would provide additional support for the inmate's claim that the defendant was
deliberately indifferent to his needs." *Jett*, 439 F.3d at 1096; s*ee also McGuckin*, 974 F.2d at 1060.
However, as discussed above, even viewing the facts as they currently exist in the record in the light most
favorable to the plaintiff, plaintiff experienced significant pain and deformity over the course of several
years, and even defendants' own 2014 CRC report indicates there were some treatments being used in the
field of urology which may have been available at the time to treat plaintiff's symptoms.

[17] The Court notes that defendants also argue they are entitled to summary judgment because plaintiff
fails to allege any specific injury suffered from or linked to conduct by an individual defendant and
plaintiff cannot demonstrate any individual defendant engaged in a medically unacceptable course of
treatment. Dkt. 47, at 17-18, Defendants' Motion for Summary Judgment. However, it is undisputed that
defendants were all members of the CRC (on at least one of the occasions in question) and that the CRC
voted against referring plaintiff for a urology consult "by consensus" i.e. by general agreement. Dkt. 53,
at 4, Edwards Decl; Dkt. 81, at 4, 80, Amended Kahrs Decl., Exh. W; Dkt. 92, at ¶4.5, Second Amended
Complaint. The evidence indicates defendants were members of the CRC and were present for at least
one of the meetings in question. *Id.* While several of the defendants indicate they do not remember what
transpired, none of the defendants presents evidence that they did not participate in the decision, or that
they disagreed with the rest of the CRC's decision to deny the request for the consult or to prescribe the
medication recommended by the urology specialist Dr. Russell. *See, e.g.*, Dkt. 81, at 4, 80, Amended
Kahrs Decl., Exh. W. At this early point in the litigation, with discovery just beginning, the Court cannot
conclude defendants are entitled to summary judgment on this issue at this point. *See, e.g., Rutherford v.*

1    As such, the Court agrees with plaintiff that ruling with respect to defendants' other

2  arguments (as opposed to the qualified immunity argument) would, at this point, be premature.

3  Accordingly, the remainder of defendants' motion for summary judgment should be denied

4  without prejudice as premature at this point in the litigation. Defendants should be granted leave

5  to move again, if appropriate, at the close of discovery.

6                                    CONCLUSION

7    Based on the foregoing discussion, the undersigned recommends the Court deny

8  defendants' motion for summary judgment on qualified immunity grounds. The Court also

9  recommends the remainder of the defendants' motion for summary judgment be denied without

10  prejudice as premature at this point in the litigation and that defendants be granted leave to move

11  again, if appropriate, at the close of discovery.

12    The parties have **fourteen (14) days** from service of this Report and Recommendation to

13  file written objections thereto. 28 U.S.C. § 636(b)(1); FRCP 6; FRCP 72(b). Failure to file

14  objections will result in a waiver of those objections for purposes of appeal. *Thomas v. Arn*, 474

15  U.S. 140 (1985). Accommodating this time limitation, this matter shall be set for consideration

16  on **June 7, 2019**, as noted in the caption.

17    Dated this 23rd day of May, 2019.

18                                    *Theresa L. Fricke*

19                                    Theresa L. Fricke
                                      United States Magistrate Judge

20

---

21  *City of Berkeley*, 780 F.2d 1444 (9th Cir. 1986) *overruled on other grounds by Graham v. Connor*, 490
    U.S. 386 (1989) (even though the plaintiff could not recall whether the three defendant officers were

22  among the officers who had beaten him, because they were among the five or six officers who surrounded
    him while he was being attacked, a jury could reasonably find that they participated in the assault).

23  Plaintiff should have the opportunity to conduct discovery and defendants given leave to move again, if
    appropriate, at the close of discovery.

24

25  REPORT AND RECOMMENDATION TO DENY
    DEFENDANTS' SUMMARY JUDGMENT MOTION
    CONCERNING QUALIFIED IMMUNITY - 34