UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT TACOMA

R.M.,

                          Plaintiff,

         v.

State of Washington, et al.,

                          Defendants.

Case No. 3:18-cv-05387-BHS-TLF

REPORT AND
RECOMMENDATION

Noted for <u>January 13, 2023</u>

This matter is before the Court on defendants' second motion for summary judgment. Dkt. 162. Plaintiff's Second Amended Complaint brings 42 U.S.C. § 1983 claims against defendants for alleged Eighth Amendment violations in providing inadequate medical care, as well as state law medical negligence claims. This matter has been referred to the undersigned Magistrate Judge. *Mathews v. Weber*, 423 U.S. 261 (1976); 28 U.S.C. § 636(b)(1)(B); Local Rule MJR 4(a). For the reasons set forth below, the undersigned recommends the Court recommends that defendants' motion for summary judgment be GRANTED in part and DENIED in part; the Court recommends that all of plaintiff's claims, except his claims against defendants Edwards and Kroha for failure to treat plaintiff's pain, be DISMISSED with prejudice.

<u>PROCEDURAL HISTORY</u>

Plaintiff, a prisoner currently confined at Clallam Bay Corrections center ("CBCC"), initiated this 42 U.S.C. 1983 action, through counsel, on May 15, 2018. Dkt. 1. Plaintiff has been represented by counsel throughout the majority of the pendency of

this case, until his counsel was permitted to withdraw—with plaintiff's consent—on July 22, 2021. Dkt. 134. Plaintiff is now unrepresented.

Plaintiff's Second Amended Complaint alleges defendants, employees of the Department of Corrections ("DOC"), violated his Eighth Amendment rights by acting with deliberate indifference to his serious medical need in addressing his Peyronie's disease (PD). Dkt. 92 at 9–10. Plaintiff also alleges state law medical negligence claims against the individual defendants based upon their alleged breach of their duty to properly treat him and seeks to hold the State of Washington liable for its employees' alleged negligence based upon *respondeat superior*. *Id*. at 10. Plaintiff claims that defendants delayed approximately three years before referring him to a urologist after his initial diagnosis in 2014, and failed throughout the relevant period to provide adequate treatment for his Peyronie's Disease and associated pain. *Id*. at 5–9. Plaintiff's claims arose during both his current confinement at CBCC and his previous confinement at the Washington State Penitentiary ("WSP"). *Id*. at 2

The individual defendants are current and former Department of Corrections ("DOC") employees, medical professionals and medical contractors, who were members of the Care Review Committee ("CRC") that made decisions related to plaintiff's treatment. *Id*. at 1–10. Three of these defendants—James Edwards, M.D., Edith Kroha, ARNP, and J. David Kenney, M.D.—directly examined or treated plaintiff in addition to participating in at least one of the CRC decisions at issue. *Id*.[1] The State of

---

[1] The following individual defendants named in the Second Amended Complaint who remain in this case are identified as employees of the State of Washington and members of the CRC: Sheryl Allbert, Allison Berglin, Diego Lopez de Castilla, Dale Fetroe, Steven Hammond, Mary Keppler, Frank Longano, Ken E. Moore, Shirlee M. Neisner, Martha Newlon, Joan Palmer, Kelly Remy, Jon Reyes, Kenneth Sawyer, F. John Smith, Bo Stanbury, and Jane and John Does 1-10. Dkt. 92, at 3-5. Plaintiff has dismissed five

Washington is also named as a defendant—but with respect to plaintiff's state law

negligence claim only. *Id.* at ¶3.2.

Prior to counsel's withdrawal, defendants brought an early motion for summary

judgment. Dkt. 47 (the "First Summary Judgment Motion"). The Court addressed only

the issue of qualified immunity, deferring defendants' remaining grounds for dismissal

until the completion of discovery. This Court recommended denial of the portion of the

motion based upon qualified immunity. Dkt. 102 (the "First RR"). The undersigned

concluded that, viewing the factual record developed at that early stage of the

proceedings (and prior to the introduction of expert evidence) in the light most favorable

to plaintiff, a reasonable jury could find that defendants acted with deliberate

indifference in delaying plaintiff's examination by a urology specialist. *Id*. at 23–32. The

District Court adopted this Court's Report and Recommendation in part, denying

defendants' motion. Dkt. 106

The parties then conducted further fact and expert discovery. *See* Dkt. 110

(amended scheduling order). As the discovery cutoff approached, plaintiff's counsel

sought, with plaintiff's consent, to withdraw. Dkt. 117. The Court entered an order

directing the Clerk to identify *pro bono* counsel to take over the representation of plaintiff

and suspended the case schedule until it was known whether counsel could be

appointed. Dkts. 131, 132. However, despite multiple efforts, the Clerk was

unsuccessful in locating volunteer *pro bono* counsel. Dkt. 134. Plaintiff has therefore

been unrepresented since the Court permitted counsel's withdrawal on July 22, 2021.

---

additional named defendants: Sheri Malakhova, Dale Robertson, Kevin Bovenkamp, Barbara Braid and Kenneth Lauren.

After counsel's withdrawal, the Court issued an order providing for limited additional discovery, including a direction to plaintiff to indicate whether he would be proceeding with Dr. Walsh as his expert witness—and requiring him to cooperate in the scheduling of Dr. Walsh's deposition if he were so proceeding. Dkt. 155 at 3. It appears plaintiff has decided not to proceed with Dr. Walsh as his expert. *See* Dkt. 168 at 2 and Dkt. 167 at 5 (referring to Dr. Walsh as plaintiff's "previous medical expert Urologist.").

The parties have now completed their discovery, and defendants have filed a second motion for summary judgment. Dkt. 162. Defendants rely upon the declarations submitted with their First Summary Judgment Motion (Dkts. 51–53, 55–58, 60) and have also submitted an expert report from Dennis M. Gaskill, M.D. Dkt. 163-1. Plaintiff has submitted a response, which incorporates the evidence submitted in response to defendant's First Summary Judgment Motion (Dkts. 79, 81); plaintiff has also submitted an additional declaration ("Second Plaintiff Dec.") attaching exhibits. Dkts. 167, 168.[2] Defendants have replied and submitted a supplemental declaration. Dkts. 169, 170.

## FACTUAL BACKGROUND

Plaintiff first experienced pain and curvature of his penis in October 2013, after receiving treatment for Hepatitis C. Dkt. 168 (Second Plaintiff Dec.) at ¶ 12. He initially sought medical attention in June 2014 after being awakened by severe pain in his penis and discovering hard lumps. *Id*. at ¶ 13.

Plaintiff sought medical care for his condition on July 14, 2014; he was concerned that his symptoms might have been caused by his blood pressure or

---

[2] Plaintiff's materials contain references to treatments for unrelated medical conditions (fatigue and sleep apnea). Dkt. 167 at 4; Dkt. 168 at p 30–33. The Court has not considered those references.

1   Hepatitis C medications. Dkt. 58 (Phillips Dec.) at ¶ 6. Plaintiff was seen by non-

2   defendant Physician's Assistant Joella Phillips, who is familiar with PD from prior

3   experience with at least two other patients with the condition. Dkt. 58 (Phillips Dec.) at

4   ¶¶ 5, 6.

5       Ms. Phillips assessed plaintiff's symptoms as PD, and asked Defendant Edwards

6   (WSP Facility Medical Director) to confirm her assessment. *Id* at ¶ 6. Defendant

7   Edwards is familiar with PD through his education and his experience with a few cases

8   in his medical practice. Dkt. 53 (Edwards Dec.) at ¶ 6. Defendant Edwards confirmed

9   the assessment of PD, informed plaintiff it was very unlikely to be related to plaintiff's

10  medications, and consulted a subscription on-line medical source called

11  UpToDate.com, which recommended evaluation by a urologist. *Id*. at ¶7. At Defendant

12  Edwards' request, Ms. Phillips submitted a urology consultation request to the CRC.[3] *Id*.

13  at 8.

14  A.   <u>August 6, 2014 CRC Review</u>

15      The CRC considered, and denied, the urology consultation request at its August

16  6, 2014 meeting.[4] Dkt. 81 (Amended Kahrs Dec.) at 57. The committee heard from a

17  member with urology experience and reviewed medical literature indicating there was

18  no definitive treatment or cure for PD, as well as "UpToDate" information indicating pain

19  related to this condition resolves in two years. *Id*; Dkt. 53 (Edwards Dec.) at ¶9. The

20  CRC concluded the requested consultation was not medically necessary. Dkt. 81 at 57.

21

22  [3] The CRC is "a committee created under Section IX of the DOC Offender Health Plan for the purpose of
    determining whether requests for purchased health care services are or are not medically necessary."
    Dkt. 53, at 4.

23  [4] The following remaining named defendants were present at this meeting: Kelly Remy, Diego Lopez de
    Castilla, Mary Keppler, Sheryl Albert, Frank Longano, James Edwards, F. John Smith, Jon Reyes, Ken
24  Moore, Kenneth Sawyer, David Kenney, and Steven Hammond.

25

B.    Follow-up Treatment by Defendant Edwards

Plaintiff filed a grievance contesting the denial. Dkt. 168 (Second Plaintiff Dec.) at ¶ 14. The grievance describes plaintiff's condition as excruciating, continually waking him up at night, and sometimes making it difficult to use the bathroom. *Id*. On November 13, 2014, plaintiff met with non-defendant Physician's Assistant Jen Ambrose. *Id*. Plaintiff presented an affidavit to Ms. Ambrose, which reported awakening at night due to pain, and occasional painful urination. *Id*. Ms. Ambrose's report of the meeting, however, states plaintiff reported "neg painful urination." *Id*; Dkt. 81 (Kahrs Dec.) at 60.

Defendant Edwards examined plaintiff on November 20, 2014. Dkt. 53 (Edwards Dec.) at ¶ 10, p. 49. Plaintiff reported curvature and pain in the lumps in his penis during erections; he also reported shortening and inability to masturbate. *Id*. Defendant Edwards stated his examination looked the same as on July 31, 2014, noting fibrous nodules and no observable deformity—but noting the penis was not erect. *Id*. After consulting the UpToDate database and discussion with plaintiff, defendant Edwards prescribed a 180-day trial of one of the suggested medications—Trental. *Id*.

On January 8, 2015, plaintiff was again examined by defendant Edwards. Dkt. 53 (Edwards Dec.) at p. 52. Plaintiff states he informed defendant Edwards that the pills (Trental) weren't helping, he was still experiencing severe pain with nocturnal erections and intermittent dull throbbing pain during the day, and that he actually felt the pain was worsening. Dkt. 79 (First Plaintiff Dec.) at ¶ 20. Defendant Edwards' report, however, states that plaintiff believed the Trental was helping slow the progression "a little bit." Dkt. 53 at p. 52. Defendant Edwards also noted that plaintiff still had "severe pain with nocturnal erections" and that plaintiff was upset DOC had not allowed him to see a urologist. *Id*. The examination showed "the same multiple, firm plaques of scar tissue of

1  the penile shaft, characteristic of Peyronie's disease" as on previous visits, and

2  defendant Edwards was "unable to detect any progression on exam." *Id.* Defendant

3  Edwards informed plaintiff that the only suggestion he could make was to take the issue

4  back to the CRC. *Id.*

5  C.  <u>January 21, 2015 CRC Review</u>

6      Defendant Edwards submitted another request to the CRC for a urology

7  consultation, which was considered at the CRC's January 21, 2015 meeting.[5] Dkt. 53

8  (Edwards Dec.) at 53. Defendant Edwards reported to the Committee that plaintiff

9  recounted severe pain with nocturnal erections but did not have problems urinating or

10 other symptoms, although he complained of deformity of his penis. Dkt. 53 (Edwards

11 Dec.) at ¶ 13. Defendant Edwards also reported his examination found plaques but

12 otherwise noted no problems. *Id.* The committee found, by consensus, that a urology

13 consultation was not medically necessary and denied the request. *Id*.

14 D.  <u>Treatment by Defendant Kroha</u>

15     Plaintiff next sought treatment for PD two years later, on January 3, 2017; by this

16 time, he had been transferred to CBCC and was seen by defendant ARNP Kroha. Dkt.

17 52 (Kroha Dec) at ¶ 5 and p. 5. Plaintiff's prescription for Trental had, by this time,

18 expired. Dkt. 79 (First Plaintiff Dec.) at ¶ 21. Plaintiff reported his penis had reduced in

19 size by 50% and he had painful erections and moving nodules. Dkt. 52 (Kroha Dec.) at

20 ¶ 5 and p. 5. Plaintiff stated he did not believe his prior PD diagnoses. *Id.*

21

22

23 [5] The following remaining named defendants were present at this meeting: Dale Fetroe, Edith Kroha,
Kelly Remy, Diego Lopez de Castilla, Bo Stanbury, Mary Keppler, Joan Palmer, Sheryl Albert, Martha
Newlon, Frank Longano, David Kenney, Eric Larsen, James Edwards, F. John Smith, Jon Reyes, Ken
24 Moore, Shirlee Neisner, Allison Berglin, Kenneth Sawyer, and Steven Hammond.

25

Defendant Kroha examined plaintiff and found palpable ribbons of fibrous firm tissue along the penile shaft. *Id*. She assessed his condition as PD but plaintiff "steadfastly denied this." *Id*. Plaintiff explains his denial was based on his understanding that pain from PD would resolve after two years—yet his pain was continuing past that time period. Dkt.168 (Second Plaintiff Dec.) at ¶ 18.

Plaintiff saw defendant Kroha again on June 13, 2017 and inquired regarding a urology referral. Dkt. 52 (Kroha Dec.) at ¶ 6 and pp. 6–7. Plaintiff again complained of reduced size, painful erections, and a greater amount of fibrous tissue. *Id*. Defendant Kroha's examination observed a row of nodules along the penile shaft, she measured plaintiff's penis[6], and she reported that plaintiff denied any interference with urinary stream or function. *Id*. Defendant Kroha assessed plaintiff's condition as PD and found his condition was unchanged over three years; she recommended continued observation. *Id*. Plaintiff again disputed the diagnosis. *Id*.

E.    Examination by Defendant Kenny for Grievance Investigation

Defendant Kenny examined plaintiff during the investigation of a grievance by plaintiff seeking a urology referral and questioning his PD diagnosis. Dkt. 51 (Kenney Dec.) at ¶ 7; Dkt. 79 (First Plaintiff Dec.) at 13. Defendant Kenney is aware of PD through his training and experience managing patients with the condition. He states that PD is an incurable disease that had no completely satisfactory treatments in 2017—or today. Dkt. 51 at ¶ 6.

Plaintiff reported painful nocturnal erections with bending and twisting, scar tissue with migrating lumps, reddened skin and diminished diameter of his penis. *Id*. at ¶

---

[6] The measurements are disputed. Dkt. 52 at ¶ 6; Dkt. 168 (Second Plaintiff Dec.) at ¶ 16.

8

7 and p. 5. Defendant Kenney recounts that plaintiff said he had no urinary symptoms, testicular pain or complaints and his main concerns were that his penis was smaller in size and had a lump, and that he had painful erections and loss of function. *Id*.

Defendant Kenney's assessment was that plaintiff gave a history of migratory penis lumps which have coalesced in the dorsal surface of his penis, painful erections lasting minutes accompanied by bending and twisting, and loss of penile mass. *Id*. The examination was normal with no discrete lump and did not reveal any physical changes. *Id*. Defendant Kenney discussed with plaintiff penile anatomy and his request for a urology consultation. *Id*. He discussed management of plaintiff's condition with defendant Kroha, and they agreed she would present a request for urology consultation to the CRC. *Id*.

F.    August 16, 2017 CRC Meeting

Defendant Kroha presented a third request to the CRC for a urology consultation at its August 16, 2017 meeting.[7] Dkt. 52 (Kroha Dec.) at ¶ 7 and p. 8. The presentation noted the request was made by plaintiff, who reported worsening symptoms, although examinations of plaintiff had been normal. Dkt. 52 at 8. The Committee's report indicates plaintiff is "overly concerned about this" and suggests there "might be some merit" to consult with a urologist "who will probably find it is also normal." Dkt. 52 at 9. The Committee approved the request for a urology consultation. *Id*.

---

[7] The following remaining named defendants were present at this meeting: John Kenney, Edith Kroha, Bo Stanbury, Sheryl Albert, Martha Newlon, Joan Palmer, John Smith, Jon Reyes, Ken Moore, and Kenneth Sawyer.

G.    Urology Consultation with Dr. Russell

Plaintiff received a urology consultation with Dr. Byron D. Russell on October 6, 2017. Dr. Russell diagnosed "probable Peyronie's disease fluctuating in location." Dkt. 52 at p. 10. He found no discrete nodule on the shaft of the penis. *Id*. at p. 12. Dr. Russell discussed treatment options with plaintiff but stated they "generally have been disappointing." *Id*. at 13. The options are: (1) topical verapamil,; (2) intracorporeal verapamil or Xiaflex and (3) penile implant. Dr. Russell noted that the first option is the least invasive and most conservative approach—but "cures are not that common." The injection option requires a "discrete lesion to inject and on exam [plaintiff] does not have that finding." *Id*. Finally, he characterized the third option as "aggressive" and "radical" and expressed uncertainty whether, as a prisoner, plaintiff would be considered for such treatment. *Id*. Dr. Russell suggested a trial of topical verapamil and issued a prescription for it. *Id*. at 13, 16.

Dr. Russell also made notes of a follow-up telephonic discussion with Dr. Aurich (CBCC Facility Medical Director) on February 12, 2018. Dkt. 81 (Kahrs Dec.) at 75. Dr. Russell stated the severity of any deformity cannot be confirmed without an erection and it is therefore difficult to advise on treatment options—and his practice does not handle surgical or injection solutions but instead refers to other facilities. *Id*. Dr. Russell stated that "it is unclear whether an inmate who is expected to spend the rest of his life in prison needs aggressive management," while also acknowledging that in light of reported pain with erections "it is difficult to withhold treatment altogether." *Id*.

H.     November 8, 2017 CRC Meeting

On November 8, 2017, the CRC considered plaintiff's request for all three treatment options suggested by Dr. Russell.[8] Dkt. 168 (Second Plaintiff Dec) at 42, 45, 48. The Committee noted Dr. Russell's opinion that treatment options "generally have been disappointing" and his comment that success with topical Verapamil is "not that common," as well as on-line resources indicating that transdermal use is "usually only during clinical trials." *Id*. The Committee also noted Dr. Russell's opinion that the intracorporeal injection option requires discrete lesions—which were not present in plaintiff's case—and his statement that the penile implant option, while "the best solution to both maintain quality of erections and prevent further loss of length," is "the most aggressive, radical approach." *Id*. The Committee denied all three options as not medically necessary and recommended continued clinical monitoring. *Id*.

Plaintiff grieved this outcome. Dkt. 79 (First Plaintiff Dec.) at 20–23. Plaintiff's grievances were denied at all levels. *Id*. During the course of the investigation of the grievance, Dr. Aurich met with plaintiff. Dkt. 168 (Second Plaintiff Dec.) at 51. Plaintiff reported to Dr. Aurich that he has been able to obtain only partial, not full, erections for three years, and for more than a year had no longer been getting spontaneous morning erections. *Id*. Dr. Aurich reports that he told plaintiff his PD diagnosis is described only as "probable" because none of plaintiff's examinations was performed during an erection—and the CBCC clinic was unable to perform an anesthetized intracavernous saline injection to confirm the diagnosis. *Id*.

---

[8] The following remaining named defendants were present at this meeting: Edith Kroha, Kelly Remy, Martha Newlon, Frank Longano, David Kenney, Eric Larsen, Joan Palmer, F. John Smith, Ken Moore, and Kenneth Sawyer.

I.    Expert Evidence

Defendants submitted an expert report (and a supplement) from Dennis M. Gaskill, M.D., a board-certified clinical urologist. Dkt. 163-1. Dr. Gaskill's report is made under penalty of perjury. *Id*. at 4.

Dr. Gaskill states that PD is an abnormality resulting from a wound healing disorder that causes the formation of scar tissue—which in turn causes the penis to bend and to shorten. Dkt. 163-1 at 3. The abnormal scarring "is not reversible." *Id*. PD usually presents in two phases: (1) an acute phase (usually lasting 6 months to a year) associated with penile pain with erections and a progressive curvature of the penis; and (2) the chronic phase during which the pain usually resolves but penile deformities persist. *Id*. "Early treatment of PD usually does not halt progression of the disease." *Id*. Furthermore, "there is no known cure for PD to date." *Id*. Aside from sexual dysfunction, PD usually does not interfere with normal work or recreational activities, nor with usual physiological functions like urination. *Id*.

Treatment of PD includes oral, topical and injectable agents, penile traction and surgical intervention. *Id*. Pentoxifylline (Trental) has been shown to improve curvature and decrease plaque volume--but has not been shown to relieve penile pain with erections. *Id*. While Verapamil has been used topically, no topical medication has been shown to improve outcomes in PD patients. *Id*. Injectable agents can improve angulation of the penis but usually do not improve pain with erections—and require the presence of a target plaque to be effective. *Id*. Injectable medications are not used until the patient enters the second, chronic, phase of the disease, and they carry the risk of penile rupture. *Id*. Similarly, surgical management is not indicated until the patient is in the chronic phase. Its efficacy depends on the severity of curvature and extent of

1    erectile dysfunction. Surgery is not indicated for penile pain, and "[a]ll surgical options

2    for PD are considered elective and not medically necessary." *Id*. Finally, narcotics are

3    not typically indicated for PD. *Id*.

4        Based upon his review of plaintiff's medical records, Dr. Gaskill opines that

5    plaintiff presented with "classical symptoms" of PD. *Id*. at 4. There are "no treatment

6    regimens for the acute phase" of PD "other than anti-inflammatories." *Id*. The use of

7    Trental, which is the only oral medication to show some modest improvement in

8    curvature, was "appropriate conservative treatment" by defendant Edwards during the

9    2014-15 time period. *Id*. Injectable medications would not have been appropriate during

10   the 2014-15 time period, because they are not appropriate during the acute phase and

11   plaintiff's reports of pain at that time indicate he was still in the first phase. Moreover,

12   plaintiff did not have a discrete, palpable lesion suitable for injection therapy in 2017

13   and, because such lesions typically do not resolve, this suggests he did not have such a

14   lesion in 2014/15 either. *Id*.

15       Dr. Gaskill opines that Defendant Edwards provided adequate care for plaintiff's

16   PD and appropriately managed plaintiff's condition in 2014/15 with Trental. *Id*.

17   Conservative measures such as this can be delivered by a primary health care provider

18   with experience in the management of PD. *Id*. Dr. Gaskill also opines that the CRC

19   committee members did not breach the standard of care, because a Urology

20   consultation was not medically necessary. *Id*. Even if plaintiff had seen a specialist, his

21   outcome "would likely be the same." *Id*. Because treatment options for PD are unproven

22   and not medically necessary, even if options besides Trental had been indicated or

23

24

25

1  available in 2014/15, "it is unlikely that they would have improved or changed [plaintiff's]

2  condition." *Id.*

3      Plaintiff has submitted a report from Dr. Thomas Walsh, who he describes as his

4  "previous medical expert Urologist." Dkt. 168 (Second Plaintiff Dec.) at ¶ 5 and pp 22–

5  29. Thus, plaintiff has withdrawn Dr. Walsh as an expert and will not present his

6  testimony at trial. For the reasons discussed below, the report is not evidence that can

7  be considered for purposes of summary judgment.

8                              DISCUSSION

9  A.    Summary Judgment Standard

10      Summary judgment is supported "if the pleadings, the discovery and disclosure

11  materials on file, and any affidavits show that there is no genuine issue as to any

12  material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ.

13  P. 56(c). The moving party bears the initial burden to demonstrate the absence of a

14  genuine dispute of material fact for trial. *Celotex Corp. v. Catrett,* 477 U.S. 317, 323

15  (1986). A genuine dispute concerning a material fact is presented when there is

16  sufficient evidence for a reasonable jury to return a verdict for the non-moving party.

17  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 253 (1986). A "material" fact is one which

18  is "relevant to an element of a claim or defense and whose existence might affect the

19  outcome of the suit," and the materiality of which is "determined by the substantive law

20  governing the claim." *T.W. Elec. Serv., Inc. v. Pac. Elec. Contractors Ass'n*, 809 F.2d

21  626, 630 (9th Cir. 1987).

22      When the Court considers a motion for summary judgment, "[t]he evidence of the

23  non-movant is to be believed, and all justifiable inferences are to be drawn in [their]

24  favor." *Id.,* at 255. Yet the Court is not allowed to weigh evidence or decide credibility.

25

*Anderson v. Liberty Lobby, Inc.*, at 255. If the moving party meets its initial burden, an adverse party may not rest upon the mere allegations or denials of the pleadings; the non-moving party's response, by affidavits or as otherwise provided in Fed. R. Civ. P. 56, must set forth specific facts showing there is a genuine issue for trial. Fed. R. Civ. P. 56(c). The Court may not disregard evidence solely based on its self-serving nature. *Nigro v. Sears, Roebuck & Co.,* 784 F.3d 495, 497 (9th Cir. 2015).

In response to the motion for summary judgment, the nonmoving party is required to present specific facts, and cannot rely on conclusory allegations. *Hansen v. United States,* 7 F.3d 137, 138 (9th Cir. 1993). The court must determine whether the specific facts that are presented by the non-moving party, considered along with undisputed context and background facts, would show that a rational or reasonable jury might return a verdict in the non-moving party's favor based on that evidence. *Emeldi v. Univ. of Oregon,* 698 F.3d 715, 728-29 (9th Cir. 2012).

B.    <u>Section 1983 Standard</u>

To state a claim under 42 U.S.C. § 1983, a complaint must allege: (a) the conduct complained of was committed by a person acting under color of state law, and (b) the conduct deprived a person of a right, privilege, or immunity secured by the Constitution or laws of the United States. *See Parratt v. Taylor*, 451 U.S. 527, 535 (1981), *overruled on other grounds*, *Daniels v. Williams*, 474 U.S. 327 (1986). Section 1983 is the appropriate avenue to remedy an alleged wrong only if both of these elements are present. *See Haygood v. Younger*, 769 F.2d 1350, 1354 (9th Cir. 1985).

The causation requirement of Section 1983 is satisfied only if a plaintiff demonstrates that a defendant did an affirmative act, participated in another's affirmative act, or omitted to perform an act which he was legally required to do that

1  caused the deprivation complained of. *Leer v. Murphy*, 844 F.2d 628, 633 (9th Cir.

2  1988) (quoting *Johnson v. Duffy*, 588 F.2d 740, 743–44 (9th Cir. 1978)). In addition,

3  government officials may not be held liable for the unconstitutional conduct of their

4  subordinates under a theory of supervisory liability. *See Monell v. Dept. of Soc. Servs*.

5  *of City of New York*, 436 U.S. 658, 691 (1978) (finding no vicarious liability for a

6  municipal "person" under 42 U.S.C. § 1983). Because vicarious liability is inapplicable to

7  Section 1983 suits, a plaintiff must plead that each government-official defendant,

8  through the official's own individual actions, has violated the Constitution.

9  C.    Defendants' Motion to Strike

10         Defendants request that the Court strike, or decline to consider, the report of

11  plaintiff's former expert, Dr. Walsh (Dkt. 168 at 22–29), which plaintiff attached to his

12  declaration. Dkt.169 at 8–9. Defendants note that plaintiff acknowledges Dr. Walsh is no

13  longer his expert, and this means Dr. Walsh will not testify at trial. Defendants also

14  contend Dr. Walsh's report is inadmissible for the separate reason that it is not made

15  under penalty of perjury.

16         A court may consider only admissible evidence in ruling on a motion for summary

17  judgment. *Orr v. Bank of America, NT & SA,* 285 F.3d 764, 773 (9th Cir. 2002); *see also*

18  Fed. R. Civ. P. 56(c). A party may object to cited documentation on the ground that the

19  material would not be admissible in evidence. Fed. R. Civ. P. 56(c)(2). Admissible

20  declarations or affidavits must be based on personal knowledge, must set forth facts

21  that would be admissible in evidence, and must show the declarant or affiant is

22  competent to testify on the matters stated. Fed. R. Civ. P. 56(c)(4). They must also be

23  signed under penalty of perjury. 28 U.S.C. § 1746.

24

25

1    At the summary judgment stage, the Court is focused on the admissibility of the

2    content, rather than the form, of the evidence. *Fraser v. Goodale*, 342 F.3d 1032, 1036–

3    37 (9th Cir. 2003), *Block v. City of Los Angeles*, 253 F.3d 410, 418–19 (9th Cir. 2001)

4    ("To survive summary judgment, a party does not necessarily have to produce evidence

5    in a form that would be admissible at trial, as long as the party satisfies the

6    requirements of Federal Rule of Civil Procedure 56."). Thus, even declarations that

7    contain hearsay may be considered at summary judgment if the content could be

8    presented in admissible form at trial. *Fonseca v. Sysco Food Servs. of Arizona, Inc.*,

9    374 F.3d 840, 846 (9th Cir. 2004). Furthermore, District courts must "construe liberally

10   motion papers and pleadings filed by *pro se* inmates and . . . avoid applying summary

11   judgment rules strictly[.]" *Thomas v. Ponder*, 611 F.3d 1144, 1150 (9th Cir. 2010).

12   Here, plaintiff presents the opinion of an expert witness, but he acknowledges the

13   expert will not present evidence in the event of at trial. Thus, regardless of the form in

14   which the evidence is presented on summary judgment, the record shows the evidence

15   will *not* be presented at trial.

16   Since Dr. Walsh will not be a trial witness, his statement is inadmissible hearsay:

17   it is an out of court statement presented for the truth of the matter asserted. *See* Fed. R.

18   Evid. 801(c). The report does not fall within the definitional exclusions of Fed. R. Evid.

19   801(d): because Dr. Walsh will not be testifying at trial, the report does not qualify as a

20   prior statement of a testifying witness; and because it is plaintiff who seeks to introduce

21   the evidence of his own withdrawn witness, it does not qualify as a statement of an

22   opposing party. Thus, there is no avenue by which the information contained in the

23

24

25

report may be presented at trial, and the report should be excluded as inadmissible hearsay.

In addition, the report presented by plaintiff cannot be considered as evidence for the separate reason that it is not signed under penalty of perjury. *See* 28 U.S.C. § 1746. Without such an affirmation, the report cannot be considered as evidence. *Davis v. Solid Waste Servs., Inc.*, 20 F. Supp. 3d 519, 523 n.3 (E.D. Pa. 2014), *aff'd,* 625 F. App'x 104 (3d Cir. 2015).

The Court therefore recommends defendants' motion to strike the expert report of Dr. Walsh, Dkt. 168 at 2222–2929, be GRANTED. However, the Court should consider the Guidelines of the American Urological Association ("AUA Guidelines") that are discussed in the report—and which plaintiff separately submits (Dkt. 168 at 31–38). The Guidelines are also discussed in the report of defendant's expert, Dr. Gaskill and, in any event, could be introduced at trial during his cross examination. It is therefore proper to consider them on summary judgment.

D.    Plaintiff's Section 1983 Claims for Medical Deliberate Indifference

Plaintiff's complaint alleges that defendants' delay in referring him to a consulting Urologist and their failure to adopt any of the consultant's recommended treatment modalities violated his Eighth Amendment rights. Dkt. 92. In addition, plaintiff contends in his summary judgment response that defendants Edwards, Kroha and Kenny violated his rights by failing to advise or prescribe Non-Steroidal Anti-Inflammatory medications ("NSAIDS") to alleviate his pain, and by failing to conduct an examination of his erect penis to obtain a definitive diagnosis of PD. Dkt. 167 at 7–8.

"[T]o maintain an Eighth Amendment claim based on prison medical treatment, an inmate must show 'deliberate indifference to serious medical needs.'" *Jett v. Penner*,

439 F.3d 1091, 1096 (9th Cir. 2006) (*quoting Estelle v. Gamble*, 429 U.S. 97, 104

(1976)). The two-prong test for deliberate indifference requires the plaintiff to show (1)

"'a serious medical need' by demonstrating that 'failure to treat a prisoner's condition

could result in further significant injury or the unnecessary and wanton infliction of pain,'"

and (2) "the defendant's response to the need was deliberately indifferent." *Jett*, 439

F.3d at 1096 (*quoting McGuckin v. Smith*, 974 F.2d 1050, 1059 (9th Cir. 1992)

*overruled on other grounds by WMX Techs., Inc. v. Miller*, 104 F.3d 1133 (9th Cir.

1997)).

The defendants must have known of and disregarded an excessive risk to the

plaintiff's health. *Farmer v. Brennan*, 511 U.S. 825, 837 (1994). Deliberate indifference

is shown when prison officials consciously disregard an excessive risk of harm to an

inmate's health or safety. *Id*. at 838–40. It is "obduracy and wantonness, not

inadvertence or error in good faith, that characterize the conduct prohibited by the Cruel

and Unusual Punishment Clause[.]" *Wilson v. Seiter*, 501 U.S. 294, 299 (1991).

Deliberate indifference "may appear when prison officials deny, delay or

intentionally interfere with medical treatment, or [ ] may be shown by the way in which

prison physicians provide medical care." *Hutchinson v. United States*, 838 F.2d 390, 394

(9th Cir. 1988). However, delay in providing a prisoner treatment, standing alone, does

not constitute an Eighth Amendment violation unless the delay causes harm. *See*

*McGuckin,* 974 F.2d at 1059; *Amarir v. Hill*, 243 F. App'x. 353, 354 (9th Cir. 2007).

A prison inmate has no independent constitutional right to outside medical care

supplemental or additional to the medical care provided by the prison staff within the

institution. *See Roberts v. Spalding,* 783 F.2d 867, 870 (9th Cir. 1986). But under

circumstances where the prison's medical staff is not competent to examine, diagnose, and treat inmates' medical problems, they must "refer prisoners to others who can." *Hoptowit v. Ray*, 682 F.2d 1237, 1253 (9th Cir. 1982), *overruled on other grounds*, *Sandin v. Conner*, 515 U.S. 472 (1995); *see also Ortiz v. City of Imperial*, 884 F.2d 1312, 1314 (9th Cir. 1989).

Finally, a mere difference of opinion about treatment between plaintiff and prison medical authorities "does not give rise to a § 1983 claim"—but it does not preclude one, either. *Franklin v. St. of Or., State Welfare Div.*, 662 F.2d 1337, 1344 (9th Cir. 1981); *Hamby v. Hammond*, 821 F.3d 1085, 1097 (9th Cir. 2016) (Gould, J., concurring in part and dissenting in part). "Deliberate indifference is a high legal standard. A showing of medical malpractice or negligence is insufficient to establish a constitutional deprivation under the Eighth Amendment." *Toguchi v. Chung*, 391 F.3d 1051, 1060 (9th Cir. 2004). A prisoner must instead show the chosen course of treatment "was medically unacceptable under the circumstances," and was chosen "in conscious disregard of an excessive risk to [the prisoner's] health." *Jackson v. McIntosh*, 90 F.3d 330, 332 (9th Cir. 1996); *see also Toguchi*, 391 F.3d at 1058.

1.    Delay in Urology Referral

Plaintiff asserts defendants acted with deliberate indifference in denying his 2014 and 2015 requests for a urology referral—and delaying the referral until 2017. Dkt. 92. Defendants, citing to Dr. Gaskill's opinions, contend an earlier referral to a Urology specialist was unnecessary because defendant Edwards was capable of providing adequate care during the acute phase of the disease, and an earlier consultation would not have improved or changed plaintiff's condition.

In the First RR, the Court recommended that, taking the facts as they were developed at the time in the light most favorable to the plaintiff, a reasonable jury could conclude that defendants' failure to make an early referral to a urologist constituted deliberate indifference. Dkt. 102 at 26. The Court came to this conclusion based on information in the record that defendants knew a referral was recommended by the on-line resource they consulted, and that treatments were available in the field of urology that could address both plaintiff's pain and his penile curvature. *Id*.

However, the Court also recognized that discovery—and in particular expert discovery—had not yet been completed, noting that it was not clear from the then-existing evidence whether specific treatments would have been available from a urologist and whether any such treatments would have been effective during the various time periods at issue. *Id*. at 33. Accordingly, while recommending denial of defendants' request for summary judgment on qualified immunity grounds, the Court deferred considering defendants' motion for summary judgment on the merits. *Id*. at 34.

The record now contains the expert opinion of Dr. Gaskill, which sheds additional light on those issues. Dkt. 163-1.

Dr. Gaskill's unrebutted testimony shows that PD has "no known cure to date" and early treatment "usually does not halt progression of the disease." *Id*. at 3. The disease progresses in two phases: (1) an acute phase associated with pain during erections and progressive curvature, and (2) a chronic phase where pain resolves but penile deformities persist. *Id*. During the acute phase, there are "no treatment regimens . . . other than anti-inflammatories," although Trental (the medication prescribed by defendant Edwards), is also an appropriate conservative treatment during this phase

and has shown some modest improvements in curvature. *Id*. at 4. In particular, injection and surgical treatments are not used during the acute phase of the disease. *Id*. at 3.

Here, plaintiff claims defendants improperly delayed his consultation with an expert urologist from 2014 until 2017, when he received the referral to Dr. Russell. But this was during the acute phase of plaintiff's PD—while he was continuing to experience pain during erections. Dr. Gaskill's unrebutted evidence establishes that none of the treatment modalities available from a specialist would have been available during that period, and he concludes that "if the patient had seen a urologist in 2014/15 his outcome would likely be the same." Dkt. 163-1 at 4. Referral to a urologist would not have made additional treatments available to plaintiff until his condition had progressed to stage two. Plaintiff therefore fails to establish that the delay in the referral caused him harm. Delay, without harm, does not violate the Eighth Amendment. *McGuckin,* 974 F.2d at 1059.

Liberally construing plaintiff's claims, he also appears to contend that his PD should have been managed from the outset by a specialist, rather than by defendant Edwards—based upon the AUA Guidelines. These guidelines provide best practices information; they are not mandatory or legally binding.[9] Guidelines 1 and 3 provide as follows:

> 1.   Clinicians should engage in a diagnostic process to document the signs and symptoms that characterize Peyronie's disease. The minimum requirements for this examination are a careful history (to assess penile deformity, interference with intercourse, penile pain, and/or distress) and a physical exam of the genitalia (to assess for palpable abnormalities of the penis).

---

[9] In addition, Dr. Gaskill notes that the AUA Guidelines were not published until April 2015 and therefore were not in place during plaintiff's initial diagnosis and early treatment. Dkt. 163-1 at 5. It is not clear whether any previous versions of the guidelines exist.

1

. . .

2      3.      Clinicians should evaluate and treat a man with Peyronie's
        disease only when [the clinician] has the experience and diagnostic
3        tools to appropriately evaluate, counsel, and treat the condition.

4  Dkt. 168 at 31.

5      Nothing in these guidelines requires that the clinician be a board-certified

6  urologist. Defendant Edwards has experience with patients with PD, and the record of

7  plaintiff's initial visit with Jo Ella Phillips and defendant Edwards reflects both a careful

8  history and a physical examination Dkt. 58 at 5. Dr. Gaskill opines that defendant

9  Edwards provided adequate care for plaintiff's PD based upon his experience and

10  knowledge of PD, and that conservative measures like prescribing Trental can

11  appropriately be handled by a primary health care provider with experience with PD

12  during the first phase of the disease. Dkt. 163-1 at 4.

13      Plaintiff has not established that defendants violated his Eighth Amendment

14  rights when they delayed his referral to a urology specialist.

15      2.      Denial of Treatment Options Suggested by Dr. Russell

16      Plaintiff contends his rights were violated by the CRC's denial of the three

17  treatment options suggested by Dr. Russell after his examination of plaintiff in 2017.

18  Dkt. 92 at 9. Defendants argue, based upon the testimony of Dr. Gaskill, that none of

19  the suggested treatments is medically necessary. Dkt. 169 at 8.

20      Dr. Russell's report suggests three possible treatment options: (1) topical

21  Verapamil, (2) injected Verapamil or Xiaflex, and (3) a penile implant. Dkt. 52 at 13. Dr.

22  Russell concedes that all of the suggested options "generally have been disappointing."

23  *Id*. He notes that "cures are not that common" with the topical option and characterizes

24  the implant option as "the most aggressive and radical approach." *Id*. Finally, although

25

1  noting the injection options "have been used with some success," Dr. Russell states

2  they are not an option for plaintiff, because Dr. Russell's examination of plaintiff did not

3  reveal a discrete lesion capable of being injected. *Id*.

4        Dr. Gaskill likewise opines that neither topical nor injected medications would be

5  beneficial: he states that "no topically applied medication has been shown to improve

6  outcomes in PD patients," and notes that injectable medications, while helpful in other

7  patients, are not indicated here because plaintiff has not been found to have a discrete

8  lesion suitable for injection. Dkt. 163-1 at 4. Furthermore, neither is indicated for penile

9  pain. *Id*. at 3. Similarly, surgical options are likewise not indicated for pain, and all are

10  "considered elective and not medically necessary." *Id*.

11        The CRC cannot be said to have acted with deliberate indifference in rejecting a

12  topical treatment with no demonstrated record of success, an injectable treatment

13  where there is not a suitable injection site, and a "radical" surgical solution that is

14  considered elective and not medically necessary—particularly where none of the three

15  is indicated for pain. Plaintiff has not established that the rejection "was medically

16  unacceptable under the circumstances," and was chosen "in conscious disregard of an

17  excessive risk to [the prisoner's] health." *Jackson*, 90 F.3d at 332; *see also Rauh v. Ward*,

18  112 Fed.App'x 692, 694–65 (10th Cir. 2004) (defendants were not deliberately indifferent

19  in finding that penile implant was not medically necessary for PD).

20        Plaintiff's claims arising out of the treatment options suggested by Dr. Russell

21  should be dismissed.

22       3.    <u>Pain Management</u>

23        Plaintiff has consistently complained to his medical providers of pain during

24  nocturnal erections—characterizing it as, at times, "the worst pain he has experienced."

25

Dkt. 52 at 12. In his summary judgment papers, plaintiff avers that he has never been prescribed any medication for pain, nor has he been advised to procure NSAID medications from the prison commissary to help with the pain. Dkt. 168 at 6.

The AUA Guidelines recommend NSAIDs for pain management during the active phase of PD. Dkt. 168 at 31. Dr. Gaskill opines that, while opioid pain medications are not indicated for PD, anti-inflammatories are appropriate—and indeed are the only treatment during the acute phase. Dkt. 163-1 at 3, 4. Yet plaintiff's treating providers have neither prescribed, nor even suggested, that plaintiff's pain could be alleviated with NSAIDs.

The record is clear that plaintiff's treating providers, defendant Edwards and defendant Kroha, had knowledge of plaintiff's complaints of pain. *See* Dkt. 53 at 52 (defendant Edwards' report, noting "Peyronie's disease with severe pain associated with nocturnal erection"); Dkt. 52 at 5–6 (defendant Kroha's treatment notes reporting "painful erections"). The record shows no evidence that either of them discussed or provided any treatment for plaintiff's pain, as their records make no mention of it. *Id*. This raises an issue of fact as to whether these treating defendants were deliberately indifferent to plaintiff's reports of pain.

The Court recommends that plaintiff's pain management-related claims be dismissed as to all defendants except his treating providers, defendants Edwards and Kroha.[10]

---

[10] Defendant Kenney examined plaintiff in connection with a grievance. Dkt. 51 (Kenney Dec.) at ¶ 7. There is no evidence in the record that he was ever plaintiff's treating physician.

4.    Examination  of Erect Penis

Plaintiff's summary judgment papers appear to assert that defendants violated his rights by failing to conduct an examination of his penis in an erect state. Dkt. 167 at 2, 7, 8; Dkt. 168 at 5.

All of plaintiff's treating providers, and the experts who have reviewed the records, agree that plaintiff has PD, without any additional testing. *See, e.g.,* Dkt. 53 at 49; Dkt. 52 at 5; Dkt. 163-1 at 3.  While the AUA Guidelines recommend an in-office intracavernosal injection test, the recommendation is for such a test prior to an "invasive intervention," not as a part of an initial evaluation or acute phase treatment. Dkt. 168 at 31. In short, unless "invasive" treatment like surgery is being considered, there is no need for additional testing. The lack of such testing was not deliberately indifferent to a serious medical need.

Any claim arising from an alleged failure to examine plaintiff's erect penis should be dismissed.

E.    State Law Claim for Medical Negligence

A claim of medical negligence under Washington law requires the plaintiff to prove two elements: 1) defendant "failed to exercise that degree of care, skill, and learning expected of a reasonably prudent health care provider" in defendant's position, and 2) that failure proximately caused plaintiff's injury. RCW § 7.70.040(1); *Keck v. Collins*, 184 Wn.2d 358, 371, 357 P.3d 1080 (2015).

"[T]o defeat summary judgment in almost all medical negligence or medical malpractice cases, the plaintiffs must produce competent medical expert testimony establishing that the injury was proximately caused by a failure to comply with the applicable standard of care." *Seybold v. Neu*, 105 Wn. App. 666, 676, 19 P.3d 1068

(2001). An expert must testify about "what a reasonable doctor would or would not have done, that the [d]octor[ ] failed to act in that manner, and that this failure caused her injuries." *Keck*, 184 Wn.2d at 371, 357 P.3d 1080. Expert testimony is unnecessary only in the rare instance where the facts are observable by a layperson's senses and describable without medical training. *Young v. Key Pharmaceuticals, Inc.*, 112 Wn.2d 216, 228, 770 P.2d 182 (1989) (listing as examples amputation of the wrong limb or poking a patient's eye with a needle).

Plaintiff has failed to present evidence establishing defendants rendered or failed to provide medical care in a manner falling below a defined standard of care—or that any such failure proximately caused injury. Plaintiff has withdrawn his expert, and therefore presents no expert testimony to meet his burden to show that the medical care he received failed to meet the standard of care in Washington. This failure of proof regarding an essential element of plaintiff's case merits granting summary judgment in defendants' favor. *See Reynolds v. Washington Dep't of Corr.*, 724 Fed. Appx. 604 (9th Cir. May 29, 2018) (affirming summary judgment dismissing medical negligence claim because the prisoner failed to proffer supporting expert testimony); *Thompson v. Frank Luna*, 441 Fed. Appx. 528, 529 (9th Cir. June 15, 2011) (same).

Moreover, defendants have submitted an expert opinion that their conduct met the standard of care and did not proximately cause any injury to plaintiff. Dr. Gaskill opines that defendant Edwards had adequate experience and knowledge of PD and appropriately managed plaintiff's care conservatively with Trental. Dkt. 163-1 at 4. Furthermore, Dr. Russell opines that a urology consultation in 2014/15 was unnecessary and would not have altered the course of plaintiff's disease, and that the

treatment options plaintiff contends he should have received in 2017 were not medically

necessary, are of unproven benefit and are not indicated for all patients. *Id*. Plaintiff has

not come forward with evidence to rebut these expert opinions.

The Court recommends that defendants' motion for summary judgment

dismissing plaintiff's medical negligence claims be GRANTED.

F.    Qualified Immunity

Defendants also contend they are entitled to qualified immunity. Because the

Court recommends dismissal of all claims against all defendants except defendants

Edwards and Kroha on other grounds, the Court need not reach the qualified immunity

issue with respect to the dismissed defendants. The Court addresses only the

remaining claim against defendants Edwards and Kroha for failure to treat pain.

Unless plaintiff makes a two-part showing, qualified immunity shields government

officials from liability. The plaintiff must show both: (a) the official(s) violated a federal

statutory or constitutional right and (b) at the time of the alleged act or failure to act—

there was clearly established law that defined the contours of the federal right, such that

every reasonable official would understand that what they are doing is unlawful. *City of

Escondido, Cal. v. Emmons*, 139 S. Ct. 500, 503 (2019). The inquiry "must be

undertaken in light of the specific context of the case, *not* as a broad general

proposition". *Brosseau v. Haugen*, 543 U.S. 194, 198 (2004) (emphasis added); see

also, *Rivas -Villegas v. Cortesluna,* 142 S.Ct. 4, 8-9 (2021) (per curiam) (neither the

plaintiff, nor the Court of Appeals, identified precedent that was sufficiently similar to the

undisputed facts in plaintiff's specific case, of the use of force by police; therefore there

was not "clearly established law" for purposes of qualified immunity and summary

judgment should have been granted in favor of the police officers); *Seidner v. de Vries,*

39 F.4th 591, 601-603 (9th Cir. 2022) (even where there were factual disputes such that summary judgment would not be granted on the merits of the issue of whether the police officer's use of force was reasonable under the Fourth Amendment, if the law as it existed at the time of the incident did not clearly establish that the police officer's acts or omissions violated the Fourth Amendment, then qualified immunity applies and summary judgment should be granted).

When qualified immunity is reviewed in the context of a defense motion for summary judgment, the evidence must be considered in the light most favorable to the plaintiff with respect to central facts. *Tolan v. Cotton*, 572 U.S. 650, 657 (2014). If there is a genuine issue of material fact concerning both: (1) whether it would be clear to every reasonable officer that their conduct was unlawful under the circumstances they confronted, and (2) whether the defendant's conduct violated a constitutional right," then summary judgment granting qualified immunity is not appropriate. *Daniels Sharpsmart, Inc. v. Smith,* 889 F.3d 608, 617 (9th Cir. 2018); *Bonivert v. City of Clarkston*, 883 F.3d 865, 871–72 (9th Cir. 2018).

The Court has already found an issue of fact exists as to whether defendants Edwards and Kroha violated plaintiff's Eighth Amendment rights by failing to treat his pain. It is well established, in general, that a prisoner's Eighth Amendment rights are violated by the failure to prevent or treat pain. *See, e.g., McGuckin*, *McGuckin v. Smith*, 974 F.2d 1050, 1059 (9th Cir. 1992) ("The '[u]nnecessary and wanton infliction of pain' upon incarcerated individuals under color of law constitutes a violation of the Eighth Amendment"). More specifically there is a published opinion of the United States Court of Appeals for the Seventh Circuit: *Hayes v. Snyder,* 546 F.3d 516, 524-526 (7th Cir.

2008), that existed at the time of the events of the instant case. The Seventh Circuit reversed a district court decision granting a defense motion for summary judgment regarding allegations of an Eighth Amendment violation by medical provider defendants who were made aware of pain relating to Peyronie's disease; this precedent involved facts analogous to the instant case. Dkt. 102, at 24-26 (the Court's 2019 Report and Recommendation previously cited *Hayes v. Snyder,* 546 F.3d 516, 524-526 (7th Cir. 2008) and noted that the issue of lack of treatment for pain was addressed in that case).

The Court recommends qualified immunity should not be granted as to plaintiff's pain management claim against defendant Edwards and defendant Kroha.

<u>CONCLUSION</u>

Based on the foregoing discussion, the undersigned recommends the Court GRANT IN PART defendants' second motion for summary judgment -- except -- the Court should DENY IN PART the motion for summary judgment as to the pain management claim against defendant Edwards and defendant Kroha. A proposed order accompanies this Report and Recommendation.

Pursuant to 28 U.S.C. § 636(b)(1) and Fed. R. Civ. P. 72(b), the parties shall have fourteen (14) days from service of this report to file written objections. *See also* Fed. R. Civ. P. 6. Failure to file objections will result in a waiver of those objections for purposes of *de novo* review by the district judge, *see* 28 U.S.C. § 636(b)(1)(C), and can result in a waiver of those objections for purposes of appeal. *See Thomas v. Arn*, 474 U.S. 140, 142 (1985); *Miranda v. Anchondo*, 684 F.3d 844, 848 (9th Cir. 2012) (citations omitted). Accommodating the time limit imposed by Fed. R. Civ. P. 72(b), the Clerk is directed to set the matter for consideration on **January 13, 2023**, as noted in the caption.

Dated this 29th day of December, 2022.


*Theresa L. Fricke*
Theresa L. Fricke
United States Magistrate Judge