UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT TACOMA

| | |
|---|---|
| ROBERT MADDAUS, | CASE NO. 18-cv-5387 BHS |
| Plaintiff, | ORDER |
| v. | |
| JAMES EDWARDS and EDITH KROHA, | |
| Defendants. | |

THIS MATTER is before the Court on defendants James Edwards and Edith Kroha's Federal Rule of Civil Procedure 50(b) renewed motion for judgment as a matter of law, Dkt. 254.

After a three-day trial, a jury found that Dr. Edwards and Nurse Practitioner Kroha were deliberately indifferent to Maddaus's serious medical needs—specifically by failing prescribe or suggest non-steroidal anti-inflammatory drugs (NSAIDs) for the severe penile pain caused by his Peyronie's Disease (PD)—in violation of his constitutional rights. The jury awarded Maddaus $200,000 in compensatory damages and $1,000 in punitive damages against each defendant. Dkt. 241.

ORDER - 1

1    The defendants did not put on a case.[1] When Maddaus rested, they orally moved for judgment as a matter of law under Rule 50(a), arguing there was "no evidence" that NSAIDs would be effective to treat the pain associated with Maddaus's PD. They argued that Maddaus got the "exact same treatment as if he wasn't incarcerated[.]" Dkt. 250 at 178–180. They repeated this claim in closing. Dkt. 265 at 53.

Defendants' renewed motion contends that the jury's verdict was erroneous as a matter of law. They contend there is no "credible" evidence that they were deliberately indifferent to Maddaus's serious medical needs, Dkt. 254 at 2–5, that there is no evidence that either of them had a "culpable state of mind," *id*. at 5–8, that Edwards' early prescription for the drug Trental was not deliberate indifference, *id*. at 8–9, and that the jury could not find either defendant deliberately indifferent when Maddaus admitted that the NSAIDs he occasionally obtained in prison on his own and took according to the label were not effective, *id*. at 9–10. Defendants also argue that any constitutional violations did not cause Maddaus any harm, as a matter of law, that there is no evidence supporting the punitive damage award, and that they are entitled to qualified immunity. *Id*. at 10–13.

Maddaus argues that defendants' renewed motion includes arguments that were not included in their Rule 50(a) motion, and they are waived. Dkt. 257 at 2–3. He argues defendants mischaracterize and ignore the evidence, and that there was ample evidence supporting the jury's findings that his pain was a serious medical need, that defendants

---

[1] By agreement, the defendants had latitude to elicit testimony for their own case while cross examining Edwards, Kroha, and Maddaus, during Maddaus's case.

knew about it, that they filed to take reasonable measures to address it, and that he suffered harm as the result. *Id*. at 3–6.

## I.   DISCUSSION

**A.     Renewed motion for judgment on the pleadings.**

A jury verdict must be upheld if it is supported by substantial evidence. *Johnson v. Paradise Valley Unified Sch. Dist.*, 251 F.3d 1222, 1227 (9th Cir. 2001). When considering a Rule 50(b) motion, the court must draw all reasonable inferences in the nonmoving party's favor and cannot make credibility determinations, or otherwise weigh evidence. *Reeves v. Sanderson Plumbing Prods. Inc.*, 530 U.S. 133, 150 (2000). The question is whether sufficient evidence was presented at trial that supports the verdict, not whether the jury could have come to a different conclusion. *Id.*

"Judgment as a matter of law is appropriate when the evidence, construed in the light most favorable to the nonmoving party, permits only one reasonable conclusion, which is contrary to the jury's verdict." *Omega Env't, Inc. v. Gilbarco, Inc.*, 127 F.3d 1157, 1161 (9th Cir. 1997). When considering a motion for judgment as a matter of law under Rule 50(b), the Court must uphold the jury's verdict if it was supported by substantial evidence. *Wallace v. City of San Diego*, 479 F.3d 616, 624 (9th Cir. 2006). Evidence is substantial if it is adequate to support the jury's conclusions even if drawing a contrary conclusion from the evidence is possible. *Id*. The Court may not make credibility determinations or weigh the evidence. *Winarto v. Toshiba Am. Elecs. Components, Inc.*, 274 F.3d 1276, 1283 (9th Cir. 2001). The Court must draw all inferences from the evidence in the light most favorable to the nonmoving party, and it

must disregard all evidence favorable to the moving party that the jury was not required to believe. *Id.* The Court "may not substitute its view of the evidence for that of the jury." *Id.* (internal quotation omitted).

Arguments that are not raised in the moving party's "half time" Rule 50(a) motion are waived, and may not be raised in a post-trial Rule 50(b) motion:

> A Rule 50(b) motion for judgment as a matter of law is not a freestanding motion. Rather, it is a renewed 50(a) motion. Under Rule 50, a party must make a Rule 50(a) motion for judgment as a matter of law before a case is submitted to the jury. If the judge denies or defers ruling on the motion, and if the jury then returns a verdict against the moving party, the party may renew its motion under Rule 50(b). Because it is a renewed motion, a proper post-verdict Rule 50(b) motion is limited to the grounds asserted in the pre-deliberation Rule 50(a) motion. Thus, a party cannot properly "raise arguments in its post-trial motion for judgment as a matter of law under Rule 50(b) that it did not raise in its pre-verdict Rule 50(a) motion."

*E.E.O.C. v. Go Daddy Software, Inc.*, 581 F.3d 951, 961 (9th Cir. 2009) (citations omitted).

Defendants thus waived most of the arguments they assert in their renewed motion by not making them during trial. Their reply implicitly concedes as much by not responding to that argument, although they do assert that they are entitled to raise qualified immunity at any time. Dkt. 262 at 6. The issues that were preserved are discussed in turn.

**1. Edwards and Kroha knew that Maddaus's severe pain was a serious medical need.**

There was ample evidence Maddaus's PD caused acute pain in (and several other problems with) his penis, when he had an erection, most often at night. Edwards largely[2] concedes that he knew Maddaus suffered this pain when he treated Maddaus in 2014–2015. For example, Edwards' January 8, 2015, notes report: "He thinks the Trental is helping to slow the progression of [his PD] a little bit, but *he is very troubled with severe pain with nocturnal erections*, he says." Dkt. 257 at 25 (trial exhibit 14) (emphasis added).

Kroha goes further, asserting that there was "no evidence" Maddaus was having nocturnal erections or associated pain when she saw him in 2017. Dkt. 254 at 5 ("When ARNP Kroha was seeing Mr. Maddaus, he was not having nocturnal erections, and, consequently, no penile pain with erections."). This argument asks the Court to ignore the testimony and other evidence. First, Maddaus testified his pain continued to 2020, and that he told Kroha about his painful erections in 2017. *See* Dkt. 254-1 at 47–48. This alone is sufficient for the jury to find that she was aware of his pain.

Second, in August 2017, after she presented Maddaus's case to the Care Review Committee's (CRC), Kroha signed the CRC report approving Maddaus's referral to a

---

[2] Defendants' motion does assert that when Edwards saw Maddaus, he was not in acute pain, and that "Maddaus provided no evidence showing that Dr. Edwards could infer from his personal observations that Mr. Maddaus was experiencing severe painful erections." Dkt. 254 at 4. The import of this argument is not clear, as Maddaus did not contend that Edwards personally witnessed Maddaus's painful erections. Defendants' assertion that Maddaus's suffering was "not obvious" is of no moment. *See* Dkt. 254 at 6.

urologist. Dkt. 257 at 35 (trial exhibit 20). At trial, Kroha was reticent about that report. She did not want to concede that the report reflects information she presented, including her own subjective beliefs about Maddaus, but the jury could readily find that it did. She attempted to persuade the jury that the information in it, including the reference to Maddaus being a "lifer," "overly concerned" with his penile pain, came from the patient. The jury could readily find that this was not credible. Dkt. 250 at 153–158; Dkt 254-2 at 176.

The report demonstrates that Maddaus told Kroha about his pain, and that she told the CRC she doubted it was real:

| PRIMARY CARE PRACTITIONER: | ATTENDING PHYSICIAN: | CASE PRESENTED BY: |
|---|---|---|
| Kroha, Edith T. | Kroha, Edith T. | Kroha, Edith T. |

**Case Synopsis/Differential or Working Diagnosis:**
47 yr. old male complains of worsening painful nocturnal erections which contorts, bends and twists his penis". He is convinced that the migratory penile lumps have coalesced on the dorsum of the entire shaft, causing the diameter and the length of his penis to shrink dramatically. This symptoms appeared after treatment with Boceprevir in 2013. Presented to CRC for similar complaints in 2015, and 2013 per patient request to see urologist- Level 3. Patient states symptoms worsening. Denies any urinary symptoms. Exam: No inguinal LAD, no hernia, lesions, sores, rash. Testes descended x 2 NT, no masses. Patient directed area of concern is the dorsum of normal cavernosa. Normal anatomy, also examined by Dr. Dave Kenney. Per Dr. Kenney, cannot see anything that is not normal anatomy for the area. Concerned because he is a lifer, he is so overly concerned about this, might be some merit for him to see urologist who will probably find it is also normal. Occurs at least 3x/week. RUBICON eval with urologist discussed. P wants physical exam done by a specialist. He has a very fixed idea that something is terribly wrong. He always seems to have some sort of problem that once resolved, will fixate on something else. Suggested MH eval. The committee discussed the intervention proposed and determined the intervention DID meet medical necessity.

Dkt. 257 at 35 (trial exhibit 20).

Third, and in any event, Kroha repeatedly conceded at trial that Maddaus repeatedly conveyed to her he was in "excruciating pain." Dkt. 254-2 at 170.

Furthermore, the evidence permitted the jury to disbelieve Kroha, generally. In her first, January 3, 2017, meeting with Maddaus, Kroha led him to believe that she would

ORDER - 6

pursue a urologist referral and get back to him. But she did not. Four months later, Maddaus sent a kite seeking a follow up meeting with Kroha to inquire whether she was going to refer him to a urologist or some other provider. She responded that the CRC had denied his request in 2015—two years before Maddaus saw her. Dkt. 249 at 35. The jury could view this evidence and conclude that Kroha was feigning interest and stringing Maddaus along, with no intention of addressing his reported pain, because she didn't believe his complaints. Instead, she suggested referring Maddaus to mental health. *Id*. at 37. The jury could also find that she falsely testified that she assumed Maddaus was self-treating with NSAIDs, because she didn't believe his complaints, and there was no evidence supporting that assumption. There was no evidence that Kroha deemed NSAIDs as even potentially palliative.

In short, there was ample evidence supporting the jury's finding that Maddaus's severely painful erections were a serious medical need, and that he told Kroha they were still occurring when he saw her. Kroha's current denial that she knew about them is inconsistent with the evidence—there is in fact no evidence supporting it. The defendants were aware of an excessive risk to Maddaus's health. Their Rule 50(b) motion on their claim that they did not is **DENIED**.

**2.    Edwards and Kroha were deliberately indifferent to Maddaus's serious medical need.**

Defendants argue they did not disregard[3] an excessive risk to Maddaus's health by failing to prescribe or suggest NSAIDs in an effort to reduce his pain, and that no evidence supports the finding they had a "culpable mind." Dkt. 254.

There was ample evidence supporting the jury's finding that the defendants were deliberately indifferent to excessive risks to Maddaus's health. Edwards initially prescribed Trental, but then did nothing else for Maddaus, including prescribing, suggesting, discussing, or even considering whether an NSAID of some sort at some dosage and frequency might help with his pain—even though he conceded[4] that NSAIDs "can be used in conjunction with Trental." Dkt. 254-2 at 66.

Kroha now denies she knew about Maddaus's pain, but her trial testimony readily permits the jury to find that she instead chose not to treat him because she did not believe him. She testified that if he was really in that much agony,[5] he would have called a medical emergency and gone to the emergency room. Dkt. 254-2 at 76–78; Dkt. 257 at

---

[3] Defendants' motion relies repeatedly on Edwards and Kroha's self-serving testimony that they were *not* deliberately indifferent to Maddaus's serious medical needs. Dkt. 254 at 5, 8, and 10. Credibility determinations are for the jury. The Court does not view the evidence in the light most favorable to the losing party on a Rule 50(b) motion.

[4] Asked whether that was recommended, Edwards asserted that "it's not like its required," and, when pressed, testified that he "could not recall" whether a combination of Trental and NSAIDs was recommended. Dkt. 250 at 66–68. There is a clear gap between "required" and "recommended," and the jury could readily find that Edwards' testimony on this point was not credible. Indeed, they could find he believed he need not do *anything* for Maddaus that was not "required" by published medical guidance.

[5] Maddaus testified that as the result of his "ten out of ten; 15 out of ten" pain, he contemplated both amputating his own penis and suicide. Dkt. 249 at 47–48.

35. Kroha does not claim that she ever attempted to do anything for Maddaus in his five visits, and there is no evidence that she did. A jury could find that Kroha was instead dismissive[6] of Maddaus and his pain. It could find that she told the CRC that he was "a lifer" "overly concerned" and "fixated" on the notion that "something was terribly wrong." Dkt. 257 at 35. It is apparent the jury believed Maddaus was suffering, that Kroha knew it, and that, as his primary medical provider, she should have done something about it.

Defendants now assert they chose not to prescribe or suggest NSAIDs for several, not-necessarily-consistent reasons: pain is subjective; there was no reason to believe NSAIDs would help; they would be hard to time properly given the unpredictable timing of Maddaus's nocturnal erections; one cannot take NSAIDs without risk; and/or because they need not suggest a remedy that is commonly known and readily available through the prison barter system. Dkt. 254; see also Dkt. 250 at 55 (defendants' closing argument).

---

[6] The Court (and presumably the jury) noticed that Edwards and Kroha appeared at trial only to testify; neither attended the rest of the trial. Both were dismissive and defensive, and both had trouble recalling basic facts they should have known. They did not put on a defense case, even to call a medical expert to support their current primary defense: that there is no evidence NSAIDs would have helped.

The Court does not often delve into strategy, but it can easily surmise defendants rested without calling their expert, Dr. Gaskill, because Gaskill's June 2020 report opined that "non-steroidal anti-inflammatories *are indicated* for penile pain[.]" Dkt. 112-1 (emphasis added). At the close of Maddaus's case, defendants placed their entire defense on a causation argument dependent on the jury finding there was literally nothing that could be done to alleviate Maddaus's suffering.

ORDER - 9

Maddaus fairly characterizes these arguments as "after-the-fact rationalizations." Dkt. 257 at 9. He accurately asserts there is no evidence that Edwards' and Kroha's respective failures to even discuss with him the use of NSAIDs in any dosage, at any time, to alleviate or reduce his suffering was the result of a "reasoned decision." *Id*. Neither made a single note suggesting they considered and rejected NSAIDs or discussed even such a token effort with their patient. *Id*. There is no evidence that either of them explained to Maddaus that they didn't believe him, or that it might be worth a try to take NSAIDs, in some combination or dosage, or at what times. There is no evidence that either of them ever even considered NSAIDs at the time, and the jury could easily find that they did not. There is also no evidence that either Edwards or Kroha ever even considered that Maddaus's complaint of frequent painful nocturnal erections could be addressed through above-label dosage of over-the-counter NSAIDs, or that because the pain developed multiple times at night, it was not necessary to pinpoint the exact time to take a NSAID to have some palliative effect.

Defendants' repeated claim that Maddaus got the same care he would have gotten if he was not an incarcerated "lifer" apparently did not persuade the jury, and it rings hollow here. Patients who are not incarcerated and who are experiencing excruciating pain for years rarely, if ever, have two medical professionals repeatedly tell them there is literally nothing that can be done, even palliatively, for their suffering. Civilian patients do not have to go through a CRC to get a referral. They have access to narcotic pain killers, and their doctors cannot ignore their concerns because they are "lifers." There is an old doctor joke about the *de minimus* level of care: "take two aspirin and call me in the

morning." A jury could easily find that neither of Maddaus's medical providers did even that.

Jurors are routinely asked, and expected, to use their collective common sense. The jury's finding that defendants here were deliberately indifferent, with a "culpable state of mind," [7] is abundantly supported by the evidence. Defendants' Rule 50(b) motion on this basis is **DENIED**.

### 3.  Edwards and Kroha's deliberate indifference caused Maddaus compensable harm.

Defendants' better argument is that because there is "no evidence" that NSAIDS would have helped Maddaus's severe pain, their failures did not cause him harm as a matter of law. Dkt. 254 at 9–11. This argument relies mostly on the only non-defendant medical provider, Dr. Russell, who is the urologist to whom the CRC ultimately referred Maddaus in 2017. Defendants contend that even Dr. Russell admitted that he did not discuss NSAIDs with his patients experiencing erectile pain. Dkt. 254 at 4 (citing 254-2 at 131–132). They emphasize that Russell testified there is no "general understanding" in urology that NSAIDs are effective in treating PD-related penis pain. *Id*. at 6. Thus, they contend, Edwards' failure to even consider whether NSAIDs might help Maddaus is "not a radical departure from accepted professional medical judgment." *Id*.  Defendants also reiterate that Russell acknowledged that there is "no known or medically acceptable

---

[7] Defendants' Rule 50(b) motion for judgment as a matter of law on the punitive damages award is similarly **DENIED**.

1  treatment for relieving penile pain with erections," and that NSAIDs are not "mandated."
2  Dkt. 254 at 7.

3  Maddaus accurately responds that Russell testified instead that there is no *cure* for
4  PD; he did not say there is no *treatment*, and indeed he identified various treatments. He
5  did not say that NSAIDs would *not* have alleviated Maddaus's pain; he testified that
6  while it had not been studied, it would be *reasonable* to try NSAIDs[8] to try to get relief.
7  Dkt. 257 at 11 (citing Dkt. 254-2 at 131).

8  Defendants' reliance on the argument that a medical provider need not prescribe or
9  even suggest over the counter palliative remedies because everyone knows about them is
10 also misplaced. Russell testified that NSAIDs "might be helpful," Dkt. 254-2 at 119, and
11 that the American Urological Association expressly identified NSAIDs as an "available
12 treatment" for "patients suffering from active [PD] who are in need of pain medication or
13 pain management." *Id.* at 121. Defendants contend that Russell testified "the medical
14 profession did not consider NSAIDs an effective treatment for penile pain." Dkt. 254 at
15 8. He did not. He testified that NSAIDs are instead a treatment that PD "patients can go
16 ahead and try." Dkt. 257 at 11 (citing Dkt. 254-2 at 122, 130).

17 Maddaus also argues, persuasively, that there is no evidence he tried all available
18 NSAIDs, at all possible doses (including prescription strength), or that he had any
19 guidance on when to take them for maximum efficacy. Dkt. 257 at 11–12. He correctly

---

[8] Russell compared NSAIDs to more-effective narcotic pain killers, which were not available to Maddaus in prison, but which would typically be prescribed for patients in severe pain who are not incarcerated. Russell did not opine that *nothing* would help. Dkt. 250 at 132–133.

points out that the claim he should have known to obtain and take them is inconsistent with defendants' simultaneous claim that NSAIDs are dangerous. There is no claim and no evidence either defendant warned Maddaus about any such dangers. Potential long-term kidney problems[9] aside, the jury could have found (and apparently did find) that the defendant medical providers failed to prescribe, or even suggest or consult on the use of over-the-counter NSAIDs, at any dosage, at any time, because they were deliberately indifferent to his pain. The failure to provide any help whatsoever—even just a "you could try this, in this dosage, at this time, to possibly help with the pain, but there is no cure" is itself harmful.

Indeed, the jury could find that Edwards was disingenuous and when he testified, "I did not feel, with the objective findings we had, that I needed to order something. I thought it would be satisfactory for him to just use NSAIDs off the commissary if he wished." Dkt. 250 at 74–75. The jury could regard this testimony as internally inconsistent, for at least two reasons. First, since Edwards didn't believe Maddaus, there was no reason for him to believe that "it was satisfactory for him to just use NSAIDs off the commissary." If, on the other hand, Edwards believed that NSAIDs could provide palliative relief, the jury could reasonably find that he was deliberately indifferent when he didn't prescribe or suggest the use of over-the-counter NSAIDs, either at or above the

---

[9] Kroha testified that although she did not discuss it with him, she "assumed" Maddaus was using over-the-counter NSAIDs, but she did not warn him of any potential problems with that use. Dkt. 254-2 at 170.

label dosage, rather than simply leaving Maddaus to explore the NSAID options on his own.

Maddaus was left helpless, despite his desperate efforts to obtain medical help, for three years. Maddaus accurately asserts that his medical providers' failure to even try to treat his pain damaged him. Dkt. 257 at 12 (citing *Hunt v. Dental Dep't*, 865 F.2d 198, 200 (9th Cir. 1989); and *Tenore v. Goodgame*, No. 2:11-CV-1082 WBS CKD, 2014 WL 496697, at *8 (E.D. Cal. Feb. 6, 2014), *report and recommendation adopted,* No. 2:11-CV-1082 WBS CKD, 2014 WL 907286 (E.D. Cal. Mar. 7, 2014)). There was ample evidence that NSAIDs in some form would have been a reasonable, possible treatment for Maddaus's ongoing, excruciating, penile pain. The defendants' deliberate indifference precluded that chance for Maddaus.

This is a § 1983 constitutional case, not a state law medical malpractice case. The former presents several additional hurdles, but unlike the latter it does not require the plaintiff to prove by expert testimony on a more probable than not basis that the outcome would have been different absent the medical provider's negligence. It is no defense to a deliberate indifference claim to say there's no proof you would have been better off if I tried to help you. Maddaus did not sue because he has PD, he sued because his prison medical providers did not believe that he was in excruciating pain, or worse, did not care. Ultimately, the jury could find that Edwards and Kroha did not genuinely try to help him; they were deliberately indifferent to his serious medical needs. Their failure predictably caused emotional distress and despair, and it is a compensable component of damage

resulting from the defendants' deliberate indifference. *See* Dkt. 245 at 17 (Jury Instruction No. 14, based on Ninth Circuit Model Civil Jury Instruction No. 5.2).

Defendants' motion on the basis that their deliberate indifference did not cause Maddaus any harm as a matter of law is **DENIED**.

Defendants' qualified immunity argument is **DENIED** for the reasons articulated previously. Maddaus's motion for attorneys' fees and costs, Dkt. 251, will be addressed in a separate Order.

Defendants motion for judgment as a matter of law, Dkt. 254, is **DENIED**.

**IT IS SO ORDERED**.

Dated this 22nd day of October, 2024.

BENJAMIN H. SETTLE
United States District Judge